Anthony Todaro, OSB# 150714
anthony.todaro@dlapiper.com
**DLA PIPER LLP (US)**
701 Fifth Avenue, Suite 7000
Seattle, Washington  98104-7044
Tel:  206.839.4800
Fax:  206.839.4801

*Attorney for Defendant*
*The Art Institute of Portland, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| SPF BREWERY BLOCKS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE ART INSTITUTE OF PORTLAND, LLC, an Arizona limited liability company,<br><br>Defendant. | Civil No.  18-1749<br><br>**DECLARATION OF ANTHONY TODARO IN SUPPORT OF NOTICE OF REMOVAL** |

I, Anthony Todaro, declare as follows:

1.      I am an attorney admitted to appear before this Court, and am a partner with the law firm DLA Piper LLP (US), attorneys for Defendant The Art Institute of Portland, LLC.  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify thereto.

2.      The purpose of this declaration is to place before the Court the documents filed in *SPF Brewery Blocks, LLC v. The Art Institute of Portland, LLC*, 18LT13703, which was pending in Oregon Circuit Court for Multnomah County (the "State Court Action").

1 – TODARO DECLARATION

3.    As required by 28 U.S.C. § 1446(a), I have attached to this declaration as Exhibit A-1 true and correct copies of all pleadings and other documents that were previously filed in the State Court Action as of the date of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: October 1, 2018.                    By:  *s/ Anthony Todaro*

                                           Anthony Todaro
                                           **DLA PIPER LLP (US)**
                                           701 Fifth Avenue, Suite 7000
                                           Seattle, WA  98104-7044
                                           Telephone:  206.839.4800
                                           Facsimile:   206.839.4801

                                           *Attorney for Defendant*
                                           *The Art Institute of Portland, LLC*


2 – TODARO DECLARATION

# EXHIBIT A

9/25/2018 9:21 AM
18LT13703

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| SPF BREWERY BLOCKS, LLC, a<br>Delaware limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>THE ART INSTITUTE OF PORTLAND,<br>LLC., an Arizona limited liability company,<br><br>        Defendant. | Case No.<br><br>SUMMONS<br><br>(COMMERCIAL EVICTION) |

TO:     THE ART INSTITUTE OF PORTLAND
        1122 NW Davis Street, Portland, OR 97209 (Street address and city of property occupied by defendant)

**NOTICE TO TENANTS:**
**READ THIS PAPERS CAREFULLY**
**YOUR LANDLORD WANTS TO EVICT YOU**

ON ___October 3, 2018___ AT ___9:00___ A.M., you must come to the **Multnomah County Court House located at 1021 SW, Hillsboro, Oregon 97124.** You do not have to pay any fees to the court for this first hearing.

- If you do not appear in court and your landlord does, your landlord will win automatically and can have the Sheriff physically remove you from the property.
- If you do appear in court and your landlord does not, the court will dismiss this case.
- If both of you appear in court:
  - If you and your landlord do not reach an agreement, the court will schedule a trial after you file an Answer.

**IF YOU WANT A TRIAL, YOU MUST:**
- Appear in court at the time scheduled above. Allow time to get through security;
- On the same day, file an Answer with the court giving a *legal* reason why you should not be evicted. The Court can give you a form;
- Serve a copy of the Answer to your landlord (or your landlord's agent or attorney); **and**
- Pay a filing fee. The Judge may defer payment if you are low-income. Go to www.courts.oregon.gov to see what the filing fee will be.

**IF YOU HAVE QUESTIONS YOU SHOULD SEE A LAWYER IMMEDIATELY.** If you need help finding a lawyer, you can call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 (in the Portland metropolitan area) or toll-free in Oregon at (800) 452-7636 or go to www.oregonstatebar.org.

9/24/2018
_____
Date

Signature of Landlord, Agent or Attorney        OSB #012492

1122 NW Davis St
_____
Address of Plaintiff (Landlord, Agent or Attorney)

Amy Edwards
_____
Printed/Typed Name of Landlord, Agent or Attorney

Portland            OR            97204
_____
City            State            Zip

(503) 294-3380
_____
Telephone

**I HEREBY CERTIFY that the above is a true copy of the original Summons in the above entitled action.**

Date: 09/25/2018
_____

By: _____
        Trial Clerk Administrator / Clerk /Notary

78031098.1 0066366-00014

1

2

3

4 IN THE CIRCUIT COURT OF THE STATE OF OREGON

5 FOR THE COUNTY OF MULTNOMAH

6 SPF BREWERY BLOCKS, LLC, a
Delaware limited liability company,
7
       Plaintiff,
8
9      v.

THE ART INSTITUTE OF PORTLAND,
10 LLC., an Arizona limited liability company,

11      Defendant.

No. 18LT13703

COMPLAINT

(Forcible Entry and Unlawful Detainer)

(Tenancy not covered by ORS chapter 90)

12

13      For its **FIRST CLAIM** against defendant The Art Institute of Portland, LLC.

14 ("**Defendant**" or "**Art Institute**"). an Arizona limited liability company, plaintiff SPF

15 Brewery Blocks, LLC, a Delaware limited liability company ("**Plaintiff**" or "**SPF Brewery**

16 **Blocks**"), alleges:

17                                   1.

18      SPF Brewery Blocks is entitled to immediate possession of the premises consisting of

19 approximately 59.972 rentable square feet of space in a building located at 1122 NW Davis

20 Street in the City of Portland, County of Multnomah, State of Oregon, and commonly known

21 as the M Financial Plaza (the "**Premises**"). Plaintiff is the landlord for the Premises;

22 Defendant is the tenant for the Premises.

23                                   2.

24      Defendant is in possession of the Premises and is unlawfully holding the Premises

25 with force.

26

Page 1 - COMPLAINT

STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000, Portland, OR 97205
Main 503.224.3380   Fax 503.220.2480

1                                          3.

2          SPF Brewery Blocks is entitled to possession of the Premises for the reason that

3   Defendant is in default of that certain Lease Agreement, dated October 30, 2000, as amended

4   by a First Amendment to Lease, dated October 29, 2001; a Second Amendment to Lease,

5   dated December 19, 2001; a Third Amendment to Lease, dated May 9, 2003; a Fourth

6   Amendment to Lease, signed in October 2006; a Fifth Amendment to Lease, dated February

7   27, 2015; a Sixth Amendment to Lease, dated April 28, 2015; and a Seventh Amendment to

8   Lease, dated April 6, 2016 (collectively, the "Lease"), by and between SPF Brewery Blocks,

9   as successor-in-interest to The Brewery Blocks I, LLC, an Oregon limited liability company,

10  and Defendant, as successor-in-interest to The Art Institute of Portland, Inc., an Oregon

11  corporation. A copy of the Lease is attached hereto as Exhibit 1 and incorporated herein by

12  reference.

13                                         4.

14         Education Management Corporation is the guarantor of tenant's obligations under the

15  Lease. Ex. 1 at 105.

16                                         5.

17         On June 29, 2018, Education Management Corporation filed bankruptcy as part of a

18  case titled *In re Education Management II LLC et al.*, Case Number 18-11494, filed in the

19  U.S. Bankruptcy Court for the District of Delaware. A copy of that bankruptcy petition is

20  attached hereto as Exhibit 2 and incorporated herein by reference.

21                                         6.

22         Pursuant to Section 20.1.5 of the Lease, if "any guarantor of the Tenant's obligations

23  under this Lease shall . . . file a petition in bankruptcy," then tenant will be deemed to have

24  breached, and be in default under, the Lease. Ex. 1 at § 20.1.5.

25

26

Page 2   -   COMPLAINT

STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000, Portland, OR 97205
Main 503.224.3380   Fax 503.220.2480

1                                    7.

2          Defendant Art Institute is in default of the Lease as a result of Education Management

3 Corporation's June 29, 2018 bankruptcy petition.

4                                    8.

5          On July 24, 2018, counsel for SPF Brewery Blocks sent a Notice of Default and

6 Breach and Notice to Quit (the "**Notice**") to Defendant pursuant to ORS 105.120(2). A copy

7 of the Notice is attached hereto as Exhibit 3 and incorporated herein by this reference.

8 Defendant has not vacated the Premises.

9                                    9.

10         The Lease provides that Tenant will pay to Landlord all reasonable attorneys' fees

11 and legal expenses incurred or paid by Landlord caused by and following tenant's default.

12 Plaintiff has been required to retain an attorney and is entitled to recover its attorneys' fees

13 and expenses incurred herein.

14         WHEREFORE. Plaintiff prays for relief as follows:

15         A.       For possession of the Premises, for Plaintiff's reasonable attorneys' fees as

16 provided for in the Lease, and for Plaintiff's expenses incurred herein.

17         DATED: September 24, 2018.

                                          STOEL RIVES LLP
18

19                                        /s/ Amy Edwards
                                          Amy Edwards, OSB No. 012492
20                                        amy.edwards@stoel.com
                                          Reed Morgan, OSB No. 140664
21                                        reed.morgan@stoel.com

22                                        Attorneys for Plaintiff

23

24

25

26

Page 3   -   COMPLAINT

STOEL RIVES LLP
760 SW Ninth Avenue. Suite 3000. Portland, OR 97205
Main 503.224.3380   Fax 503.220.2480

# LEASE AGREEMENT

Between

### THE BREWERY BLOCKS I, LLC,
an Oregon limited liability company,
Landlord

And

### THE ART INSTITUTE OF PORTLAND, INC.,
an Oregon corporation,
Tenant

EXHIBIT 1
Page 1 of 158

# LEASE AGREEMENT
## TABLE OF CONTENTS

Page

SECTION 1.   DEMISE AND RENT ................................................................
SECTION 2.   USE .......................................................................... 1
SECTION 3.   TENANT IMPROVEMENTS; TENANT'S ACCEPTANCE; MAINTENANCE OF ........ 5
             PREMISES AND COMMON AREA MAINTENANCE ........................... 8
SECTION 4.   COMMON AREA EXPENSES, COMMON AREA AND OPERATING EXPENSES
             AND TAXES........................................................ 9
SECTION 5.   PAYMENT OF COMMON AREA AND OPERATING EXPENSES ................ 11
SECTION 6.   SECURITY DEPOSIT.  INTENTIONALLY OMITTED .............................. 14
SECTION 7.   SUBORDINATION, NOTICE TO SUPERIOR LESSORS AND MORTGAGEES .... 14
SECTION 8.   QUIET ENJOYMENT .............................................................. 16
SECTION 9.   ASSIGNMENT AND SUBLETTING ............................................... 16
SECTION 10.  INSURANCE .................................................................... 18
SECTION 11.  RULES AND REGULATIONS ....................................................20
SECTION 12.  ALTERATIONS ..................................................................20
SECTION 13.  LANDLORD'S AND TENANT'S PROPERTY ......................................21
SECTION 14.  SERVICES AND UTILITIES .....................................................22
SECTION 15.  ACCESS AND NAME ...........................................................27
SECTION 16.  NOTICE OF OCCURRENCES .....................................................31
SECTION 17.  NONLIABILITY AND INDEMNIFICATION........................................31
SECTION 18.  DAMAGE OR DESTRUCTION .....................................................32
SECTION 19.  SURRENDER AND HOLDING OVER...............................................33
SECTION 20.  EVENTS OF DEFAULT .........................................................34
SECTION 21.  REMEDIES UPON DEFAULT .....................................................35
SECTION 22.  SERVICES IN THE EVENT OF DEFAULT ........................................37
SECTION 23.  NO WAIVERS OF PERFORMANCE ...............................................37
SECTION 24.  CURING TENANT'S DEFAULTS...................................................37
SECTION 25.  BROKER .......................................................................37
SECTION 26.  NOTICES ......................................................................38
SECTION 27.  ESTOPPEL CERTIFICATES .....................................................38
SECTION 28.  MEMORANDUM OF LEASE........................................................38
SECTION 29.  ADJUSTMENT OF THE COMMENCEMENT DATES AND EXPIRATION DATES .. 39
SECTION 30.  MISCELLANEOUS ...............................................................40

EXHIBIT A - LEGAL DESCRIPTION FOR LAND
EXHIBIT B - FLOOR PLAN FOR THE BUILDING
EXHIBIT C - WORK AGREEMENT
EXHIBIT D - SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT
EXHIBIT E - RULES AND REGULATIONS
EXHIBIT F - GUARANTY
EXHIBIT G – MEMORANDUM OF LEASE
EXHIBIT H – PROHIBITED USES

i

EXHIBIT 1
Page 2 of 158

## LEASE AGREEMENT

### BASIC LEASE INFORMATION

The following Basic Lease Information is hereby incorporated into and made a party of the Lease between Landlord and Tenant to which it is attached. Each reference in the Lease to any of the Basic Lease Information shall mean the respective information set forth below, and such information shall be deemed incorporated as part of the terms provided under the particular Lease Section pertaining to such information. In the event of any conflict between any Basic Lease Information and the Lease, the Basic Lease Information shall control.

1. **Building:** The building located at NW 10th and Davis, Block 4, The Brewery Blocks.

2. **Landlord:** The Brewery Blocks I, LLC, an Oregon limited liability company

3. **Landlord's Address for Giving of Notices and Payment of Rent:**

    c/o Gerding/Edlen Development Company
    4650 SW Macadam, Suite 220
    Portland, Oregon 97201

4. **Tenant:** The Art Institute of Portland, Inc., an Oregon corporation.

5. **Premises:** The floor area of the Building consisting of approximately Seven Thousand Five Hundred (7,500) rentable square feet ("RSF") on the ground floor ("Retail Space") and approximately Fifty Thousand (50,000) RSF on the second and third floors ("Office/School Space") as outlined on the floor plan of the Building attached hereto as **Exhibit B** (Section 1.2).

6. **Parking Allowance:** Two (2) stalls per One Thousand (1,000) usable square feet of the Premises (Section 14.6).

7. **Use of Premises:** General office use and post-secondary school use. For purposes of this Lease, "post-secondary school" shall mean (a) any post-secondary educational or training programs or courses offered by Tenant from time to time, its permitted subtenant and assigns, which may or may not culminate in the issuance of degrees, certificates or diplomas, together with uses related and/or incidental thereto, including without limitation, (i) instruction or training programs or courses of limited duration which do not lead to a degree or other certification, (ii) management, administration and/or supervision of a correspondence or distance learning course of study, whether or not leading to a degree

1 – LEASE AGREEMENT – BASIC LEASE INFORMATION

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS.109906.1

EXHIBIT 1
Page 3 of 158

or other certification, (iii) one or more galleries exhibiting art or relating to the general promotion of the school use then being made of the Premises, (iv) operation of a food lounge for students and faculty, including food and beverage vending machines and microwave oven for use with pre-prepared items, food services, sales of supplies and materials, and other provision of goods and/or services primarily intended for the use and/or benefit of the faculty, students and/or invitees of Tenant, (v) long distance training, (vi) on-line courses, (vii) programs for graphic arts, applied arts, computer animation, hospitality arts and multimedia design computer-based instruction for certificate programs, seminars or individual courses, (b) offices for admissions, administration and other general office purposes, and (c) any business use that provides services incidental to any of the foregoing permitted uses. Notwithstanding anything herein to the contrary, for so long as Sur La Table, its successors or assigns, or a similar tenant, is a tenant in the Development and is offering non-degree programs or classes, Tenant may only offer professional culinary programs or courses intended to lead to the issuance of certificates, diplomas or degrees, and a restaurant facility (if permitted by applicable law) operated in connection with a culinary school for use by Tenant's invitees (including the general public). Such restaurant facility shall be operated primarily as a training facility in connection with such culinary programs or courses, and not solely for Tenant's profit. Tenant shall obtain all necessary licenses in connection with such restaurant facility, including, without limitation, liquor licenses. Tenant agrees it will not offer culinary programs, courses, or classes which are solely for the benefit of culinary aficionados and home chefs, such as those offered by Sur La Table. In the event Tenant elects to offer professional culinary programs or courses intended to lead to the issuance of certificates, diplomas or degrees, Landlord and Tenant shall mutually agree on the necessary mechanical alterations, additions and improvements to the Premises, including, without limitation, vents.

8.    **Lease Document Issuance and Reference Date:** October 30, 2000.

9.    **Commencement Date:** The later of: (i) September 1, 2002, (ii) (a) if Tenant elects to have Landlord perform the Tenant Improvements, as provided in **Exhibit C**, the date Landlord delivers possession of the Premises to Tenant with all Tenant Improvement work to be performed by Landlord in the Premises (as agreed by Landlord in **Exhibit C** attached to this Lease) substantially completed with a permanent or temporary Certificate of Occupancy issued and Tenant has received written notice of the same and a copy of such Certificate of Occupancy, or (b) if Tenant elects to perform the Tenant Improvements, the date

2 – LEASE AGREEMENT – BASIC LEASE INFORMATION

ninety (90) days after Landlord provides Tenant with complete and exclusive access to the Premises to perform the Tenant Improvements, (iii) such later date as provided in Section 29 of the Lease Agreement, (iv) the date the Premises is delivered to Tenant vacant and free and clear of all leases (other than this Lease), and all possessory rights of any tenant(s) or any other party, or (v) the date Tenant receives a non-disturbance agreement from any Superior Lessor or Mortgagee who is not subordinate to Tenant's Lease. (Section 1.3)   Tenant shall have access to the Premises at least sixty (60) days prior to the Commencement Date to install Tenant's telephone and computer wiring, equipment and fixtures, provided Tenant shall not unreasonably interfere with Landlord's contractors or subcontractors.

Notwithstanding the foregoing, if Landlord performs the Tenant Improvements, Landlord hereby agrees to use its best efforts to deliver the permanent certificate of occupancy on or before one hundred twenty (120) days after the temporary certificate of occupancy is issued. If the temporary certificate of occupancy is revoked for any reason prior to the issuance of the permanent certificate of occupancy, Landlord shall be liable for all reasonable costs and expenses incurred by Tenant as a result thereof and Tenant shall be entitled to terminate the Lease at any time after the temporary certificate of occupancy is revoked and prior to the issuance of the permanent certificate of occupancy.

10.   **Expiration Date:** July 31, 2017

11.   **Rent:**

| Years | Office/School Annual Base Rent Amount | Years | Retail Space Annual Base Rent Amount |
|---|---|---|---|
| 1–3 | $19.80 per RSF | 1-3 | $28.00 per RSF |
| 4 – 6 | $21.66 per RSF | 4 – 6 | $30.63 per RSF |
| 7 – 9 | $23.70 per RSF | 7 – 9 | $33.51 per RSF |
| 10 | $25.93 per RSF | 10-12 | $36.67 per RSF |
| 11-12 | $26.31 per RSF | 13-15 | $40.12 per RSF |
| 13-15 | $28.75 per RSF | | |

Handwritten annotations beside Years column:
- 9/1/02 – 8/31/05 → 1-3
- 9/1/05 – 8/31/08 → 4-6
- 9/1/08 – 8/31/2011 → 7-9
- 9/1/2011 – 8/31/2012 → 10
- 9/1/2012 – 2014 → 11-12
- 7/8/14 – 8/31/17 → 13-15

The Base Rent referred to above is stated on an annual basis. Base Rent shall be payable in equal monthly installments at the rate specified for the first full calendar month when Base Rent is payable, and may be payable pursuant to wire transfer, pursuant to instructions provided by Landlord upon Tenant's request therefor.

3 –LEASE AGREEMENT – BASIC LEASE INFORMATION

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS.109906.1

EXHIBIT 1
Page 5 of 158

12. **Tenant's Percentage of Operating Expenses:** (Section 5.2) This is a net lease and Tenant will be responsible for its share of all operating expenses benefiting the Premises and for its share of all interior and exterior common area expenses, except as excluded in Section 4.3. Tenant's pro rata share for the Retail Space shall be a fraction, the numerator of which shall be the rentable square feet of the Retail Space, and the denominator of which shall be the total rentable square feet of retail space in the Building.   Tenant's pro rata share for the Office/School Space shall be a fraction, the numerator of which shall be the rentable square feet of the Office/School Space, and the denominator of which shall be the total rentable square feet of office space in the Building.

13. **Tenant's Percentage of Common Area Expenses:** Tenant's pro rata share of Common Area Expenses shall be determined by multiplying the Common Area Expenses in question by a fraction, the numerator of which shall be the number of parking spaces allocated to the Premises per Paragraph 6 of the Basic Lease Information and the denominator of which shall be the total number of parking spaces in The Brewery Project.

14. **Security Deposit:**  Not Applicable.  (Section 6)

15. **Brokers:**  Tenant is represented by Grubb & Ellis Company.

16. **Guarantors:**   Education Management Corporation, a Pennsylvania corporation.

**LANDLORD**

**THE BREWERY BLOCKS I, LLC,**
**an Oregon limited liability company**

By: _Mark Edlen_

Name: _Mark C. Edlen_

Title:  Member

Date: _10/30/00_

**TENANT**

**THE ART INSTITUTE OF PORTLAND, INC.,**
**an Oregon corporation**

By: _Steven Goldman_

Name: _STEVEN  GOLDMAN_

Title: _President_

Date: _10/23/00_

4 –LEASE AGREEMENT – BASIC LEASE INFORMATION

## LEASE AGREEMENT

## TERMS AND CONDITIONS

### SECTION 1. DEMISE AND RENT

1.1 **Demise**. Landlord leases to Tenant, and Tenant leases from Landlord, upon and subject to the terms, covenants, provisions and conditions of this Lease Agreement (the "Lease"), the premises described in Section 1.2 below in the building (the "Building") located on the land described on **Exhibit A** attached hereto and incorporated herein (the "Land"). Tenant acknowledges that the Building is a part of The Brewery Project, a retail, commercial office and residential complex, more specifically described in **Exhibit A-1**. Landlord may record operating and easement agreements, management or maintenance agreements, or other related documents ("**OEA**") to provide for maintenance and operation of the Common Areas (as defined below) now or hereafter designated in The Brewery Project, provided, the OEAs shall not materially limit or reduce any of Tenant's rights under this Lease or materially increase Tenant's obligations hereunder. This Lease shall be subordinate to the OEA now or hereafter in force against the Building or The Brewery Project, any portion thereof, or upon any buildings hereafter placed upon the land of which the Premises forms a part. The aforesaid provisions shall be self-operative and no further instrument of subordination shall be required to evidence such subordination. Tenant covenants and agrees to execute and deliver, upon demand, such further instrument or instruments subordinating this Lease on the foregoing basis to the OEA as shall be reasonably desired by Landlord.

1.2 **Premises**. The premises (the "Premises") leased to Tenant are described in the Basic Lease Information, and are outlined on the floor plan(s) for the Building attached hereto as **Exhibit B** and incorporated herein by this reference.

1.3 **Commencement and Expiration Dates**. The term of this Lease (herein called "Lease Term") shall be for the period specified in the Basic Lease Information (or until sooner terminated as herein provided). Landlord and Tenant shall execute a letter in a form and substance reasonably satisfactory to the parties hereto confirming when the actual Commencement Date occurred, and such letter shall be considered a part of this Lease.

1.4 **Calculation of Rentable Footage**. The initial rentable and usable square footage of the Premises shall be determined by Landlord based on the final plans and specifications for the Premises and shall be calculated in accordance with BOMA Standard ANSI Z65.1 (1996) for "Rentable Area"; provided, however, for purposes of this Lease, the usable square footage shall also include the square footage of Tenant's exclusive elevators.

1.5 **Common Area**. The "Common Area" shall include the Parking Structure (as defined below), including, without limitation, any common service areas, driveways, areas of ingress and egress, storage space, bicycle facilities, elevators and elevator vestibules (excluding elevators and elevator vestibules exclusively maintained by other tenants), sidewalks

1 – LEASE AGREEMENT – TERMS AND CONDITIONS

and other pedestrian ways located in the Parking Structure, but shall not include the Land and/or Building which are subject to the Operating Expenses set forth in Section 4.3. The Parking Structure shall mean the multi-block, subsurface, three-level parking structure constructed by Landlord in connection with The Brewery Project.

## 1.6 Extension Option.

1.6.1  **Right to Extend**. So long as this Lease remains free from material default beyond applicable notice and cure periods, Tenant shall have the option to extend the Lease Term for all or a portion constituting at least fifty percent (50%) of the Premises that is contiguous for three (3) successive terms of five (5) years each, on the terms and conditions contained herein, except for Base Rent, which shall be determined as hereinafter provided. Other than as set forth herein, Tenant shall have no further option to extend this Lease. Exercise of each extension option shall be by written notice given to Landlord at least eighteen (18) months prior to expiration of the original or immediately preceding term.

1.6.2  **Determination of Rent**. During the extended term, Base Rent shall be adjusted to reflect ninety-five percent (95%) of the fair market rental value of the Premises for the extended term, determined as hereinafter provided. Tenant may, prior to exercise of its extension option, request Landlord's statement of the fair market rental value and Landlord shall provide such statement within 30 days after Tenant's request. After the exercise of the option to extend and at least 150 days prior to the commencement of the extended term in question, if Landlord has not already done so pursuant to the preceding sentence, Landlord shall notify Tenant of its determination of the fair market rental value for the extended term. Within 30 days after the effective date of such notice, Tenant shall either (i) notify Landlord of Tenant's acceptance of Landlord's determination of the fair market rental value, in which event Base Rent for the extended term in question shall be as so determined by Landlord; or (ii) notify Landlord of Tenant's rejection of Landlord's determination of the fair market rental value, in which event the fair market rental value shall be determined in accordance with Section 1.6.3. The failure of Tenant to give notice as contemplated in the preceding sentence within the required time period shall be deemed an acceptance by Tenant of Landlord's determination of the fair market rental value.

1.6.3  **Arbitration Procedure**. Within ten (10) days after Tenant's rejection of Landlord's determination of fair market rental value, each party shall designate a representative who is either an Oregon licensed MAI appraiser skilled in determining rental rates for office space in the Portland office market between I-405 to the West, South and North and the Willamette River to the East (the "Relevant Market Area"), or a real estate broker experienced in leasing office space in the Relevant Market Area. The two representatives so chosen shall select an arbitrator having the above qualifications or, if they cannot agree, the presiding judge of the Circuit Court of Multnomah County, Oregon shall, upon application by either party, select an arbitrator having the above qualifications. At least ninety (90) days prior to the commencement of the extended term in question, each party's representative shall submit to the arbitrator a written report stating such representative's opinion of the fair market rental value of the Premises, based on a consideration of rental rates then being charged (under the most recently executed leases) in the Relevant Market Area for office space comparable to

2 – LEASE AGREEMENT – TERMS AND CONDITIONS

the Premises. Within 30 days after receipt of such reports, the arbitrator shall accept one or the other of the reports. The determination of the fair market rental value in the report so accepted shall be binding on the parties. The cost of the determination of the fair market rental value pursuant to this Section shall be shared equally by Landlord and Tenant. If the arbitrator does not decide the fair market rental value to be paid prior to commencement of the extended term in question, Rent and Common Area and Operating Expenses shall continue to be payable in the amount previously in effect, and retroactive adjustment shall be made when the arbitrator reaches a decision. In no event shall the Base Rent during any extension term be less than the Base Rent payable at expiration of the preceding term.

1.7 **Right of First Offer**. Landlord shall provide Tenant with an on-going and continuous right of first offer to lease up to an additional approximately fifteen thousand (15,000) rentable square feet adjacent to the Premises ("Right of First Offer") which shall include the balance of the second (2nd) floor (excluding the retail tenant), as mutually determined by Landlord and Tenant (the "Adjacent Space"). Landlord shall use commercially reasonable efforts to lease the Adjacent Space for a term of forty-eight (48) to eighty-four (84) months during the initial lease up of the building. Tenant's Right of First Offer shall be exercised, if at all, in writing within fifteen (15) business days of Landlord presenting Tenant with Landlord's good faith proposal for lease terms for such Adjacent Space. In the event Tenant exercises this Right of First Offer, Tenant shall lease such Adjacent Space on the terms set forth in such notice and the Base Rent shall be at the then current fair market rate determined as set forth in Sections 1.6.2 and 1.6.3 based on a minimum three (3) year lease term, or if the term will be greater than three (3) years, the number of years in the actual term (except Base Rent shall be 100% of fair market rate), but in no event less than the rent being paid on the Office/School Space at such time. The exercise of the Right of First Offer shall be effective upon receipt of a written notice from Tenant, subject only to the execution of an amendment to this Lease incorporating the Adjacent Space in the Premises. The term for the Adjacent Space shall be for a term ending on the Expiration Date of this Lease as the same may be extended, but in no event less than eighteen (18) months. Tenant's Right of First Offer with respect to such offer shall be forfeited if Tenant shall fail to provide timely written notice of exercise as required by this Section. If Tenant desires to exercise the Right of First Offer, Landlord shall provide Tenant with a Tenant Improvement Allowance for such space at the current market allowance for new tenants coming into the Building and/or in comparable leases in the Relevant Market Area. Notwithstanding the foregoing, any tenant improvement allowance provided as to the Adjacent Space shall be reduced pro rata on an annual basis to the extent the unexpired Lease Term following the Commencement Date for payment of Rent for such space shall be less than five (5) years.

1.8 **Expansion Space**. Landlord shall provide Tenant with a continuous and on-going right of first opportunity (the "Expansion Right") to lease any space in the Building after the initial lease up of the Building (the "Expansion Space") whenever the Expansion Space may be available for lease during the Lease Term. Tenant's Expansion Right shall be exercised, if at all, in writing within fifteen (15) business days of Landlord presenting Tenant with Landlord's good faith proposal for lease terms for such Expansion Space. In the event Tenant exercises

3 – LEASE AGREEMENT – TERMS AND CONDITIONS

this Expansion Right, Tenant shall lease such Expansion Space on the terms set forth in such notice and the Base Rent shall be at the then current fair market rate determined as set forth in Sections 1.6.2 and 1.6.3 (except Base Rent shall be 100% of fair market rate), but in no event less than the rent being paid on the Office/School Space at such time. The exercise of the Expansion Right shall be effective upon receipt of a written notice from Tenant, subject only to the execution of an amendment to this Lease incorporating the Expansion Space in the Premises. The term for the Expansion Space shall be coterminous with the term of this Lease. Tenant's Expansion Right shall be forfeited with respect to such offer if Tenant shall fail to provide timely written notice of exercise as required by this Section. If Tenant desires to exercise the Expansion Right, Landlord shall provide Tenant with a Tenant Improvement Allowance for such space at the current market allowance for new tenants coming into the Building and/or in comparable leases in the Relevant Market Area for the same lease term. Notwithstanding the foregoing, any tenant improvement allowance provided as to any Expansion Space shall be reduced pro rata on an annual basis to the extent the unexpired Lease Term following the Commencement Date for payment of Rent for such space shall be less than five (5) years.

1.9 **Rent.** The rent shall be and consist of a Base Rent (herein called "Base Rent") and Additional Rent (herein called "Additional Rent"). For purposes of this Lease Agreement, Base Rent and Additional Rent are referred to collectively as "Rent." Base Rent shall be the amount indicated in the Basic Lease Information. Base Rent shall be payable in equal monthly installments in advance on the first day of each and every calendar month during the Lease Term (except to the extent otherwise specifically provided elsewhere in this Lease and except that Tenant shall pay, upon the execution and delivery of this Lease by Tenant, the sum of $100,000, to be applied against the first installment(s) of Base Rent becoming due under this Lease). Additional Rent shall consist of all other sums of money as shall become due from and payable by Tenant to Landlord under this Lease. All Rent shall be paid in lawful money of the United States of America to Landlord at its office or such other place, as Landlord shall designate by notice to Tenant. Tenant shall pay the Base Rent and Additional Rent promptly when due without notice or demand and without any abatement, deduction or offset for any reason whatsoever, except as expressly provided in this Lease. If the Commencement Date or the Expiration Date occurs on a day other than the first day of a calendar month, the Base Rent for that partial calendar month shall be prorated on a daily basis.

1.10 **Late Charge.** Tenant recognizes that late payment of any Rent from Tenant to Landlord will result in administrative expense to Landlord, the extent of which additional expense is extremely difficult and economically impractical to ascertain. Tenant therefore agrees that if Rent from Tenant to Landlord remains unpaid ten (10) days after said amount is due, the amount of such unpaid Rent or other payments shall be increased by a late charge to be paid to Landlord by Tenant in an amount equal to five percent (5%) of the amount of the delinquent Rent or other payment. Tenant agrees that such amount is a reasonable estimate of the loss and expense to be suffered by Landlord as a result of such late payment by Tenant and may be charged by Landlord to defray such loss and expense. The provisions of this Section in no way relieve Tenant of the obligation to pay Rent or other payments on or before the date

4 – LEASE AGREEMENT – TERMS AND CONDITIONS

on which they are due, nor do the terms of this Section in any way affect Landlord's remedies pursuant to Section 21 of this Lease in the event Rent is past due.

   1.11    **Confidentiality**.    Tenant shall keep the Rent and other terms of this Lease confidential from other current and prospective occupants of the Building and any other buildings owned by Landlord except to the extent disclosure is reasonably necessary in the conduct of Tenant's business or as may be required by law.

## SECTION 2. USE

   2.1 **Generally**.    Tenant (i) shall use and occupy the Retail Space in the Premises continuously during the Lease Term, and (ii) may use and occupy the Office/School Space in the Premises during the Lease Term for the use specified in the Basic Lease Information and for no other purpose without the written consent of Landlord, which consent shall not be unreasonably withheld.  Notwithstanding any other provision in this Lease, so long as Tenant continues to pay rent as required in the Lease, Tenant may close its business operations in the Retail Space (i) not visible from the storefront for any period of time, or (ii) for remodeling or for alterations by Tenant for a period not to exceed three (3) months.  For purposes of the foregoing sentence, "not visible from the storefront" shall mean the area beginning forty feet (40') from the storefront to the back of the Retail Space.  If any governmental license or permit, other than a Certificate of Occupancy, shall be required for the proper and lawful conduct of Tenant's business in the Premises or any part thereof, Tenant, at its expense, shall duly procure and thereafter maintain such license or permit and submit the same to landlord for inspection. Tenant shall at all times comply with the terms and conditions of each such license or permit. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Building or injure or annoy them, nor use or allow the Premises to be used for any improper, immoral, unlawful or objectionable purpose, nor shall Tenant cause or maintain or permit any nuisance in, on or about the Premises.  Tenant shall not commit or allow the commission of any waste in, on, or about the Premises.  Tenant shall not use the Premises or permit anything to be done in or about the Premises which will in any way conflict with any law, statute, ordinance, or governmental rule or regulation now in force or which may hereafter be enacted or promulgated.  Tenant shall not do or permit anything to be done on or about the Premises or bring or keep anything therein which will in any way increase the rate of any insurance upon the Building in which the Premises are situated or any of its contents or cause a cancellation of said insurance or otherwise affect said insurance in any manner, provided, however, Landlord agrees that Tenant will not be responsible for any such rate increase resulting from Tenant's use of the Premises for any of the uses expressly permitted under this Lease except that Tenant shall reimburse Landlord for any increase in Landlord's insurance costs due to any culinary programs or courses offered by Tenant.  Tenant shall, at its sole cost and expense, promptly comply with all laws, statutes, ordinances, and governmental rules, regulations, or requirements now in force or which may hereafter be in force ("Legal Requirements") and with the requirements of any board of fire underwriters or other similar body now or hereafter constituted relating to or affecting the condition, use, or occupancy of the Premises, excluding structural changes not related to or affected by: (i) alterations or improvements made by or for

5 – LEASE AGREEMENT – TERMS AND CONDITIONS

Tenant; or (ii) Tenant's acts. The judgment of any court of competent jurisdiction or the admission of Tenant in an action against Tenant, whether Landlord be a party thereto or not, that Tenant has so violated any such law, statute, ordinance, rule, regulation, or requirement, shall be conclusive of such violation as between Landlord and Tenant. Tenant shall use its reasonable efforts to prevent any violation of applicable Legal Requirement by its partners, directors, officers, agents and employees. During the Lease Term, provided Tenant is not in material default after the expiration of all applicable notice and cure periods and is occupying the Premises for use as a post-secondary school, Landlord shall not lease space in the Building for use as a post-secondary school as defined in Paragraph 7 of the Basic Lease Information, provided, however, nothing herein shall restrict Landlord from leasing space to a restaurant or other food service tenant except as set forth below. During the Term, Landlord shall not allow any uses in the Building which are unlawful or illegal or any uses which may be permissible or legal but shall be deemed immoral, objectionable or offensive in Landlord's reasonable business judgment. Such uses shall include the uses on **Exhibit H** and any bar, pub, lounge, nightclub, music hall or disco in which less than fifty percent (50%) of its space is devoted to food preparation or service, where the foregoing is defined as a business whose primary source of income is derived from live or pre-recorded musical performances that also serve alcoholic beverages.

2.2 **ADA Law Compliance**. Landlord and Tenant acknowledge that the provisions of the Americans with Disabilities Act (the "ADA") allow allocation of responsibility for compliance with the terms and conditions of the ADA in the Lease. Landlord and Tenant agree that the responsibility for compliance with the ADA shall be allocated as set forth in this Section 2.2. Tenant shall be responsible for compliance with the applicable provisions of the ADA with respect to all improvements within the Premises except that Landlord represents that any improvements designed by Landlord's office planner or installed by Landlord pursuant to **Exhibit C** will conform to the ADA requirements imposed by the local governmental authorities in connection with the issuance of building permits and inspection of the Premises to verify compliance with the approved plans and specifications. Landlord hereby further represents to Tenant that, that the Premises, as well as the Building, shall comply with all applicable Requirements, including, without limitation, all Requirements relating to "Hazardous Substances" (as defined below) and with the ADA in effect as of the Commencement Date. For purposes of this Lease, all applicable laws, order, regulations and rules of federal, state, county and municipal authorities are hereinafter, collectively, referred to as "Requirements." Landlord shall be responsible for compliance with the provisions of Title III of the ADA with respect to the exterior of the Building, structural elements of the Premises and Building, the sprinkler system, other fire-retardant system or any other mechanical system not otherwise installed solely by Tenant within the Premises, and the Land including parking areas, sidewalks and walkways, and the like, together with all common areas of the Building. Neither Landlord nor Tenant shall be obligated to supervise, monitor, or otherwise review the compliance activities of the other. Tenant acknowledges that the expense of Landlord's fulfillment of its ADA obligations is an element of Common Area and Operating Expenses as such terms are defined in the Lease; provided, however, that Landlord shall be solely responsible for any costs to bring the Building and the Premises into compliance with any such laws in effect as of the Commencement Date. Any such ADA expense for capital

6 – LEASE AGREEMENT – TERMS AND CONDITIONS

improvements shall be amortized over the useful life of the same for purposes of Common Area and Operating Expenses in the same manner as provided in the Lease for capital improvements intended to reduce Common Area and Operating Expenses. References in this Lease to Legal Requirements shall be deemed to refer to the ADA among other laws. If either party in good faith contests any claim of lack of ADA compliance, and such contest does not jeopardize or subject the other party to any liability, claim or penalty, then the temporary failure to comply until such contest is complete shall not be deemed a default hereunder.

2.3 **Environmental Law Compliance.** For purposes of this Section 2.3 the term "Hazardous Substances" shall mean and include all hazardous and toxic substances, waste or materials, any pollutant or contaminant, including, without limitation, PCBs, asbestos, asbestos-containing material, and raw materials that are included under or regulated by any Environmental Laws. For purposes of this Lease the term "Environmental Laws" shall mean and include all federal, state and local statutes, ordinances, regulations and rules presently in force or hereafter enacted relating to environmental quality, contamination, and clean-up of Hazardous Substances. References in this Lease to Legal Requirements shall be deemed to refer to Environmental Laws among other laws. Landlord represents that to the best of its current actual knowledge, the Building, parking facilities and the Land are in compliance with all Environmental Laws respecting Hazardous Substances, and that Landlord has received no notice of any pending or threatened lien, action or proceeding respecting any alleged violation of Environmental Laws respecting Hazardous Substances that has occurred on or near the Land or in or about the Building. Landlord hereby agrees to defend, indemnify, and hold Tenant harmless (including defending and paying Tenant's attorneys' fees) with regard to Landlord's obligation to handle, remove, or treat any Hazardous Substance not caused by Tenant. Landlord, at Landlord's sole cost and expense and not a part of Common Area and Operating Expenses, shall be fully responsible for, and shall conduct, all assessment, remediation and clean-up activities required by the Environmental Laws to be conducted in connection with the Hazardous Substances unless caused by Tenant, its agents, employees, or contractors, and, in connection therewith, Landlord shall use due diligence, shall fully comply with all Environmental Laws and shall not unreasonably interfere with Tenant's use of the Building or Premises. Landlord's obligations hereunder shall survive the termination or expiration of the Lease or Premises. Tenant shall, at Tenant's sole cost and expense, be fully responsible for, and shall conduct, all assessment, remediation and clean-up activities required by the Environmental Laws to be conducted in connection with the Hazardous Substances caused by Tenant, its agents, employees, or contractors, and, in connection therewith, Tenant shall use due diligence, shall fully comply with all Environmental Laws. Tenant shall inform and cooperate with Landlord regarding any such conduct, assessment, remediation and/or clean-up by Tenant.

2.4 **Indemnity Regarding Legal Violations.** Tenant shall indemnify and hold harmless Landlord and all Superior Lessors and/or Superior Mortgagees (as defined in Section 17.2 herein) and its and their respective partners, directors, officers, agents and employees from and against any and all claims arising from Tenant's breach of its representations, warranties and covenants under this Lease which require compliance with Legal Requirements including but not limited to the ADA or Environmental Laws; together with all reasonable costs, expenses and liabilities incurred or in connection with each such claim, action, proceeding or

7 – LEASE AGREEMENT – TERMS AND CONDITIONS

appeal, including, without limitation, all reasonable attorney fees and expenses. Landlord shall indemnify and hold harmless Tenant and its partners, directors, officers, agents and employees from and against any and all claims arising from Landlord's breach of its representations, warranties and covenants under this Lease which require compliance with Legal Requirements including but not limited to the ADA or Environmental Laws; together with all costs, expenses and liabilities incurred or in connection with each such claim, action, proceeding or appeal, including, without limitation, all attorney fees and expenses.

## SECTION 3. TENANT IMPROVEMENTS; TENANT'S ACCEPTANCE; MAINTENANCE OF PREMISES AND COMMON AREA MAINTENANCE

3.1 **Tenant's Improvements, Acceptance and Maintenance.** Landlord and Tenant agree that the Premises will be improved for tenant use in accordance with the provisions of **Exhibit C** and attached hereto and incorporated herein. Subject to the provisions of **Exhibit C** by taking possession of the Premises, Tenant accepts the Premises as being in compliance with the provisions of **Exhibit C** and otherwise in good order, condition and repair. Landlord's obligations to maintain the Building are as set forth in Section 14.1 hereof. Tenant shall, at all times during the Lease Term hereof at Tenant's sole cost and expense, keep the following items in the Premises in good order, condition and repair: (i) floor coverings, (ii) wall coverings, (iii) paint, (iv) casework, (v) ceiling tiles, (vi) all of Tenant's Property (as defined in Section 13.2 herein); and (vii) any and all Additional Tenant Improvements (defined in **Exhibit C**). Landlord shall have no obligation to alter, remove, improve, repair, decorate, or paint the Premises or any part thereof except as specified in **Exhibit C**, or as necessary in connection with Landlord's obligations pursuant to Section 14.1. No representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant, except as herein set forth.

3.2 **Common Area Maintenance.** Landlord shall be responsible for maintaining, repairing and keeping the Common Area in a good and orderly condition, landscaped and adequately insured. Landlord shall provide lighting in the Parking Structure in compliance with all applicable code requirements. Landlord's obligations under this paragraph shall include, without limitation, resurfacing, painting, restriping, cleaning, sweeping, removing snow and ice, and providing janitorial services. Landlord shall install, maintain and repair (i) irrigation, fire protection (to the extent required by applicable code), lighting, drainage and other utility systems, (ii) directional signs, markers, curbs and bumpers, and (iii) plants and other landscaping in the Common Area. Landlord shall repair any damage to the facilities in the Common Area and, to the extent that Landlord reasonably determines appropriate, Landlord shall provide security guards for the Common Area. Landlord may cause any or all of such services to be performed by an independent contractor(s) or by employees or affiliates of Landlord; provided that the charges for such services shall be at reasonable and competitive rates for similar developments in the general geographic area of the Building.

## SECTION 4. COMMON AREA EXPENSES, COMMON AREA AND OPERATING EXPENSES AND TAXES

4.1 **Common Area Expenses.** The term "Common Area Expenses" as used herein shall mean the amounts reasonably and directly expended by Landlord in performing its obligations under Section 3.2 above, and shall include a reasonable management fee as set forth in Section 4.2 below. In addition, if in the future Landlord ceases to be the owner of the Parking Structure, the term Common Area Expenses shall include the share of the amounts reasonably and directly expended by the owner of the Parking Structure in maintaining and repairing the Parking Structure in accordance with the standards set forth in Section 3.2 above that is allocated to the Building.

4.2 **Operating Expenses.** For the purposes of this Lease, the term "Operating Expenses" shall mean all expenses paid or incurred by Landlord (or on Landlord's behalf) as reasonably determined by Landlord to be necessary or appropriate for the efficient operation, maintenance and repair of the Land and/or Building, including the common areas of the Building, including without limitation:   (i) salaries, wages, medical, surgical, union and general welfare benefits (including, without limitation, group life insurance) and pension payments of employees of Landlord engaged in the repair, operation and maintenance of the Land and/or Building; (ii) payroll taxes, workers' compensation insurance, uniforms and related expenses for employees; (iii) the cost of all charges for gas, steam, electricity for the common areas of the Building, heat, ventilation, air-conditioning for the common areas of the Building, water and other utilities furnished to the Building, together with any taxes on such utilities; (iv) the cost of painting of public areas; (v) the cost of all charges of insurance, including but not limited to all risk property insurance with rent loss coverage, liability and fidelity insurance, with regard to the Land and/or Building and the maintenance and/or operation thereof; (vi) the cost or rental cost of all supplies, including without limitation, cleaning supplies, light bulbs, tubes and ballasts, materials and equipment, and sales and other taxes thereon; (vii) the cost of hand tools and other movable equipment used in the repair, maintenance or operation of the Building amortized over the useful life of such hand tools and movable equipment (as reasonably estimated by Landlord) and such amortized costs are only included in Operating Expenses for that portion of the useful life of such equipment which falls within the Lease Term; (viii) the cost of all charges for window and other cleaning and janitorial and security services; (ix) charges of independent contractors performing repairs or services to the Land and/or Building; (x) non-capital repairs; (xi) remodeling of the public and common areas of the Building including, without limitation, repainting, replacement and repair of furnishings, fixtures, accessories, carpeting or other floor covering, walls and window coverings in the public and common areas, the cost of which shall be amortized (with interest at the prime rate of interest publicly announced by Key Bank as its prime rate of interest, plus 2% per annum ("Prime Plus 2%"), on the unamortized balance) over the useful life of the improvements as reasonably estimated by Landlord and such amortized costs are only included in Operating Expenses for that portion of the useful life of such item which falls within the Lease Term; (xii) alterations and improvements to the Building made by reason of the laws and requirements of any public authorities or the requirements of insurance bodies; (xiii) management fees paid to a third party, or, if no managing agent is employed by

9 – LEASE AGREEMENT – TERMS AND CONDITIONS

Landlord, Landlord shall be entitled to charge a management fee which is not in excess of four percent (4%) of gross revenue, and such fee shall be included in the Operating Expenses; (xiv) the cost of any capital improvements or repairs to the Building and/or of any machinery or equipment installed in the Building amortized (with interest at Prime Plus 2% on the unamortized balance) over the useful life of the improvement, machinery and/or equipment as reasonably estimated by Landlord and such amortized costs are only included in Operating Expenses for that portion of the useful life of such improvements or equipment which falls within the Lease Term, which is made or becomes operational, as the case may be, after the completion of the construction of the Building and which have a reasonable probability of reducing the expenses which otherwise would be included in Operating Expenses, but excluding any capital repairs to the foundation or structural repairs to the Building shell; (xv) reasonable legal, accounting and other professional fees incurred in connection with operation, maintenance and management of the Land and/or Building; (xvi) the cost of providing elevator service; (xvii) the cost of landscape and parking area maintenance and repair; (xviii) the common area charges to which the Building is subject; (xix) Taxes; and (xx) all other charges properly allocable to the operation, repair and maintenance of the Building in accordance with generally accepted accounting principles.

4.3 **Exclusions From Operating Expenses.** Operating Expenses shall not include: (i) depreciation or amortization (except as provided above in Section 4.1); (ii) interest on and amortization of debts (except as provided above in Section 4.1); (iii) leasehold improvements made for new tenants of the Building; (iv) leasing commissions, attorney fees, costs and disbursements and other expenses (including advertising) incurred in connection with leasing, renovating, or improving space for tenants or other occupants or prospective tenants or occupants of the Building; (v) refinancing costs; (vi) the cost of any work or services performed for any occupants of any leased space in the Building (including Tenant), whether at the expense of Landlord or such occupants, to the extent that such work or services is in excess of the work or services which Landlord, at its expense, is required to furnish to Tenant under this Lease; (vii) the cost of any electricity furnished to the Premises or any other leased space in the Building in excess of the electricity to be provided by Landlord under this Lease; (viii) damages recoverable by any occupant due to violation by Landlord of any of the terms and conditions of this Lease or any other lease relating to the Building; (ix) repairs occasioned by fire, windstorm or other casualty, to the extent such repairs are paid for by insurance proceeds; and (x) capital repairs and replacements (except as provided above in Section 4.2), (xi) transfer, gains, franchise, inheritance, estate, occupancy, succession, gift, corporation, unincorporated business, gross receipts, profit and income taxes imposed upon Landlord (unless as a substitution or in lieu of Taxes as defined in Section 4.4), (xii) ground rent or any other payments paid under superior leases; (xiii) financing and refinancing costs with respect to the Building or land on which the Building is located, but not with respect to any of the Building's equipment or fixtures, (xiv) the cost of installing or operating any specialty facility such as an observatory, broadcasting facilities, luncheon club, athletic or recreational club, child care facility, auditorium, cafeteria or dining facility, conference center or similar facility unless Tenant elects (in its sole discretion) to use such facilities; (xv) expenditures for repairing and/or replacing any defect in any work performed by Landlord.

10 – LEASE AGREEMENT – TERMS AND CONDITIONS

4.4 **Taxes**. The term "Taxes" shall include (i) all real property taxes and assessments and personal property taxes, charges, rates, duties and assessments rated, levied or imposed by any governmental authority with respect to the Land, the Building and any improvements, fixtures and equipment located therein or thereon, and with respect to all other property of Landlord, real or personal, located in or on the Land or the Building and used in connection with the operation of the Building; (ii) any tax in lieu of a real property tax; (iii) any tax or excise levied or assessed by any governmental authority on the rentals payable under this Lease or rentals accruing from the use of the Land or the Building; provided that this shall not include federal or state, corporate or personal income taxes; and (iv) any tax or excise imposed or assessed against Landlord which is measured or based in whole or in part on the capital employed by Landlord to improve the Land and construct the Building. If Landlord receives a refund of Taxes then Landlord shall credit such refund, net of any reasonable professional fees and costs incurred by Landlord to obtain the same, against the Taxes for the Operating Year to which the refund is applicable or the current Operating Year, at Landlord's option (provided if such refund is for the last year of the term, Landlord shall pay such amount to Tenant within thirty (30) days after receipt of such refund). Landlord shall pay all penalties and fines (including, without limitation, all late fees) and "Taxes" shall never include such items. Further, if Tenant overpays, or if taxes are later reduced due to an appeal or otherwise, Tenant shall be entitled to a refund notwithstanding the termination of this Lease. Landlord shall institute tax reduction or other proceedings to reduce Taxes as Landlord (in good faith) deems advisable to minimize Taxes. With respect to any allowable special assessments for Taxes which may be evidenced by improvement or other bonds, or may be paid in installments, only the amount of such installment (with appropriate proration for any partial calendar year) based upon the maximum period of time over which such installment may be paid pursuant to applicable law and which also actually becomes due and payable during the applicable calendar year shall be included in Tenant's annual pro rata portion of the Taxes applicable to the Premises. This Section shall survive termination or earlier expiration of the Lease.

## SECTION 5. PAYMENT OF COMMON AREA AND OPERATING EXPENSES

5.1 **Operating Year**. As used in this Section 5, the term "Operating Year" shall mean each calendar year of the Lease Term and in the event this Lease begins or ends on any date other than the first day of the calendar year, the calculations, costs and payments referred to herein shall be prorated as provided in Section 30.11.

5.2 **Tenant's Pro Rata Share**. Throughout the entire Lease Term, Tenant shall pay, as Additional Rent, its pro rata share of the Operating Expenses of the Building. Tenant's pro rata share of the Operating Expenses of the Building for each Operating Year shall be calculated as follows: The actual Operating Expenses for each Operating Year shall be multiplied by Tenant's percentage (as specified in the Basic Lease Information, and as adjusted as provided herein). If in any Operating Year Tenant occupies the Premises for less than the full Operating Year, then the product from the foregoing multiplication shall be multiplied by the percentage of the Operating Year in which Tenant occupied the Premises. "Tenant's percentage" for purposes of calculating Tenant's Share of Common Area Expenses and

11 – LEASE AGREEMENT – TERMS AND CONDITIONS

Operating Expenses (as specified in the Basic Lease Information, and adjusted as provided herein) shall be changed from time to time to reflect any change in the total rentable square footage in the Building; provided, however, such adjustment shall only be made upon (i) a conversion of any floor of the Building from multi-tenant use to single-tenant use or vice versa, or (ii) completion of Phase 2 Construction (as defined in Section 15.1), if any. All calculations of rentable area shall be on the basis as originally used to determine the rentable area shown in the Basic Lease Information. During the periods when the Building is at least 95% occupied, Landlord shall reasonably adjust Operating Expenses to reflect the costs that would normally have been incurred had the Building been 95% occupied for the entire period and the Building had been fully assessed for property tax purposes. If during any Operating Year the tenant of any space in the Building performs work or services therein pursuant to a written agreement between Landlord and such tenant in lieu of having Landlord perform the same and the cost thereof would have been included in Landlord's Operating Expenses, then in any such event(s), at Landlord's option, the Operating Expenses for such Operating Year shall be adjusted to reflect the Operating Expenses that would have been incurred if Landlord had performed such work or services, as the case may be.

**5.3 Written Statement of Estimate**. Prior to the commencement of each Operating Year during the Lease Term, Landlord shall furnish Tenant with a written statement setting forth Tenant's pro rata share of the Common Area and Operating Expenses for the next Operating Year. Tenant shall pay to Landlord as Additional Rent commencing on January 1 of the Operating Year, and thereafter on the first day of each calendar month, an amount equal to one-twelfth of the amount of Tenant's pro rata share as shown in Landlord's written statement; provided, however, Tenant's Pro Rata Share of Common Area and Operating Expenses excluding uncontrollable Common Area and Operating Expenses shall never be increased more than four percent (4%) per calendar year during the initial lease Term above Tenant's Pro Rata Share of Common Area and Operating Expenses for the immediately prior calendar year. Tenant shall pay the actual Common Area and Operating Expenses during the first year of the Option Periods, if any, and thereafter, Tenant's Pro Rata Share of Common Area and Operating Expenses excluding uncontrollable Common Area and Operating Expenses shall never be increased more than four percent (4%) per calendar year during the remainder of the Option Period above Tenant's Pro Rata Share of Common Area and Operating Expenses for the immediately prior calendar year. For purposes of this Section, uncontrollable expenses shall mean the cost of utilities, Taxes, insurance, and other uncontrollable costs incurred by Landlord pursuant to multi-year wage increases contained in union contracts. In the event Landlord delivers the written statement late, Tenant shall continue to pay to Landlord an amount equal to one-twelfth of Tenant's pro rata share of the estimated Common Area and Operating Expenses for the immediately preceding Operating Year until Landlord does furnish the written statement, at which time Tenant shall pay the amount of any excess of Tenant's pro rata share for the expired portion of the current operating Year over Tenant's actual payments during such time and any excess payments by Tenant shall be credited to the next due payment of Rent from Tenant. The late delivery of any written statement by Landlord shall not constitute a waiver of Tenant's obligation to pay its pro rata share of Common Area and Operating Expenses nor subject Landlord to any liability, but Landlord shall use reasonable

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS 109906.1

EXHIBIT 1
Page 18 of 158

efforts to deliver such written statements of Common Area and Operating Expenses as soon as reasonably possible after the commencement of each Operating Year.

5.4 **Final Written Statement.** Within 120 days after the close of each Operating Year during the Lease Term, Landlord shall deliver to Tenant a written statement (the "Operating Statement") setting forth Tenant's actual pro rata share of the Common Area and Operating Expenses for the preceding Operating Year. In the event Tenant's pro rata share of the actual Common Area and Operating Expenses is in excess of Tenant's pro rata estimated Common Area and Operating Expenses, Tenant shall pay the amount of such excess to Landlord as Additional Rent within thirty (30) days after receipt of such statement by Tenant. In the event Tenant's pro rata share of the actual Common Area and Operating Expenses is less than Tenant's pro rata share of the estimated Operating Expense actually paid by Tenant then the amount of the excess overpayment shall be paid by Landlord to Tenant within thirty (30) days following the date of such statement or Landlord may elect to apply the overpayment to Tenant's next Rent payment, reimbursing only the excess over such next payment, if any (provided that if each overpayment occurs at the end of the term of this Lease, Landlord shall pay such amount to Tenant within thirty (30) days after rendering the statement). The late delivery of any written statement by Landlord shall not constitute a waiver of Tenant's obligation to pay its pro rata share of Common Area and Operating Expenses, but Landlord shall use reasonable efforts to deliver such written statements as soon as reasonably possible after the close of each Operating Year. The provisions of this Section shall survive the termination of this Lease.

5.5 **Tenant Examination.** The Operating Statement referred to herein need not be audited, but shall be certified by an officer of Landlord, but shall contain sufficient detail to enable Tenant to verify the calculation of its pro rata share. In addition, Tenant, upon at least five (5) days advance written notice to Landlord and during business hours, may examine, at Landlord's offices, any invoices, receipts, canceled checks, vouchers or other instruments used to support the figures shown on the Operating Statement, provided however, that Tenant shall only be entitled to such an examination once in each Operating Year. In the event Tenant elects to audit the Operating Statement, Tenant agrees to use only one (1) auditor who will charge Tenant at the same rates as such auditor bills for Tenant's corporate accounting work. Tenant shall diligently prosecute such audit to completion.

5.6 **Disputes.** Each such Operating Statement given by Landlord pursuant to this Section shall be conclusive and binding upon Tenant unless within one hundred twenty (120) days after the receipt of such Operating Statement Tenant shall notify Landlord that it disputes the correctness of the Operating Statement, specifying the particular respects in which the Operating Statement is claimed to be incorrect. If such disputes shall not have been settled by agreement, either party, within one hundred twenty (120) days after receipt of such Statement, may pursue its available legal remedies, but Tenant hereby agrees that a dispute over the Operating Statement or any error by landlord interpreting or applying Section 4 or in calculating the amounts in the Operating Statement shall not be a breach of this Lease by Landlord, and even if any legal proceeding over the Operating Statement is resolved against

13 – LEASE AGREEMENT – TERMS AND CONDITIONS

Landlord this Lease shall remain in full force and effect and Landlord shall not be liable for any consequential damages, and pending the determination of such dispute, Tenant, within ten (10) days of receipt of such Operating Statement, shall pay Additional Rent in accordance with the Operating Statement, without prejudice to Tenant's position. If the dispute shall be determined in Tenant's favor, Landlord shall forthwith pay to Tenant the amount of Tenant's overpayment of rents resulting from compliance with the Operating Statement. In the event the overstatement of charges exceeds four percent (4%) of the sum previously billed to Tenant by audit, Landlord shall reimburse Tenant for all reasonable expenses related to said audit. Landlord shall retain its records regarding Common Area and Operating Expenses for a period of at least three (3) years following the final billing for the calendar year in question. The failure of Tenant to elect to examine Landlord's records pertaining to Common Area and Operating Expenses within one (1) year shall be deemed to be a waiver by Tenant with respect to such examination or auditing and the acceptance by Tenant of the annual statement for the particular calendar year to which the annual statement relates.

5.7 **Payment**. If an Operating Year ends after the expiration or termination of this Lease, any Additional Rent payable under this Section shall be paid by Tenant within thirty (30) days of its receipt of the Operating Statement for such Operating Year.

5.8 **No Reduction in Amount of Base Rent**. Nothing in the Lease shall be construed to mean the Base Rent amount specified in the Basic Lease Information shall be reduced due to any decrease in Common Area and Operating Expenses, it being intended that the amount of the Base Rent remain fixed throughout the Lease Term.

## SECTION 6. SECURITY DEPOSIT. INTENTIONALLY OMITTED

## SECTION 7. SUBORDINATION, NOTICE TO SUPERIOR LESSORS AND MORTGAGEES

7.1 **Subordination**. Any lease to which this Lease is, at the time referred to, subject and subordinate is herein called "Superior Lease" and the lessor of a Superior Lease or its successor in interest, at the time referred to, is herein called "Superior Lessor," and any mortgage to which this Lease is, at the time referred to, subject and subordinate is herein called "Superior Mortgage" and the holder of a Superior Mortgage, or its successor in interest, at the time referred to, is herein called "Superior Mortgagee." This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate to any ground leases covering the Land and/or the Building now or hereby existing, and to all mortgages which may now or hereafter affect the Land and/or the Building and/or any of such leases, whether or not such mortgages shall also cover other lands and/or buildings and/or leases, to each and every advance made or hereafter to be made under such mortgages, and to all renewals, modifications, replacements and extensions of such leases and such mortgages. This Section shall be self-operative, and no further instrument of subordination shall be required, provided, however that Tenant shall obtain a non-disturbance agreement from the Superior Mortgagee in a form reasonably acceptable to Superior Mortgagee and Tenant. In confirmation of such subordination, Tenant shall promptly execute, acknowledge or deliver any instrument that

14 – LEASE AGREEMENT – TERMS AND CONDITIONS

Landlord, any Superior Lessor or any Superior Mortgagee may reasonably request to evidence such subordination subject to the nondisturbance provisions of Section 7.3. Without limiting the generality of the foregoing, upon Landlord's request, Tenant shall provide a Superior Mortgagee with a subordination, nondisturbance and attornment agreement substantially in the form attached as **Exhibit D**, or such other form reasonably acceptable to Tenant and the Superior Mortgagee.

7.2 **Notice**. If any act or omission of Landlord would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right: (i) until it has given written notice of such act or omission to Landlord and each Superior Mortgagee and each Superior Lessor whose name and address shall previously have been furnished to Tenant; and (ii) until a reasonable period of time for such parties to cure the condition has passed.

7.3 **Attornment**. For the purposes of this Section, the term "Successor Landlord" shall mean the Superior Lessor or Superior Mortgagee if the same succeeds to the rights of Landlord under this Lease, whether through possession or foreclosure action or delivery of a new lease or deed, or any third party that succeeds to the rights of Landlord under this Lease by virtue of having purchased the Land and the Building at a foreclosure sale. The Successor Landlord shall accept Tenant's attornment, assume Landlord's obligations under the Lease, and shall not disturb Tenant's quiet possession of the Premises. Tenant shall attorn to and recognize such Successor Landlord as Tenant's Landlord under this Lease and shall promptly execute and deliver any instrument that such Successor Landlord may reasonably request to evidence such attornment. Upon such attornment this Lease shall continue in full force and effect as a direct lease between the Successor Landlord and Tenant upon all of the terms, conditions and covenants as are set forth in this Lease except that the Successor Landlord shall not; (i) be liable for any previous act or omission of Landlord under this Lease except that Tenant may terminate the Lease if the Successor Landlord fails to cure any continuing breach of this Lease caused by Landlord's prior acts or omissions within a reasonable period of time; (ii) be subject to any offset, deficiency or defense which theretofore shall have accrued to Tenant against Landlord; (iii) be bound by any previous modification of this Lease or by any previous prepayment of more than one (1) month's Base Rent, unless such modification or prepayment shall have been expressly approved in writing by the Superior Lessor or the Superior Mortgagee whose name and address shall previously have been furnished to Tenant and through or by reason of which the Successor Landlord shall have succeeded to the right of Landlord under this Lease; (iv) be liable for any lien, right, power or interest, if any, which may have arisen or intervened in the period between the recording of any Superior Mortgage and the execution of this Lease or any lien or judgment which may arise at any time under the terms of this Lease; or (v) be liable for the return of any security deposit which was not actually transferred to the Successor Landlord. On or prior to the date hereof, Landlord will obtain a non-disturbance agreement from all current Superior Lessors and Superior Mortgagees ("Lien Holders") and, prior to the effective date of such lien, from all future Lien Holders, for the benefit of Tenant, its successors, subtenants and assigns. Such non-disturbance agreement(s) shall be an agreement in recordable form between Tenant and such applicable

Lien Holder(s) in form and substance reasonably satisfactory in all respects to Tenant and Lien Holder(s) which shall provide in substance, among other things, as follows: (a) neither such Lien Holder, nor any other holder of such lien on the Building and/or the Premises, shall name or join Tenant (or its assigns or subtenants) as a party-defendant or otherwise in any suit, action or proceeding to enforce its liens or claims nor will this Lease, or the Term hereof, be terminated (except as permitted by the provisions of this Lease); (b) Tenant's, its subtenants' and assigns', use and occupancy of the Premises (and/or any portion thereof) shall not be disturbed or any rights under this Lease diminished; (c) all condemnation awards and proceeds of insurance shall be applied in the manner provided for in this Lease; and provided, however, the foregoing shall not apply if Tenant is in default (after the expiration of all applicable notice and cure periods) of this Lease.  In the event that such non-disturbance agreement(s) are not received by Tenant within thirty (30) days after the date of this Lease, then Tenant may terminate this Lease.  This Lease shall not be subordinate to any future Lien Holder or any superior instrument until, and unless, Tenant has received a non-disturbance agreement reasonably satisfactory to Tenant from such Lien Holder in a form similar to the Key Bank or Bank of America form of subordination, nondisturbance and attornment agreement and otherwise complying with the terms set forth above from such Lien Holder.

## SECTION 8.  QUIET ENJOYMENT

**8.1 Generally**.  So long as Tenant pays all of the Base Rent and Additional Rent and performs all of Tenant's other obligations hereunder, Tenant shall peaceably and quietly have, hold and enjoy the Premises without hindrance, ejection or molestation by Landlord or any person lawfully claiming through or under Landlord, subject nevertheless, to the provisions of this Lease and to the rights of any Superior Lease and/or Superior Mortgage.  This covenant shall be construed as a covenant running with the land, and is not, nor shall it be construed as, a personal covenant of Landlord, except to the extent of Landlord's interest in this Lease and only so long as such successors in interest of Landlord's interest in this Lease, to the extent of their respective interests, for so long as they shall retain such interest.  Landlord warrants that it is the fee simple owner and record title holder of all of the Building, that it has the full right, power and authority to execute this Lease, that there is (and will be throughout the Term subject to eminent domain and casualty) legal and physical access, sufficient for Tenant's purposes, to and from a public right-of-way, that there is no agreement, restriction or encumbrance, or any other matter which would limit or reduce any of Tenant's rights under this Lease or which would increase Tenant's obligations, other than OEAs.

## SECTION 9.  ASSIGNMENT AND SUBLETTING

**9.1 Generally**.  Tenant shall not sell, assign, sublet, encumber or otherwise transfer by operation of law or otherwise this Lease or any interest herein, or the Premises or any portion thereof, without the prior written consent of Landlord (which Landlord shall not unreasonably withhold) nor shall Tenant permit any lien to be placed on Tenant's interest by operation of law.  Any transfer hereunder by Tenant shall not result in Tenant being released or discharged from any liability under this Lease.   Any sale, assignment, encumbrance, subletting, occupation, lien or other transfer of this lease which does not comply with the provisions of

16 – LEASE AGREEMENT – TERMS AND CONDITIONS

fees, collection costs even though no suit or action is filed thereof, and any other fees or expenses incurred by the nondefaulting party.

30.17.1    **Arbitration or Mediation; Trial and Appeal.**    If any arbitration, mediation, or other proceeding is brought in lieu of litigation, or if legal action is instituted to enforce or interpret any of the terms of the Lease or if legal action is instituted in a Bankruptcy Court for a United States District Court to enforce or interpret any of the terms of this Lease, to seek relief from an automatic stay, to obtain adequate protection, or to otherwise assert the interest of Landlord in a bankruptcy proceeding, the party not prevailing shall pay the prevailing party's costs and disbursements, the fees and expenses of expert witnesses in determining reasonable attorney fees pursuant to ORCP 68, and such sums as the court may determine to be reasonable for the prevailing party's attorney fees connected with the trial and any appeal and by petition for review thereof.

30.17.2    **Definitions.**    For purposes of this Lease, the term attorney fees includes all charges of the prevailing party's attorneys and their staff (including without limitation legal assistants, paralegals, word processing, and other support personnel) and any post-petition fees in a bankruptcy court.    For purposes of this Lease, the term fees and expenses includes but is not limited to long-distance telephone charges; expenses of facsimile transmission; expenses for postage (including costs of registered or certified mail and return receipts), express mail, or parcel delivery; mileage and all deposition charges, including but not limited to court reports' charges, appearance fees, and all costs of transcription; and costs incurred in searching records and obtaining reports.

30.17.3    **Effect of Failure to Consent.**    The parties acknowledge that the obligation of good faith and fair dealing generally applies to this Lease requiring each party to act reasonably except to the extent explicitly and specifically provided otherwise in this Lease. If either party unreasonably withholds or conditions a requested consent or demands payment of an unreasonable sum, the other party shall not be entitled to any damages for the unreasonableness, it being intended that the sole remedy shall be to proceed as if the unreasonable party had responded reasonably.

30.18    **Satellite Dish.**    The parties acknowledge and agree that subject to prior written approval of Landlord of the size and location, and method of attachment which approval shall not be unreasonably withheld or delayed, Tenant may place a satellite dish, antennae or other equipment ("Dish") on the roof upon prior written notice to Landlord provided that Tenant obtains the necessary permits, at its sole cost and expense, to complete the installation.    Tenant shall reasonably screen such Dish from view and shall not unreasonably interfere with other tenants in the Building.    Tenant shall use the Dish solely for the operation of its business and shall not sell use of or transmission from the Dish to any third party.    Tenant shall not make any roof penetrations and shall coordinate with Landlord's roofing contractor in the installation of the Dish.    If roof penetrations are required and Landlord consents to such roof penetrations, Landlord's roofing contractor shall make the penetrations, at Tenant's expense.    Tenant shall operate, maintain, repair and replace the Dish at Tenant's sole cost and expense and shall

45 – LEASE AGREEMENT – TERMS AND CONDITIONS

remove the Dish upon Expiration or earlier termination of this Lease and repair any damage caused thereby. In the event Tenant voids Landlord's roof warranty in connection with Tenant's operation, maintenance, repair or replacement of the Dish, Tenant shall maintain, repair and replace the roof, at Tenant's sole cost and expense thereafter. Landlord shall provide Tenant with a copy of its roof warranty. If Tenant's service to the Dish is interrupted as a result of the Phase 2 Construction, Landlord shall cooperate and coordinate with Tenant to promptly restore such service.

30.19 **Guaranty**. As a condition to Landlord's execution and delivery of this Lease, Education Management Corporation, a Pennsylvania corporation, has this day delivered to Landlord its Guaranty of this Lease in the form attached as **Exhibit F**.

30.20 **Recording**. Tenant may record a memorandum of lease in the form reasonably acceptable to Landlord attached hereto as **Exhibit G**.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease as of the date and year first above written.

LANDLORD                          TENANT

THE BREWERY BLOCKS I, LLC,        THE ART INSTITUTE OF PORTLAND, INC.,
an Oregon corporation             an Oregon corporation

By: _____     By: _____

Title: _____    Title: _____

Date: _____     Date: _____

46 – LEASE AGREEMENT – TERMS AND CONDITIONS

## EXHIBIT A

### Legal Description for Land

Block 80, Couch's Addition to the City of Portland, in the City of Portland, County of Multnomah, State of Oregon.

EXHIBIT B
Floor Plan of Building



1    Block 4 1st floor
N.T.S.

1- Exhibit B: Floor Plan of Building

**THE BREWERY BLOCKS**
GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS · NOVEMBER 2000



EXHIBIT I
Page 54 of 158

EXHIBIT B
Floor Plan of the Building



GROUND FLOOR PLAN
1/31" = 1'-0"

1 - Exhibit B: Floor Plan of Building

**THE BREWERY BLOCKS**
GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS • OCTOBER 2000



EXHIBIT I
Page 55 of 158

EXHIBIT B
Floor Plan of Building



✳   Tenant's rentable square feet on the Second Floor shall commence on the North side of
the Building, shall encompass Tenant's exclusive elevators, and shall consist of sufficient
contiguous square footage so that the amount of rentable square feet of Office/School
Space on the Second and Third Floors totals 50,000 rentable square feet.

SECOND FLOOR PLAN
1/32" = 1'-0"

2 - Exhibit B: Floor Plan of Building

THE BREWERY BLOCKS
GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS · OCTOBER 2000



EXHIBIT I
Page 56 of 158

EXHIBIT B
Floor Plan of Building



THIRD FLOOR PLAN
1/32" = 1'-0"

3 – Exhibit B: Floor Plan of Building



THE BREWERY BLOCKS
GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS - OCTOBER 2000

EXHIBIT 1
Page 57 of 158

## EXHIBIT C

### BLOCK 4, COUCH'S ADDITION

## WORK AGREEMENT

## SECTION 1. IMPROVEMENTS PROVIDED BY LANDLORD

Promptly after execution of this Lease, Landlord shall apply for and shall diligently pursue obtaining the applicable building permits for the building improvements set forth in this Section 1 ("Building Improvements"). Promptly following issuance of the applicable building permits, Landlord shall commence construction of the following Building Improvements in the Building and in the Premises, at Landlord's sole cost and expense, and shall thereafter, diligently continue construction of the Building Improvements in accordance with the terms of this Lease. Landlord agrees to perform and complete the Building Improvements in a good and workmanlike manner using only new quality materials and as required by the terms of this Lease, and in conformity with all applicable municipal, county, state and federal statutes, laws and ordinances, including, without limitation, zoning ordinances and regulations governing and relating to the use, construction, condition and occupancy of the Premises ("Building Code"). The Building Improvements shall have no structural defects and shall be watertight. Landlord shall provide all building utilities, including, without limitation, electricity, water, sewer, and telephone conduits to the Premises.

1.1 "Second look" 2x4 ceiling tile purchased, inventoried and uninstalled on the floor, with acoustical ceiling grid installed in 4x4 grid;

1.2 Either (i) Building standard 2x4, 3 tube, 18 cell parabolic lights in building standard quantities of one (1) per each 100 usable square feet in the Premises, purchased, inventoried, and uninstalled on the floor, or (ii) Landlord shall provide Tenant with a credit in the amount of $.67 per usable square foot in the Premises;

1.3 The base building mechanical system shall include a low temperature chilled air and gas heat roof top unit(s), all vertical shafts, a primary distribution/high pressure ductwork loop installed on each floor up to and including terminal fan-powered VAV boxes in quantities based on one per each 1,300 usable square feet. All downstream duct work, diffusers and grills, and controls programming are excluded from the Building Improvements and are to be the sole cost of Tenant. The system shall be designed to have a direct digital control system and provide 20cfm of outside air and to meet design temperatures of 18 degrees Fahrenheit outside/70 degrees Fahrenheit inside and 90 degrees Fahrenheit outside/74 degrees Fahrenheit inside;

1.4 Electrical service in building standard quantity, sized for typical office use, distributed to a distribution panel in central, common electrical room on each floor; provided, however, electricity shall be separately metered or sub-metered for Tenant. Power shall be

1 – EXHIBIT C: WORK AGREEMENT

provided to all elevators, mechanical equipment described in Section 1.3 above, and building common areas, including restrooms, exit stairs, and lobbies;  Power provided to the Premises shall be based on 1.2 watts per usable square foot for lighting and 5.3 watts per usable square foot for receptacles (convenience power), each of the foregoing to exclude HVAC requirements;

1.5 Exterior walls furred and insulated;

1.6 Landlord shall not charge a supervision fee for the oversight of construction of Tenant's interior improvements;

1.7 One each of men's and women's restrooms located on each combined floor shall be installed and completed with building standard, Class A finishes.  Restrooms shall comply with applicable ADA requirements and Building Code, as of the Date of Lease Execution;  The men's restrooms shall each have 3 sinks, 2 urinals and 3 closets; The women's restrooms shall each have 3 sinks and 4 closets;

1.8 Common telephone and janitorial closets, one per each combined floor;

1.9 First floor main lobby (excluding Tenant's lobby) installed with building standard, Class A finishes;

1.10    Second through tenth floor lobbies (excluding Tenant's lobby) ready for tenant finishes with sheetrock installed and taped but no other finishes, except for multi-tenant floors which shall have building standard, Class A finishes;

1.11    Wet fire sprinkler system installed with plugged tees for future downheads and smoke detection;

1.12    Five elevators (excluding Tenant's elevators) consisting of four 3,000 lbs., and one 3,500 lbs. traction elevators shall be installed.  Elevator cab finishes shall be of Class A office standards; and

1.13    Electronic cardkey access security system installed on all common entry building exterior doors and elevators (specifically excluding retail entrances for which each retailer shall provide its own security system).

1.14    Two (2) hydraulic elevators for Tenant's exclusive use on the north side of the Building to be incorporated into Tenant's Retail Space.  The elevators shall comply with applicable ADA requirements and Building Code as of the date of completion of Landlord's Work and delivery thereof for Tenant's exclusive use;  The two (2) elevators shall run from the P1 Level to Level 3 of the Building.

2 – Exhibit C: Work Agreement

## SECTION 2. TENANT IMPROVEMENTS AT TENANT'S EXPENSE

All improvements which are not listed in Section 1, and which are required or requested by Tenant, including but not limited to, those related to the interior improvements within the Premises (including costs for all signage, permits, governmental fees, and architectural and engineering fees), which are not listed in Section 1 (the "Tenant Improvements"), shall either be constructed by Tenant, or upon election by Tenant pursuant to the terms and conditions set forth herein, shall be constructed for Tenant by Landlord.

## SECTION 3. TENANT IMPROVEMENT ALLOWANCES PROVIDED BY LANDLORD

3.1 **Allowances:** Landlord agrees to provide an allowance in an amount equal to the sum of $33.00 multiplied by the number of RSF in the Premises ("Tenant Improvement Allowance") for actual construction of the Tenant Improvements and for any Tenant Improvements costs including construction costs, permits, and governmental fees which are not the responsibility of Landlord. Landlord shall also provide an additional amount for Tenant Improvements ("Additional Allowance"), which Additional Allowance and Tenant Improvement Allowance shall not exceed $40.00 per RSF. The Additional Allowance shall be amortized over the initial Lease Term with interest at Landlord's borrowing rate and shall be paid monthly by Tenant to Landlord as Additional Rent. In the event Tenant constructs the Tenant Improvements and provided Tenant is not in default under the Lease (after the expiration of all applicable notice and cure periods), Landlord shall make progress payments of the Tenant Improvement Allowance to Tenant, each such progress payment shall be made within thirty (30) days after Landlord's receipt of a payment application approved by Tenant's architect and partial lien releases for the work completed. Landlord shall retain 5% of the total Tenant Improvement Allowance until final completion of the Tenant Improvements, Tenant's acceptance of the Premises, and Landlord's receipt of the documents set forth in items ii-v of Section 5.3.9, provided, however, if any liens are filed on the property by Tenant's general contractor, subcontractor, suppliers or materialmen, Landlord shall pay the five percent (5%) retainage to Tenant less 125% of the amount of such lien(s) and Tenant shall discharge such lien(s) in accordance with Section 12.1.1 of the Lease. Upon discharge of any such lien, Landlord shall pay Tenant the amount withheld for such lien. In the event Landlord does not reimburse to Tenant the amount of the Tenant Improvement Allowance within the time periods set forth in **Exhibit C** and after Tenant's compliance with the requirements for payment, Tenant may, after thirty (30) days' prior written notice to Landlord and Landlord's failure to cure within such thirty (30) day period, offset amounts due Tenant from the Base Rent due to Landlord. Notwithstanding the foregoing, in the event Landlord reasonably disputes that payment of all or any portion of the Tenant Improvement Allowance is due to Tenant, Tenant shall not have the right to offset such claimed amounts and the parties shall submit such dispute to binding arbitration in Portland, Oregon within sixty (60) days of such notice. Each party shall designate an arbitrator having at least five (5) years experience in commercial leasing. The two arbitrators so chosen shall select an arbitrator having the above qualifications or, if they cannot agree, the presiding judge of the Circuit Court of Multnomah County, Oregon shall, upon application by either party, select an arbitrator having the above qualifications.

3 – EXHIBIT C: WORK AGREEMENT

Unless otherwise agreed, the arbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association. In the event the arbitration establishes that Tenant is due the claimed Tenant Improvement Allowance, Landlord shall pay such amount to Tenant within ten (10) business days. In the event Landlord fails to make such payment, Tenant shall be entitled to offset such amount without further notice to Landlord. In the event of an arbitration, the prevailing party shall be entitled to recover the costs of the arbitration as determined by the arbitrator.

3.2 **Application**: Each dollar allowance may be applied to any Tenant Improvement item, excluding Tenant's furniture and equipment. Any amount of Tenant Improvement Allowance not used shall be retained by Landlord.

## SECTION 4. DESIGN OF TENANT IMPROVEMENTS

4.1 **CDP Preparation**: Tenant shall prepare, at Tenant's sole cost and expense, a construction document package (hereafter the "CDP") consisting of a floor plan, a reflected ceiling/lighting plan and Tenant's supplemental specifications, including but not limited to electrical and mechanical requirements, any special structural requirements, and interior finishes. The CDP shall include a statement of the costs of the Tenant Improvements.

4.2 **CDP Approval**: In the event Tenant elects that Landlord construct the Tenant Improvements pursuant to Section 5.1 below, Tenant shall submit the CDP to Landlord within six (6) months after mutual execution of this Lease by Landlord and Tenant unless Tenant requests that the Tenant Improvements be included in the bids for Landlord's Work, in which case, Tenant shall submit the CDP to Landlord by November 1, 2000. In the event Tenant constructs the Tenant Improvements, Tenant shall submit the CDP to Landlord and obtain Landlord's approval of the CDP as set forth below prior to Tenant's commencement of construction and application for permits for the Tenant Improvements. Landlord shall have the right to approve, modify, or deny the CDP within fifteen (15) business days after having received the CDP from Tenant, which approval shall not be unreasonably withheld, conditioned, or delayed. In the event Landlord modifies or denies the CDP, Landlord shall provide Tenant with notice and reasonable explanation for the basis of the rejection or modification, and Tenant shall, within five (5) business days after Landlord's notice, modify the CDP accordingly and resubmit the CDP to Landlord for approval. The CDP must be approved by Landlord prior to commencement of construction. In the event Landlord fails to respond within the 15 business day period, the CDP shall be deemed approved. Landlord shall have no responsibility for Tenant's failure to comply with Building Code with respect to the Tenant Improvements, irrespective of whether or not Landlord has approved the CDP.

4.3 **Tenant Responsibilities**: Tenant shall be responsible for delays and additional costs, including without limitation design fees, caused by: (i) any changes made by Tenant to the CDP other than corrections and deletions of the type described in Section 4.2 above; or (ii) by delays in delivery of non-building-standard materials requiring long lead times; or (iii) Tenant's failure to prepare the CDP in a timely manner .

## SECTION 5. CONSTRUCTION

5.1 The Tenant Improvements shall be constructed by Tenant unless Tenant notifies Landlord in writing, by the date on which Tenant submits the CDP to Landlord, that Tenant elects to have Landlord's contractor construct the Tenant Improvements ("Construction Notice"). If the CDP is approved and Landlord is in receipt of the Construction Notice by November 1, 2000, Landlord will bid the Tenant Improvements with the Building Improvements in order to provide the most effective cost to Tenant. If the Construction Notice is delivered after November 1, 2000 but within six (6) months after mutual Lease execution by Landlord and Tenant, Landlord will, within thirty (30) days after delivery of the Construction Notice and after CDP approval, obtain no less than three (3) bids for the work of the general contractor for the Tenant Improvements. Within ten (10) business days after Landlord's delivery to Tenant of such bids (which bids need not be delivered at the same time), Tenant shall approve or disapprove Landlord's selection for such general contractor stating the reasons for any disapproval, which approval will not be unreasonably withheld or delayed. Landlord shall provide Tenant with a copy of the agreements with the general contractor promptly after execution thereof, which contract shall be for a guaranteed maximum price. Landlord shall be directly responsible to Tenant for all Tenant Improvements required to be provided by Landlord hereunder, regardless of whether the Tenant Improvements are performed by the general contractor or its subcontractors, and Landlord shall not be excused from any obligation hereunder on account of any default or neglect of the general contractor or its subcontractors.

5.2 **Landlord Construction of Tenant Improvements**: If Tenant elects to have Landlord construct the Tenant Improvements, Landlord shall complete the construction of the Tenant Improvements in substantial compliance with the CDP as soon as reasonably possible after the CDP has been approved or deemed approved and Landlord has received the Construction Notice from Tenant. The construction by Landlord of the Tenant Improvements shall be on an "open book" basis with all costs directly available to Tenant. Landlord agrees to perform and complete the Tenant Improvements in a good and workmanlike manner using only new quality materials and as required by the terms of this Lease, and in conformity with Building Code. The Tenant Improvements shall have no structural defects and shall be watertight.

5.2.1 Landlord shall provide to Tenant, as soon as is commercially reasonable after approval of the CDP, a budget (the "Budget") for the construction of the Tenant Improvements, which budget shall include the estimated costs of each of the discrete components of design and construction. During the progress of work, and with each payment application, Landlord shall submit to Tenant an updated Budget which shall reflect all costs and charges incurred during the preceding month against the original Budget.

5.2.2 Landlord and Tenant shall mutually agree to a construction schedule for the completion of the Tenant Improvements. Such schedule shall accurately reflect the general contractor's actual planned activities, duration and sequence to complete the Tenant Improvements.

5 – Exhibit C: Work Agreement

5.2.3 Tenant may inspect and conduct reasonable tests, at its sole cost and expense, to determine whether the Tenant Improvements are being performed consistent with the CDP and the construction contract, regardless of whether such inspections or tests are required by the CDP or the construction contract. Tenant shall use commercially reasonable efforts to conduct such tests or inspections in a timely manner so as not to require uncovering of completed or partially completed work. Should Tenant's inspections or tests reveal that the work is not installed or constructed substantially in accordance with the CDP and the construction contract, the costs of uncovering and replacement shall be at Landlord's expense. If Tenant's inspections or tests require work to be uncovered and such inspections or tests reveal that the Work has been installed substantially in accordance with the CDP and construction contract, the costs of uncovering and replacement shall be at Tenant's expense and any delay associated therewith shall be a Tenant Caused Delay. If Tenant's inspections or tests are not timely and the Work is not substantially in accordance with the CDP and construction contract, Landlord shall correct the Work at Landlord's expense, and Tenant shall be responsible for the costs of uncovering and replacement and any delay associated therewith shall be a Tenant Caused Delay.

5.2.4 Upon substantial completion of the Landlord's Work and the Tenant Improvements, if constructed by Landlord, Landlord shall remove from the Premises all temporary systems, tools, equipment, machinery, surplus materials, waste and rubbish, clean all tile and glass surfaces, replace broken glass, remove stains, paint spots and direct, clean and polish all plumbing fixtures and equipment, leave the Tenant Improvements "vacuum clean", or its substantial equivalent to the reasonable satisfaction of Tenant; provided, however, that Landlord may in an orderly fashion leave such equipment and supplies at the Building as are necessary to achieve Final Completion of the Tenant Improvements.

5.3 **Tenant's Authorization to Proceed**:  In the event Tenant elects to construct the Tenant Improvements, Tenant shall proceed as follows:

5.3.1 **Commencement of Construction**.  It is the intention of Landlord and Tenant that the Tenant Improvements be completed on or before September 1, 2002. In order to meet the foregoing schedule, the parties acknowledge and agree that they will need to construct the Landlord's Work and the Tenant Improvements, to the extent feasible, simultaneously and in cooperation with one another. In the event Tenant elects to construct the Tenant Improvements, Landlord shall use commercially reasonable efforts to complete all of the Landlord's Work within Premises on or before June 1, 2002. Landlord's failure to complete Landlord's Work within the Premises, subject to Tenant delays, shall constitute a "Landlord Caused Delay". Tenant shall not proceed with the construction of the Tenant Improvements until Landlord's written approval of each of the following items, which approval will not be unreasonably withheld or delayed:  (a) Tenant's contractor; and (b) public liability and property damage insurance carried by Tenant or its contractor. If Landlord has not approved or disapproved (with a reasonable explanation for such disapproval) Tenant's

6 – Exhibit C: Work Agreement

contractor and the foregoing insurance within ten (10) business days after Landlord's receipt thereof, Landlord's consent shall be deemed granted.

5.3.2 **Construction**. All construction of Tenant Improvements shall be done in strict conformity with the CDP (subject to minor deviation), subject to FCOs (as defined below) prepared and approved in the manner specified in Section 6. Any work requiring modifications to structural, plumbing, mechanical or electrical systems ("MEP/S Systems") at Tenant's election, may be completed by the Building contractor or such other contractors or subcontractors as may be approved by Landlord, which approval will not be unreasonably withheld or delayed. If Tenant constructs the Tenant Improvements, then Landlord shall not be liable for any problems that may arise from the Tenant Improvements with respect to any work by Tenant or its contractors. Tenant agrees to perform and complete the Tenant Improvements in a good and workmanlike manner using only new quality materials and as required by the terms of this Lease and the CDP.

5.3.3 **Permits**. All work shall be done in conformity with a valid building permit (obtained at Tenant's expense) when required, a copy of which shall be furnished to Landlord before such work is commenced, and in any case, all such work shall be performed in accordance with the Building Code, at Tenant's sole expense. Notwithstanding any failure by Landlord to object to any such work, Landlord shall have no responsibility for Tenant's failure to comply with the Building Code.

5.3.4 **Coordination**. All work by Tenant or Tenant's contractor shall be scheduled through Landlord. Tenant or Tenant's contractor shall arrange for necessary utility, hoisting and elevator service with Landlord or Landlord's contractor. Landlord may schedule work to be provided by Tenant or Tenant's contractor in a manner which does not interfere with Landlord's work in the Premises, or cause Landlord Delays. Landlord shall cooperate in good faith with Tenant to schedule such work and the use of Landlord's loading docks. Landlord shall provide to Tenant electricity and water as may be reasonably necessary to enable contractor(s) to perform the Tenant Improvements and Tenant shall pay the actual cost to Landlord of such items without any markup. Tenant shall obtain its own toilets necessary during construction of the Tenant Improvements. Tenant shall pay for parking at current rate charged by parking garage operator in the Parking Structure.

5.3.5 **Manner of Entry**. Tenant's entry to the Premises for any purpose, including without limitation, inspection or performance of Tenant construction by Tenant's agents, prior to substantial completion of the Building Improvements, shall be at such times as are approved by Landlord (which approval will not be unreasonably withheld or delayed) and subject to all the terms and conditions of the Lease except the payment of Rent. Tenant's entry shall mean entry by Tenant, its officers, contractors, licensees, agents, servants, employees, guests, invitees, or visitors.

5.3.6 **Faulty Work**. Landlord shall provide Tenant with five (5) days written notice of any work by Tenant which fails to comply with Building Code or the CDP of which

7 – EXHIBIT C: WORK AGREEMENT

Landlord is aware. Tenant shall cure such faulty work prior to substantial completion. In the event Tenant fails to correct such faulty work within the time periods set forth herein, Landlord may correct such faulty work and Tenant shall promptly reimburse Landlord upon demand for any extra expense reasonably incurred by Landlord by reason of faulty work done by Tenant or its contractors or by reason of any delays caused by such work, or by reason of inadequate cleanup.

     5.3.7 **Performance of Work.** All work to be performed by Tenant in the Premises shall be performed in a manner and at times which do not impede any work in the Premises by Landlord or its contractor. Landlord shall use reasonable efforts to coordinate Tenant's Work with the conduct of Landlord's Work so that no such interference occurs. Landlord shall not be responsible for delays in completion or costs resulting from Tenant's failure to comply with this provision.

     5.3.8 Upon substantial completion of the Tenant Improvements, if constructed by Tenant, Tenant shall remove from the Premises all temporary systems, tools, equipment, machinery, surplus materials, waste and rubbish, clean all tile and glass surfaces, replace broken glass, remove stains, paint spots and direct, clean and polish all plumbing fixtures and equipment, leave the Tenant Improvements "vacuum clean", or its substantial equivalent to the reasonable satisfaction of Landlord.

     5.3.9 **Completion.** Upon completion of the Tenant Improvements if performed by Tenant, Tenant shall provide Landlord with the following:

        i.     a full set of as-built construction documents depicting the Tenant Improvements as they are actually built

        ii.    an affidavit of the general contractor of Tenant indicating that (A) Tenant's construction has been completed, (B) Tenant's construction was completed in strict accordance with the CDP (subject to minor deviations and FCOs), and (C) all subcontractors, laborers and material suppliers have been paid in full;

        iii.   final unconditional lien releases from Tenant's general contractor, subcontractors, suppliers and materialmen;

        iv.   copy of a temporary or permanent Certificate of Occupancy;

        v.    copy of the completion notice.

5.4 **Payment:** In the event Tenant constructs the Tenant Improvements, Tenant shall pay for Tenant Improvements when due. In the event Landlord constructs the Tenant improvements, Tenant shall pay for such Tenant Improvements in excess of the Tenant Improvement Allowance and Additional Allowance. Landlord shall submit monthly statements, together with a payment application approved by the Project Architect and partial lien releases, to Tenant and Tenant shall pay such statements within thirty (30) days of receipt from Landlord and in any event, prior to taking occupancy of the Premises; provided, however, that the final payment shall not be due until final completion of the Tenant

Improvements. Notwithstanding anything herein to the contrary, Landlord shall not be in default if Landlord fails to deliver partial lien releases and Tenant shall pay Landlord the sums due hereunder; provided, however, if such liens adversely interfere with Tenant's use of the Premises or interest therein, the provisions of Section 15.1.9 of the Lease shall apply.

5.5 **Tenant's Access to Premises if Landlord Constructs Tenant Improvements**:  In the event Landlord constructs the Tenant Improvements and provided Tenant does not unreasonably interfere with Landlord's construction of the Tenant Improvements or Landlord's Work, Landlord shall allow Tenant access to the Premises approximately sixty (60) days prior to substantial completion of the Tenant Improvements so Tenant can make final electrical and mechanical connections as may be required for the installation of Tenant's FF&E.  Any delays in completion resulting from Tenant or Tenant's vendors installations of FF&E shall be a Tenant Caused Delay and at Tenant's sole cost pursuant to Section 7 herein unless such was the result of delay by Landlord.  Tenant's access to the Premises for installation of low-voltage systems or FF&E prior to the Commencement Date shall be suspended in the event said access shall unreasonably interfere with completion of the Premises by Landlord.  In the event Landlord constructs the Tenant Improvements, a Certificate of Substantial Completion shall not be conditioned upon issuance of a temporary occupancy permit, if such a permit is unavailable, in the determination of the Project Architect, solely because of exposed wiring or other conditions caused or required by Tenant's installation of Tenant's FF&E on any other Tenant-caused delays.

5.6 **Acceptance of Premises**:  Within 5 business days following notice from Landlord to Tenant indicating substantial completion of either (i) the Building Improvements, or (ii) the Tenant Improvements (if Landlord constructs the Tenant Improvements), Landlord and Tenant shall conduct a joint inspection of the Premises during which they shall develop a mutually agreeable punchlist of items to be completed by Landlord following issuance of a Certificate of Substantial Completion by the Project Architect for the Building Improvements and/or the Tenant Improvements, as the case may be.  Except for the punchlist items for the Building Improvements and/or the Tenant Improvements, as the case may be, which shall be promptly addressed by Landlord and diligently prosecuted to completion within a reasonable time thereafter, Tenant shall be deemed to have accepted the Premises upon Tenant's receipt from Landlord of (i) a temporary or permanent Certificate of Occupancy, if applicable; (ii) copy of completion notice; and (iii) affidavit from Landlord's general contractor indicating (A) Landlord's construction is complete, (B) Landlord's construction was completed in accordance with **Exhibit C** and/or the CDP, as the case may be.  Within sixty (60) days after substantial completion, Landlord shall provide Tenant with marked up "as builts" depicting the portion of the Work completed by Landlord.

## SECTION 6.  FIELD CHANGE ORDERS

If Tenant shall desire a change in the approved CDP, Tenant shall provide a field change order ("FCO") for approval in writing to Landlord (which approval shall not be unreasonably withheld), accompanied by plans and specifications for the FCO and estimated cost of the FCO.  Tenant shall not proceed with work affected by the proposed FCO until

::ODMA\GRPWISE\DUNN-CAR POST1 CLIENTS 109906.1
EXHIBIT I
Page 66 of 158

receipt of Landlord's written approval. In the event Landlord fails to respond to Tenant's FCO request within ten (10) business days after Tenant submits the FCO to Landlord, the FCO shall be deemed approved. Tenant shall be responsible for any and all delays in construction and occupancy caused by Tenant's FCO requests. In the event Landlord is constructing the Tenant Improvements, the proposed FCO shall be effective only when signed by both Landlord and Tenant. Even if Landlord fails to approve the proposed FCO, Tenant shall be responsible for the cost of preparing any plans and specifications for the proposed FCO. The actual cost, including design and administrative fees, of any FCO shall be paid by Tenant on or before the date Tenant first occupies the Premises unless stated otherwise in the FCO.

## SECTION 7. TENANT CAUSED DELAYS

7.1 Delays in completion of the Building or Tenant Improvements caused by Tenant including, but not limited to, any of the following, shall constitute delays caused by Tenant ("Tenant Caused Delays"):

7.1.1 Tenant's failure to comply with any timelines or to provide approvals or information as provided herein;

7.1.2 Delays in delivery of non-building standard materials requiring long lead times. Landlord will identify any long lead time items when and as discovered by Landlord and allow Tenant to make substitutions;

7.1.3 Tenant's failure to timely select and approve interior finish items when they cause delay in the delivery of the Premises by the scheduled Commencement Date;

7.1.4 Tenant's failure to timely inspect the Premises and develop a punchlist of items to be completed by Landlord;

7.1.5 Tenant's FCOs if they delay delivery of the Premises by the scheduled Commencement Date;

7.1.6 Improvements constructed by Tenant if they delay delivery of the Premises by the scheduled Commencement Date;

7.1.7 Installation of furnishings, fixtures, equipment or component parts or wiring associated therewith if it delays delivery of the Premises by the scheduled Commencement Date;

7.1.8 Tenant's failure to make timely payment as required in Section 5.4 and Section 6 of this Agreement;

7.1.9 Tenant's failure to timely provide the CDP as provided in Section 4.1 above, any delays resulting from inaccurate or incomplete construction information and/or specifications in the CDP;

10 – EXHIBIT C: WORK AGREEMENT

7.1.10 Tenant's failure to comply with any term, provision or agreement hereunder when they cause delay in the delivery of the Premises by the scheduled Commencement Date. Tenant Caused Delays shall not result in the abatement of Rent or delay the scheduled Commencement Date. Tenant shall be responsible for all additional costs, including without limitation Tenant's Architect and Tenant's Contractor fees, resulting from conduct described in this Section 7 and shall be charged pursuant to Section 5; and

7.1.11 In the event of Tenant Caused Delay, Landlord shall notify Tenant in writing within five (5) business days after becoming aware of a matter which Landlord deems could result in a Tenant Caused Delay. Landlord and Tenant will each use reasonable efforts to mitigate the effects of any delay. Each Landlord notice of delay to Tenant under this Section will include Landlord's good-faith estimate of the delay in the Commencement Date which will be attributable to the event identified in such notice. Notwithstanding the foregoing, none of the foregoing provisions in this Section 7 shall constitute a Tenant Caused Delay if such was solely the result of any action or inaction of Landlord.

## SECTION 8. LANDLORD CAUSED DELAYS

Delays attributable to Landlord shall include those actual delays caused by Landlord, including, but not limited to, any of the following ("Landlord Caused Delays"):

8.1 Landlord's failure to furnish in writing within the timelines provided herein information to Tenant or Tenant's architect or space planner in connection with the preparation of the CDP (or revisions thereto) or FCOs;

8.2 Any changes in the CDP requested by Landlord except as set forth in Sections 4.2 and 4.3;

8.3 Unreasonable interference by Landlord or Landlord's contractors, agents or employees with Tenant's or Tenant's contractor's, subcontractor's, architect's or other agent's or representative's work in the Premises;

8.4 Landlord's failure to provide Tenant with access to the Premises as required in this Lease;

8.5 Landlord's failure to cooperate with the reasonable requests of Tenant in connection with obtaining any permits, authorizations or approvals as soon as reasonably practicable; and

8.6 Landlord's failure to provide approvals or information within the timelines set forth herein.

## SECTION 9. GENERAL CONDITIONS

9.1 **Remedies**: If the Tenant causes any delay (as determined pursuant to Section 7 above) in the delivery of the Premises beyond the scheduled Commencement Date pursuant to the Lease, then Tenant's obligation to pay rent shall commence on the scheduled Commencement Date, as extended under the Lease for delays other than Tenant Caused Delays. Notwithstanding any Tenant Caused Delays, Landlord shall be obligated to deliver finished space ready for occupancy as soon as practically possible, so long as Tenant complies with its obligations under this Work Agreement. Except for requiring payment of rent as provided in this **Exhibit C** and the Lease, Landlord shall have no claim for damages arising from the delay in completion of the Building or Premises which result from Tenant Caused Delays.

9.2 **Indemnity**: Tenant shall indemnify and hold harmless Landlord, Project Architect and Project Contractor from and against any and all claims, losses, liabilities, and expenses (including without limitation attorneys' fees) arising out of or in any way related to the activities of Tenant's contractors (and any subcontractors) in the Premises or on the Property. Landlord shall indemnify and hold harmless Tenant, its contractors, agents and employees from and against any and all claims, losses, liabilities, and expenses (including without limitation attorneys' fees) arising out of or in any way related to the activities of Landlord's contractors (and any subcontractors) in the Premises or on the Property.

9.3 **Interest**: Interest shall accrue at the rate of 12% per annum on all balances which remain due from Tenant to Landlord after the required date for payment.

9.4 **Substantial Completion**: As used in this **Exhibit C**, "substantial completion" or "substantially complete" shall mean completion of all items to be constructed by Landlord or Tenant, as the case may be, in accordance with any plans and specifications therefor and the requirements of the Building Code, except for punchlist items. Punchlist items means items which are qualitatively minor and which do not materially impair Tenant's ability to perform its Tenant Improvements work or materially impair Tenant's ability to conduct its business in the Building.

9.5 **Final Completion**: As used in this **Exhibit C**, "final completion" shall mean substantial completion along with completion of the punch list items.

## SECTION 10.    AUTHORIZED REPRESENTATIVES

10.1   Mark Hodges or his designee is authorized by Tenant to make changes, authorize FCOs, and otherwise make binding commitments for and on behalf of Tenant as it relates to the Tenant Improvements. Written authorization by the above representative will indicate Tenant's binding approval.

10.2   Landlord's authorized representatives shall be Kelly Saito, Dennis Wilde, Bob Gerding and Mark Edlen, who are authorized by Landlord to make changes, authorize FCOs,

12 – EXHIBIT C: WORK AGREEMENT

and otherwise make binding commitments for and on behalf of Landlord as it relates to the Tenant Improvements. Written authorization by any one of the above representatives will indicate Landlord's binding approval.

13 – EXHIBIT C: WORK AGREEMENT

## EXHIBIT D

Subordination, Nondisturbance and Attornment Agreement

After Recording Mail To:

KEYBANK NATIONAL ASSOCIATION
Real Estate Commercial Banking
[_____ ]
[_____ ]
[_____ ]
Attn:[_____ ]

Loan No.[_____ ]

---

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

This Agreement is made this [___] day of [_____], 2000, between KEYBANK NATIONAL ASSOCIATION, a national banking association ("*Lender*"), and THE ART INSTITUTE OF PORTLAND, INC. (hereinafter "*Tenant*").

### Recitals

A.      [_____] ([**individually and collectively referred to as**] "*Landlord*"), [**is/are**] the owner[s] of the real property ("*Premises*") legally described on **Exhibit A**.

B.      Tenant is the occupant of the Premises under a lease ("*Lease*") with Landlord dated [_____], 2000.

C.      Lender has agreed to make a loan ("*Loan*") to Landlord, secured by a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing ("*Deed of Trust*") encumbering the Premises. The Deed of Trust includes an assignment to Lender of all right, title, and interest of Landlord under the Lease. The Deed of Trust is recorded under [_____] County Auditor's File No. _____.

D.      Lender's agreement to make the Loan is conditioned on Tenant's subordination of the Lease to the Deed of Trust, and Tenant's agreement to attorn to Lender if Lender obtains possession of the Premises by foreclosure or deed in lieu of foreclosure. Tenant is willing to do so in consideration of Lender's agreement not to disturb Tenant's possession of the Premises under the Lease, and to recognize the Lease and Tenant's rights thereunder, all as provided herein.

1 – EXHIBIT D:  SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

### Agreement

NOW, THEREFORE, Lender and Tenant agree as provided below.

1. **Subordination**. Tenant hereby subordinates the Lease and all of its rights thereunder to the lien of the Deed of Trust, including any and all renewals, modifications and extensions thereof, subject nonetheless to the terms and provisions hereof.

2. **Nondisturbance**. Lender agrees that Tenant's possession of the Premises shall not be disturbed by Lender during the term of the Lease, and Lender shall not join Tenant in any action or proceeding for the purpose of terminating the Lease, except in connection with the occurrence of a default by Tenant under the Lease and the continuance of such default beyond any cure period given to Tenant under the Lease.

3. **Attornment**. If Lender obtains possession of the Premises by foreclosure or deed in lieu of foreclosure, Lender will not join Tenant in summary or foreclosure proceedings and the Lease shall continue in full force and effect and Lender shall recognize Tenant and its rights thereunder and will thereby establish direct privity of estate and contract between Lender and Tenant with the same force and effect as though the Lease were made directly between Lender and Tenant. In such event, Tenant shall attorn to Lender and recognize Lender as the landlord under the Lease for the unexpired term of the Lease, and Lender shall accept such attornment. Tenant and Lender each hereby agree to be bound to one another under all of the terms, covenants and conditions of the Lease. Notwithstanding the foregoing, such recognition, nondisturbance and attornment shall be effective without Lender being (i) subject to any offsets or defenses, or otherwise liable, for any prior act or omission of Landlord accruing prior to the date when Lender succeeded to the interest of Landlord except to the extent such condition continues on or after such date, (ii) bound by any amendment, modification, or waiver of any of the provisions of the Lease, or by any separate agreement between Landlord and Tenant relating to the Premises or Premises, unless any such action was taken with the prior written consent of Lender or except pursuant to the express provisions of the Lease, (iii) liable for the return of any security or other deposit unless the deposit has been paid to Lender, or (iv) bound by any payment of rent under the Lease made by Tenant more than one (1) month in advance of the due date or for more than the applicable period set forth in the Lease, where such rent payments are payable in accordance with the terms of the Lease at intervals of more than one month. Lender's obligations as landlord under the Lease after obtaining possession of the Premises by foreclosure or deed in lieu of foreclosure shall terminate upon Lender's subsequent transfer of its interest in the Premises, provided that Lender's successor assumes such liability.

4. **Covenants of Tenant**. Tenant covenants and agrees with Lender as follows:

(a)    Tenant shall pay to Lender all rent and other payments otherwise payable to Landlord under the Lease upon written demand from Lender. The consent and approval of Landlord to this Agreement shall constitute an express authorization for Tenant to make such payments to Lender, a release and discharge of all liability of Tenant to Landlord for any such payments made to Lender, and Landlord agrees that Tenant will not be deemed in default of the Lease by reason of its compliance with such notice.

(b)    Tenant shall enter into no material amendment or modification of any of the provisions of the Lease without Lender's prior written consent.

(c)    In the event the Lease is rejected or deemed rejected in any bankruptcy proceeding with respect to Landlord, Tenant shall not exercise its option to treat the Lease as terminated under 11 U.S.C. § 365(h), as amended.

(d)    Tenant shall promptly deliver written notice to Lender of any default by Landlord under the Lease and agrees to recognize any cure by Lender as a cure by Landlord.

5. **Effect of Assignment**. Notwithstanding that Landlord has made a present assignment of all of its rights under the Lease to Lender, Lender shall not be liable for any of the obligations of Landlord to Tenant under the Lease until Lender has obtained possession of the Premises by foreclosure or deed in lieu of foreclosure, and then only to the extent provided in Section 3.

6. **Representations and Warranties**. Tenant represents and warrants to Lender that the Lease constitutes the entire agreement between Landlord and Tenant relating to the Premises, and except as otherwise provided in the Lease, Tenant has made no agreements with Landlord concerning free rent, partial rent, rebate of rental payments, setoff, or any other type of rental concession.

7. **Costs and Attorneys' Fees**. In the event of any litigation as to a dispute arising out of this Agreement, the party that substantially prevails shall be awarded, in addition to all other relief, all attorneys' fees and other costs and expenses incurred in connection with such litigation; including without limitation those fees, costs, and expenses incurred in any appeal, any proceedings under any present or future bankruptcy act or state receivership, and any post-judgment proceedings.

8. **Notices**. All notices to be given under this Agreement shall be in writing and personally delivered or mailed, postage prepaid, certified or registered mail, return receipt requested, to Lender at the address indicated on the first page of this Agreement, and to Tenant, if prior to Tenant's occupancy of the Premises, at 2000 SW

Fifth Avenue, Portland, Oregon  97201-4972, and at the Premises thereafter, with copies to:

> Education Management Corp.
> 300 Sixth Avenue
> Pittsburgh, Pennsylvania 15222
> Attention:  Frederick W. Steinberg, Esq.

> and to

> Education Management Corp
> 716 Middle River Drive
> Ft. Lauderdale, FL  33304-3512
> Attention:  Mark C. Hodges, Vice President – Project Development

> and to

> Greenberg Traurig
> 200 Park Avenue
> New York, New York 10166
> Attention:      Richard Rosenbaum, Esq.
>                 Angela Crowder, Esq.

9.  All notices which are mailed shall be deemed given three (3) days after the postmark thereof.  Either party may change their address by delivery of written notice to the other party.

10. **Miscellaneous**.  This agreement may not be modified except in writing and executed by the parties hereto or their successors in interest.  This agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.  As used herein, "*Landlord*" shall include Landlord's predecessors and successors in interest under the Lease, and "*Lender*" shall include any purchaser of the Premises at any foreclosure sale.  If any provision of this Agreement is determined to be invalid, illegal or unenforceable, such provision shall be considered severed from the rest of this Agreement and the remaining provisions shall continue in full force and effect as if such provision had not been included.  This Agreement shall be governed by the laws of the State of Oregon.

IN WITNESS WHEREOF, the parties execute this Agreement as of the day and year first above written.

**"LENDER"**
KEYBANK NATIONAL ASSOCIATION,
a national banking association

By:_____
Its:_____

**"TENANT"**

By:_____
Its:_____

## [ACKNOWLEDGEMENT FOR TENANT]

The undersigned Landlord hereby consents and agrees to the foregoing Subordination, Nondisturbance and Attornment Agreement.

**"LANDLORD"**

By:_____
Its:_____

5 – Exhibit D:  Subordination, Nondisturbance and Attornment Agreement
ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS_10900 1

EXHIBIT 1
Page 75 of 158

EXHIBIT A
To
Subordination, Nondisturbance and
Attornment Agreement

**Legal Description**

Block 80, Couch's Addition to the City of Portland, in the City of Portland, County of Multnomah, State of Oregon.

6 – EXHIBIT D:  SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

## EXHIBIT E

### Rules and Regulations

1.　　　　The rights of each tenant in the entrances, corridors and elevators servicing the Building are limited to ingress to and egress from such Tenant's Premises for Tenant and its employees, licensees and invitees, and no tenant shall use, or permit the use of, the entrances, corridors or elevators for any other purpose. No tenant shall invite to the tenant's Premises, or permit the visit of, persons in such numbers or under such conditions as to unreasonably interfere with the use and enjoyment of any of the plazas, entrances, corridors, elevators and other facilities of the Building by any other Tenants. No Tenant shall encumber or obstruct, or permit the encumbrance or obstruction of any of the sidewalks, plazas, entrances, corridors, elevators, fire exits or stairways of the Building. Landlord reserves the right to control and operate the public portions of the Building and the public facilities as well as facilities furnished for the common use of the Tenants, in such manner as it in its reasonable judgment deems best for the benefit of the tenants generally. Notwithstanding the foregoing, Landlord acknowledges that the reasonable use of such common areas by Tenant's students, faculty and invitees shall not be a violation of this paragraph, provided Tenant shall use commercially reasonable efforts to prevent its students from using the Building's main lobby areas, except as permitted in Section 14.5 of the Lease.

2.　　　　Admission to the Building in certain areas and during certain hours may be restricted by Landlord by means of access devices such as keys, entry cards, combination codes and the like. Landlord may require all persons admitted to or leaving the Building outside of business hours on business days to provide appropriate identification, use a designated access device and to comply with all other Building security requirements. Tenant shall be responsible for all persons to whom it issues an access device or discloses an access code and shall be liable to Landlord for all acts or omissions of such persons. Any person whose presence in the Building at any time shall, in the reasonable judgment of landlord, be prejudicial to the safety, character or reputation of the Building or of its Tenants may be denied access to the Building or may be ejected therefrom. During any invasion, riot, public excitement or other commotion, Landlord may prevent all access to the Building by closing the doors or otherwise for the safety of the tenants and protection of property in the Building. Each tenant shall pay Landlord a refundable deposit in an amount reasonably determined by Landlord from time to time for each access device issued to a Tenant.

3.　　　　Smoking is prohibited at all times in all areas of the Building, including, but not limited to, offices, rest rooms, corridors, stairwells, lobbies and elevators.

4.　　　　No Tenant shall obtain or accept for use in its Premises ice, food, beverages, cleaning or other similar services from any persons reasonably prohibited in writing from furnishing such services. Such services shall be furnished only at such

1 – EXHIBIT E: RULES AND REGULATIONS

hours, and under such reasonable regulations, as may be fixed by Landlord from time to time.

5.          The cost of repairing any damage to the public portions of the Building, the common areas or the public facilities or to any facilities used in common with other Tenants, caused by a Tenant or its employees, agents, contractors, licensees or invitees, shall be paid by such Tenant.

6.          No awnings or other projections shall be attached to the outside walls of the Building.  No curtains, blinds, shades or screens, if any, which are different from the standards adopted by Landlord for the Building shall be attached to or hung in or used in connection with any exterior window or door of the Premises of any Tenant without the prior written consent of Landlord, except for shades or screens necessary in connection with the operation of Tenant's business.  All Tenants with Premises visible from one of the lobbies, or any other public portion of the Building, shall furnish and maintain the Premises in a first-class manner, utilizing furnishings and other decorations commensurate in quality and style with the furnishings and décor in the public portions of the Building.

7.          No lettering, sign, advertisement, notice or object shall be displayed in or on the exterior window or doors, or on the outside of any Tenant's Premises, or at any point inside any Tenant's Premises where the same might be visible outside of such Premises, without the prior written consent of Landlord which consent may be withheld in Landlord's sole and unfettered discretion except as otherwise provided in the Lease.  In the event of the violation of the foregoing by any Tenant, Landlord may, after the expiration of all applicable notice and cure periods, remove the same without any liability, and may charge the expense incurred in such removal to the Tenant violating this rule.  Interior signs, elevator cab designations, and lettering on doors, if and when approved by Landlord, shall be inscribed, painted or affixed for each Tenant by Landlord at the reasonable expense of such Tenant, and shall be of a size, color and style reasonably acceptable to Landlord.

8.          The windows that reflect or admit light and air into the halls, passageways or other public places in the Building shall not be covered or obstructed by any Tenant, except in connection with Tenant's Permitted Uses which shall not include placing signs in the windows, nor shall any bottles, parcels or other articles be placed on the windowsills.  In the event Tenant blacks out any windows in connection with Tenant's Permitted Uses, Tenant shall still place standard window coverings between the window and the black out.

9.          No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, nor placed in the halls, corridors or vestibules outside of the Premises.

2 – EXHIBIT E:  RULES AND REGULATIONS

10.        No bicycles, vehicles, animals, fish or birds of any kind shall be brought into or kept in the Premises of any Tenant or the Building except in areas designated by Landlord, except for seeing eye dogs.

11.        No noise, including, but not limited to, music or the playing of musical instruments, recordings, radio or television, which, in the reasonable judgment of Landlord, might disturb other Tenants in the Building, shall be made or permitted by any Tenant.  Nothing shall be done or permitted in the Premises of any tenant which would impair or interfere with the use or enjoyment by any other Tenant of any other space in the Building.

12.        No Tenant, nor any Tenant's contractors, employees, agents, visitors or licensees, shall at any time bring into or keep upon the Premises or the Building any inflammable, combustible, explosive or otherwise dangerous fluid, chemical or substance, except any fluids or substances used in the ordinary course of Tenant's business as part of a use permitted under the Lease.

13.        Additional locks or bolts of any kind which shall not be operable by the Grand Master Key for the Building shall not be placed upon any of the doors or windows by any Tenant, nor shall any changes be made in locks or mechanisms thereof which shall make such locks inoperable by said Grand Master Key.  Additional keys for a Tenant's Premises and rest rooms shall be procured only from Landlord who may make a reasonable charge therefor.  Each Tenant shall, upon the termination of its tenancy, turn over to Landlord all keys of stores, offices and toilet rooms, either furnished to, or otherwise procured by, such Tenant, and in the event of the loss of any keys furnished by Landlord, such Tenant shall pay to Landlord the costs thereof.

14.        All removals, or the carrying in or out of any safes, freight, furniture, packages, boxes, crates or any other object or matter of any description must take place during such hours and in such elevators, and in such manner as Landlord or its agent may reasonably determine from time to time.  The persons employed to move safes and other heavy objects shall be reasonably acceptable to Landlord and, if so required by law, shall hold a Master Rigger's or comparable license.  Arrangements will be made by Landlord with any Tenant for moving large quantities of furniture and equipment into or out of the Building.  All reasonable labor and engineering costs incurred by landlord in connection with any moving specified in this rule, shall be paid by Tenant to Landlord, on demand.

15.        Landlord reserves the right to inspect all objects and matter to be brought into the Building and to exclude from the Building all objects and matter which violate any of these Rules and Regulations or the Lease of which this Exhibit is a part.  Landlord may require any person leaving the Building with any package or other object or matter to submit a pass listing such package or object or matter from the Tenant from who se Premises the package or object or matter is being removed, but the establishment and enlargement of such requirement shall not impose any

responsibility on Landlord for the protection of any tenant against the removal of property from the Premises of such Tenant. Landlord shall in no way be liable to any Tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the Premises or the Building under the provisions of this Rule or of Rule 2 hereof, except for Landlord's gross negligence or willful misconduct.

16.        No Tenant shall occupy or permit any portion of its Premises to be occupied as an office for secretarial or word processing services to third parties without the prior written consent of Landlord which consent may be withheld in the sole and unfettered discretion of Landlord. No Tenant shall use its Premises or any part thereof to be used, for manufacturing or the sale at retail or auction of merchandise, goods or property of any kind or for the possession, storage, manufacture, or sale of liquor, narcotics, dope, tobacco in any form, or as a barber, beauty or manicure shop, except in connection with the uses permitted in the Lease.

17.        Landlord shall have the right to prohibit any advertising or identifying sign by any Tenant which, in good faith, Landlord reasonably believes will impair the reputation of the Building or its desirability as a Building for others, and upon written notice from Landlord, such Tenant shall refrain from and discontinue such advertising or identifying sign.

18.        Landlord shall have the right to reasonably approve the weight and position of safes and other objects of excessive weight, and no safe or other object whose weight exceeds the lawful load for the area upon which it would stand shall be brought into or kept upon any Tenant's Premises. If, in the reasonable judgment of Landlord, it is necessary to distribute the concentrated weight of any heavy object, the work involved in such distribution shall be done at the expense of the Tenant and in such manner as Landlord shall reasonably determine.

19.        Except in connection with the uses permitted under the Lease, no machinery or mechanical equipment other than ordinary portable business machines may be installed or operated in any Tenant's Premises without Landlord's prior written consent which consent shall not be unreasonably withheld, conditioned or delayed, and in no case (even where the same are of a type so excepted or as so consented to by Landlord) shall any machines or mechanical equipment be so placed or operated as to disturb other Tenants, but machines and mechanical equipment which may be permitted to be installed and used in Tenant's Premises shall be so equipped, installed and maintained by such Tenant as to prevent any disturbing noise, vibration or electrical or other interference from being transmitted from such Premises to any other area of the Building.

20.        Landlord, its contractors, and their respective employees shall have the right to use, without charge therefor, all light, power and water in the Premises of any Tenant while cleaning or making repairs or alterations in the Premises of such Tenant.

4 – EXHIBIT E:  RULES AND REGULATIONS

21.        No Premises of any Tenant shall be used for lodging or sleeping or for any immoral or illegal purpose.

22.        The requirements of Tenants will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties, unless under special instructions from Landlord.

23.        Canvassing, soliciting and peddling in the Building are prohibited and each Tenant shall cooperate to prevent the same.

24.        No Tenant shall cause or permit any unusual or objectionable odors to emanate from its Premises which would annoy other Tenants or create a public or private nuisance. No cooking shall be done in the Premises of any Tenant except as is expressly permitted in such Tenant's Lease, except that Tenant may sue microwave ovens for non-commercial microwave cooking of food to be consumed on the premises by the Tenant's personnel.

25.        Nothing shall be done or permitted in any Tenant's Premises, and nothing shall be brought into or kept in any Tenant's Premises, which would impair or interfere with any of the Building's services or the proper and economic hearing, cleaning or other servicing of the Building or the Premises, or the use or enjoyment by any other Tenant of any other Premises, nor shall there be installed by any Tenant any ventilating, air-conditioning, electrical or other equipment of any kind which, in the reasonable judgment of Landlord, might cause any such impairment or interference.

26.        No acids, vapors or other materials shall be discharged or permitted to be discharged into the waste lines, vents or flues of the Building which may damage them. The water and wash closets and other plumbing fixtures in or serving any Tenant's Premises shall not be used for any purpose other than the purposes for which they were designed or constructed, and no sweepings, rubbish, rags, acids or other foreign substances shall be deposited therein. All damages resulting from any misuse of the fixtures shall be borne by the Tenants who, or whose servants, employees, agents, visitors or licensees shall have caused the same.

27.        All entrance doors in each Tenant's Premises shall be left locked and all windows shall be left closed by the Tenant when the Tenant's Premises are not in use. Entrance doors shall not be propped open at any time. Each Tenant, before closing and leaving its Premises at any time, shall turn out all lights.

28.        Hand trucks not equipped with rubber tires and side guards shall not be used within the Building.

: ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS.109906.1

EXHIBIT 1
Page 81 of 158

29.        The coverings for all windows in each Tenant's Premises above the ground floor shall be lowered and closed as reasonably required because of the position of the sun, during the operation of the Building air-conditioning system to cool or ventilate the Tenant's Premises.

30.        Landlord reserves the right to rescind, alter or waive any rule or regulation at any time prescribed for the Building when, in its reasonable judgment, it deems it necessary, desirable or proper for its best interest and for the best interests of the Tenants generally, and no alteration or waiver of any rule or regulation in favor of one Tenant shall operate as an alteration or waiver in favor of any other Tenant. Landlord shall not be responsible to any Tenant for the nonobservance or violation by any other Tenant of any of the rules and regulations at any time prescribed for the Building.    In the event of any conflict between the terms of these Rules and Regulations and the terms of the Lease, the terms of the Lease shall control.

6 – EXHIBIT E:  RULES AND REGULATIONS

## EXHIBIT F

Guaranty

DATED:        October __, 2000

FROM:         Education Management Corporation,
              a Pennsylvania corporation                    ("Guarantor(s)")


IN FAVOR OF:  The Brewery Blocks I, LLC,
              an Oregon limited liability company           ("Landlord")


REGARDING:    The Art Institute of Portland, Inc.
              an Oregon corporation                         ("Tenant")


As an inducement to Landlord to enter into that certain Lease Agreement dated the same day as this Guaranty (the "Lease") with the above named Tenant, and as a material part of the consideration for that Lease, each of the undersigned for good and valuable consideration, hereby agrees as follows:

### 11. GUARANTY

Guarantor, jointly and severally, unconditionally and irrevocably guarantees to Landlord the full and prompt payment when due or whenever payment may become due under the terms of the Lease, of all payments of Base Rent, Additional Rent, and all other charges, expenses and costs of every kind or nature, which are or may be due now or in the future under the terms of the Lease, any agreements or documents related to the Lease, or any other transaction between landlord and Tenant directly or indirectly related to the Lease; and the complete and timely performance, satisfaction and observance of the terms and conditions of the Lease, rules and regulations and related obligations arising by reason of the Lease, and required to be performed, satisfied or observed by Tenant. If there is more than one guarantor named above, all references to the guarantor shall be deemed to refer to the all of the guarantors collectively or to each guarantor individually as the context may require.

### 12. COVERAGE OF GUARANTY

This Guaranty extends to any and all liability which Tenant has or may have to Landlord by reason of the Lease, including any obligations of Tenant which survive the expiration or termination of the Lease. This guaranty extends to failure of payment or performance by any successor of Tenant or by any assignee or sublessee of Tenant, and

1 – EXHIBIT F: GUARANTY

EXHIBIT 1
Page 83 of 158

to any extensions or renewals of the Lease and to any term established by reason of the holdover of Tenant, an assignee or sublessee. This Guaranty shall not be in any way affected by any indulgences granted by Landlord to Tenant or any modifications or amendments to the Lease granted by Landlord. Receipt by Landlord of rent with knowledge of the breach of any provision of the Lease shall not be deemed a waiver of such breach nor have any affect on this Guaranty.

### 13. PERFORMANCE GUARANTY

In the event that Tenant fails to perform, satisfy or observe the terms and conditions of the Lease, rules and regulations, and related Lease obligations required to be performed, satisfied or observed by Tenant, the Guarantor will promptly and fully perform, satisfy and observe the obligation or obligations in the place of Tenant. Guarantor shall pay, reimburse and indemnify landlord for any and all damages, costs, expenses, losses and other liabilities arising or resulting from the failure of Tenant to perform, satisfy or observe any of the terms and conditions of the Lease, rules and regulations and related obligations.

### 14. CONTINUING GUARANTY

This Guaranty shall be continuing. Without notice to or further assent from the Guarantor, Landlord may waive or modify any of the terms or conditions of the Lease, any rules and regulations or related Tenant obligations; or compromise, settle or extend the time of payment of any amount due from Tenant or the time of performance of any obligation of Tenant. These actions may be taken by Landlord without discharging or otherwise affecting the obligations of Guarantor. Landlord need not provide Guarantor with any notice of default or demand for payment. Guarantor hereby waives diligence, presentment, demand, all notices (including notice of dishonor, presentment, acceptance and default), and the benefit of any statute of limitations.

### 15. LEASE SECURITY

This Guaranty shall remain in full force and effect, and the Guarantor shall be fully responsible, without regard to any security deposit or other collateral, for the performance of the terms and conditions of the Lease, or the receipt, disposition, application, or release of any security deposit or other collateral, now or hereafter held by or for Landlord.

### 16. UNCONDITIONAL OBLIGATIONS

This Guaranty shall not be affected by: (a) the validity or enforceability of any obligation of Tenant or any Guarantor; (b) any amendment, renewal, waiver, compromise, or new agreement, including but not limited to, the grant of a security interest to Landlord by Tenant, or interruption in relations between and/or among Tenant, any Guarantor, and Landlord; (c) relief granted pursuant to any statute now or

hereafter in force; or (d) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of a Guarantor. The liability of Guarantor is direct, immediate, absolute, continuing, unconditional, primary and unlimited. Landlord shall not be required to pursue any remedies it may have against Tenant, against any other person or entity who is liable (primarily or otherwise) for performance of the Lease, or against any security deposit or other collateral as a condition to enforcement of this Guaranty. Nor shall Guarantor be discharged or released by reason of the discharge or release of Tenant, such other person or entity, or any collateral, for any reason, including a discharge in Bankruptcy, receivership or other proceedings, a disaffirmation or rejection of the Lease by a trustee, custodian, or other representative in Bankruptcy, a stay or other enforcement restriction, or any other reduction, modification, impairment or limitations of the liability of Tenant or any remedy of Landlord.

### 17. BINDING EFFECT

This Guaranty is binding upon the Guarantor, its heirs, legal representatives, successors and assigns, and is binding upon and shall inure to the benefit of Landlord, its successors and assigns. No assignment or delegation by the Guarantor shall release the Guarantor of its obligations under this Guaranty. Landlord may assign this Guaranty in connection with an assignment of Landlord's interest in the Lease, in which event the assignee of Landlord shall have the right to enforce this Guaranty as if originally named as Landlord herein.

### 18. MODIFICATIONS

This Guaranty may not be modified orally, but only by a writing signed by both the Guarantor and Landlord. Modifications include any waiver, change, discharge, modification, or termination.

### 19. ATTORNEY FEES

In the event of litigation to enforce or interpret this Guaranty, the prevailing party shall be entitled to recover, in additional to all other costs, damages, and awards, its reasonable costs and attorney fees, both at and in preparation for trial and any appeal or review (including in connection with any petition for review), such amounts to be set for the court(s) before which the matter is heard.

### 20. REMEDIES CUMULATIVE

No remedy granted herein to Landlord is intended to be exclusive of any other available remedy or remedies, but each and every remedy granted under this Guaranty shall be cumulative and shall be in addition to every other remedy given under this Guaranty, now or hereafter existing at law or in equity.

### 21. INTERPRETATION

3 – EXHIBIT F:  GUARANTY

This Guaranty shall be interpreted under and enforced in accordance with the laws of the State of Oregon.

### 22. INSOLVENCY OF TENANT

If, as and when Tenant becomes insolvent (defined below), Guarantor shall be deemed to have absolutely waived and released any claim or other right which Guarantor may now or hereafter acquire against Tenant that arises from the existence, payment, performance or enforcement of the obligations of Guarantor under this Guaranty, including (without limitation) any right of subrogation, reimbursement, setoff, exoneration, contribution or indemnification, regardless of whether such claim arises in equity or under contract, statute or common law (such rights and claims are hereinafter collectively referred to as "Claims"). Such waiver and release of Claims shall be effective as of the date that Tenant becomes insolvent and shall remain in force and effect throughout the period of Tenant's insolvency. As used herein, the term "insolvent" shall have the meaning ascribed to it in the Federal Bankruptcy Code, as amended from time to time (as amended, the "Code), and shall include any presumption of insolvency mandated by the Code that is not overcome.

IN WITNESS WHEREOF, the Guarantor has duly signed this Guaranty for Lease Agreement effective on the date and year stated above.

Dated:_____        Education Management Corporation,
                               a Pennsylvania corporation


                               By: _____

                               Print Name:_____

                               Title: _____

4 – EXHIBIT F:  GUARANTY

EXHIBIT B
Floor Plan of Building



2   **Block 4 2nd floor**

N.T.S.

2 – Exhibit B: Floor Plan of Building

**THE BREWERY BLOCKS**

GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS · NOVEMBER 2000



EXHIBIT I
Page 87 of 158

EXHIBIT B
Floor Plan of Building



THIRD FLOOR PLAN
1/32" = 1'-0"

3 - Exhibit B: Floor Plan of Building

THE BREWERY BLOCKS
GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS  OCTOBER 2000



EXHIBIT I
Page 88 of 158

EXHIBIT B-1

BLITZ BLOCK 4 - NEW OFFICE BUILDING
PLAT BOOK
Revised: 8/27/01

Printed: 10/1/01

## PRORATION SUMMARY BY FLOOR

| Floor | Notes | C Floor Usable S.F. | D Floor Common | E = F/C Floor Proration | F = C + D Floor Rentable S.F. | G Building Common | H = F * % Building Proration | I = F + H Rentable S.F. |
|---|---|---|---|---|---|---|---|---|
| LL3 | | 408 | 0 | | 408 | 2,211 | 29 | 437 |
| LL2 | | 692 | 0 | | 692 | 1,615 | 49 | 741 |
| LL1 | | 487 | 0 | | 487 | 4,842 | 34 | 521 |
| Ground Floor | | 27,255 | 0 | 1.000 | 27,255 | 7,192 | 1,928 | 29,183 |
| Second Floor | | 31,727 | 3,139 | 1.099 | 34,866 | 0 | 2,466 | 37,332 |
| Third Floor | | 34,791 | 1,477 | 1.042 | 36,268 | 0 | 2,565 | 38,833 |
| Fourth Floor | | 20,208 | 2,182 | 1.108 | 22,390 | 0 | 1,583 | 23,973 |
| Fifth Floor | | 20,170 | 2,159 | 1.107 | 22,329 | 0 | 1,579 | 23,908 |
| Sixth Floor | | 20,170 | 2,159 | 1.107 | 22,329 | 0 | 1,579 | 23,908 |
| Seventh Floor | | 20,170 | 2,159 | 1.107 | 22,329 | 0 | 1,579 | 23,908 |
| Eighth Floor | | 20,223 | 2,135 | 1.106 | 22,358 | 0 | 1,581 | 23,939 |
| Ninth Floor | | 20,112 | 2,135 | 1.106 | 22,247 | 0 | 1,573 | 23,820 |
| Tenth Floor | | 20,109 | 2,135 | 1.106 | 22,244 | 0 | 1,573 | 23,817 |
| Rooftop Mech. | | 0 | 0 | | 0 | 2,259 | 0 | 0 |
| Total | | | | | | | | |

Building Proration Factor = Total Floor Rentable plus Building Common Area/Total Floor Rentable:    1.0707

EXHIBIT 1
Page 89 of 158

BLITZ BLOCK 4 - NEW OFFICE BUILDING
PLAT BOOK
Revised: 8/27/01

EXHIBIT B-2

Printed: 10/11/01

## Ground Floor

| Room No. | Description | Tenant Usable | Floor Common Area | Building Common Area | Total Rentable | Non-Rentable |
|---|---|---|---|---|---|---|
| 101 | Lobby | | | 2,508 | 2,508 | |
| 102 | Retail | 1,866 | | | 1,866 | |
| 103 | Retail | 535 | | | 535 | |
| 104 | Retail | 3,912 | | | 3,912 | |
| 105 | Vestibule | | | 318 | 318 | |
| 106 | Parking Ramp | | | | - | 2,783 |
| 107 | Passage | | | 252 | 252 | |
| 108 | Building Engineer | | | 159 | 159 | |
| 109 | Fire Command Center | | | 138 | 138 | |
| 110 | Vestibule | | | 387 | 387 | |
| 111 | Retail | 1,996 | | | 1,996 | |
| 112 | Loading/Service | | | 2660 | 2,660 | |
| 113 | Storage | | | 62 | 62 | |
| 114 | Retail (All) | 7,627 | | | 7,627 | |
| 115 | Vestibule | | | 69 | 69 | |
| 116 | Corridor | | | 243 | 243 | |
| 117 | Retail | 9,330 | | | 9,330 | |
| 118 | Retail | 1,249 | | | 1,249 | |
| 119 | Vestibule | | | 229 | 229 | |
| 120 | Storage (for Retail 117) | 740 | | | 740 | |
| 121 | Pump Room | | | 121 | 121 | |
| 122 | Electrical Room | | | 46 | 46 | |
| S4.1 | Stair (Shaft) | | | | - | 198 |
| S4.2 | Stair (Shaft) | | | | - | 265 |
| S4.3 | Stair & Exit (Circulation) | | | | - | 175 |
| S4.4 | Stair (Circulation) | | | | - | 71 |
| E1 | Elevator | | | | - | 103 |
| E2 | Elevator | | | | - | 124 |
| E3 | Elevator | | | | - | 103 |
| E4 | Elevator | | | | - | 124 |
| E5 | Elevator (service) | | | | - | 108 |
| E6 | Elevator (parking) | | | | - | 86 |
| E7 | Elevator (parking) | | | | - | 86 |
| | Vertical Shafts | | | | - | 248 |
| | Outdoor Covered Entry (Not In Gross) | | | | - | 1,094 |

EXHIBIT 1
Page 90 of 158

EXHIBIT B-2

BLITZ BLOCK 4 - NEW OFFICE BUILDING
PLAT BOOK
Revised: 8/27/01



EXHIBIT 1
Page 91 of 158

## ATTACHMENT 1

WHEN RECORDED MAIL TO:

Gilbert E. Parker
851 SW Sixth Avenue, Suite 1500
Portland, Oregon 97204

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## AMENDMENT TO
## MEMORANDUM OF LEASE

This is an Amendment to the Memorandum of Lease made in reference to that certain Lease Agreement dated October 30, 2000, by and between BREWERY BLOCKS INVESTORS, LLC, an Oregon limited liability company ("Landlord") whose address is 4650 SW Macadam, Suite 220, Portland, Oregon, successor in interest to THE BREWERY BLOCKS I, LLC, and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation ("Tenant") whose address is 2000 SW Fifth Avenue, Portland, Oregon.

The parties hereby agree that Paragraph 7 of the Memorandum of Lease is modified as follows:

> 7. Landlord shall provide Tenant with an on-going and continuous right of first offer ("Right of First Offer") to lease the balance of the remaining space (less any retail space) on the second (2nd) floor ("Adjacent Space").

IN WITNESS WHEREOF the parties have executed this Amendment to Memorandum of Lease as of the dates set forth in their respective acknowledgments.

**LANDLORD:**
BREWERY BLOCKS INVESTORS, LLC,
an Oregon limited liability company

By: _____
Name: _____
Title: _____

**TENANT:**
THE ART INSTITUTE OF PORTLAND,
INC., an Oregon corporation

By: _Steven Goldman_
Name: _STEVEN GOLDMAN_
Title: _President_

1 – ATTACHMENT 1

[Acknowledgment of Landlord]

STATE OF                         )
                                 ) ss
COUNTY OF                        )

    On _____, 2001, before me, _____, a Notary Public in and for said County and State, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                        WITNESS my hand and official seal.

                        Signature: _____

[SEAL]

[Acknowledgment of Tenant]

STATE OF Oregon                  )
                                 ) ss
COUNTY OF Multnomah              )

    On October 29, 2001, before me, Belia Marquez, a Notary Public in and for said County and State, personally appeared Steve Goldman, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                        WITNESS my hand and official seal.

                        Signature: Belia Marquez

[SEAL]

OFFICIAL SEAL
BELIA MARQUEZ
NOTARY PUBLIC-OREGON
COMMISSION NO. 348828
MY COMMISSION EXPIRES SEPTEMBER 18, 2005

2 – ATTACHMENT 1

# EXHIBIT A

## Legal Description For Land

Block 80, Couch's Addition to the City of Portland, in the City of Portland, County of Multnomah, State of Oregon.

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS:157307.1

EXHIBIT 1
Page 94 of 158

## EXHIBIT G

Memorandum of Lease

**WHEN RECORDED MAIL TO:**

Gilbert E. Parker
851 SW Sixth Avenue, Suite 1500
Portland, Oregon  97204

_____SPACE ABOVE THIS LINE FOR RECORDER'S USE_____

## MEMORANDUM OF LEASE

This is a Memorandum of Lease made in reference to that certain Lease Agreement dated _____, by and between THE BREWERY BLOCKS I, LLC, LLC, an Oregon limited liability company ("Landlord") whose address is 4650 SW Macadam, Suite 200, Portland, Oregon, and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation ("Tenant") whose address is 2000 SW Fifth Avenue, Portland, Oregon upon the following terms:

1. <u>Date of Lease</u>:  October __, 2000

2. <u>Description of Premises</u>:  A portion of the property, more particularly described on **Exhibit A**, attached hereto

3. <u>Date of Commencement</u>:  The later of: (i) September 1, 2002, (ii) (a) if Tenant elects to have Landlord perform the Tenant Improvements, as provided in **Exhibit C**, the date Landlord delivers possession of the Premises to Tenant with all Tenant Improvement work to be performed by Landlord in the Premises (as agreed by Landlord in **Exhibit C** attached to this Lease) substantially completed with a permanent or temporary Certificate of Occupancy issued and Tenant has received written notice of the same and a copy of such Certificate of Occupancy, or (b) if Tenant elects to perform the Tenant Improvements, the date ninety (90) days after Landlord provides Tenant with complete and exclusive access to the Premises to perform the Tenant Improvements, (iii) such later date as provided in Section 29 of the Lease Agreement, (iv) the date the Premises is delivered to Tenant vacant and free and clear of all leases (other than this Lease), and all possessory rights of any tenant(s) or any other party, or (v) the date Tenant receives a non-disturbance agreement from any Superior Lessor or Mortgagee who is not subordinate to Tenant's Lease.

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS.189006.1

EXHIBIT 1
Page 95 of 158

4. Term: Approximately Fifteen (15) years, expiring on July 31, 2017

5. Renewal Option(s): Three (3) Five (5) year

6. Purchase Option(s): None

7. Right of First Offer: Landlord shall provide Tenant with an on-going and continuous right of first offer to lease up to an additional approximately fifteen thousand (15,000) rentable square feet adjacent to the Premises ("Right of First Offer") which shall include the balance of the second (2nd) floor (excluding the retail tenant), as mutually determined by Landlord and Tenant (the "Adjacent Space").

8. Expansion Offer: Landlord shall provide Tenant with a continuous and on-going right of first opportunity (the "Expansion Right") to lease any space in the Building after the initial lease up of the Building (the "Expansion Space") whenever the Expansion Space may be available for lease during the Lease Term.

9. Exclusive Use: During the Lease Term, provided Tenant is not in material default after the expiration of all applicable notice and cure periods and is occupying the Premises for use as a post-secondary school, Landlord shall not lease space in the Building for use as a post-secondary school as defined in Paragraph 7 of the Basic Lease Information (as defined in the Lease).

The purpose of this Memorandum of Lease is to give record notice of the lease and of the rights created thereby, all of which are hereby confirmed.

IN WITNESS WHEREOF the parties have executed this Memorandum of Lease as of the dates set forth in their respective acknowledgments.

**LANDLORD:**
THE BREWERY BLOCKS, LLC,
an Oregon limited liability company

By:_____

Name:_____

Title:_____

**TENANT:**
THE ART INSTITUTE OF PORTLAND, INC.,
an Oregon corporation

By:_____

Name:_____

Title:_____

6 – EXHIBIT G:  MEMORANDUM OF LEASE

[Acknowledgment of Landlord]

STATE OF                    )
                           ) ss
COUNTY OF                   )

On _____, 2000, before me, _____, a Notary Public in and for said County and State, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature:_____

[SEAL]


[Acknowledgment of Tenant]

STATE OF                    )
                           ) ss
COUNTY OF                   )

On _____, 2000, before me, _____, a Notary Public in and for said County and State, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature:_____

[SEAL]

7 – EXHIBIT G:  MEMORANDUM OF LEASE

## EXHIBIT A
### To
### Memorandum of Lease
### Legal Description For Land

Block 80, Couch's Addition to the City of Portland, in the City of Portland, County of Multnomah, State of Oregon.

## EXHIBIT H

### Prohibited Uses of the Building

The following uses and occupancies constitute "Prohibited Uses":

1.    Any business or use that emits offensive odors, fumes, dust or vapors;

2.    Any business or use that emits loud noises or sounds that are reasonably objectionable;

3.    Adult book or adult videotape store;

4.    Off-track betting parlor;

5.    Recycling facility or stockyard;

6.    Check cashing business; or

7.    Pawn shop.

Tenant acknowledges that Landlord has the right in its sole and absolute discretion, to permit any uses in the Building except as set forth above.

## GUARANTY

| | | |
|---|---|---|
| DATED: | October 20, 2000 | |
| FROM: | Education Management Corporation,<br>a Pennsylvania corporation | ("Guarantor(s)") |
| IN FAVOR OF: | The Brewery Blocks I, LLC,<br>an Oregon limited liability company | ("Landlord") |
| REGARDING: | The Art Institute of Portland, Inc.,<br>an Oregon corporation | ("Tenant") |

As an inducement to Landlord to enter into that certain Lease Agreement dated the same day as this Guaranty (the "Lease") with the above named Tenant, and as a material part of the consideration for that Lease, each of the undersigned for good and valuable consideration, hereby agrees as follows:

## 1. GUARANTY

Guarantor, jointly and severally, unconditionally and irrevocably guarantees to Landlord the full and prompt payment when due or whenever payment may become due under the terms of the Lease, of all payments of Base Rent, Additional Rent, and all other charges, expenses and costs of every kind or nature, which are or may be due now or in the future under the terms of the Lease, any agreements or documents related to the Lease, or any other transaction between landlord and Tenant directly or indirectly related to the Lease; and the complete and timely performance, satisfaction and observance of the terms and conditions of the Lease, rules and regulations and related obligations arising by reason of the Lease, and required to be performed, satisfied or observed by Tenant. If there is more than one guarantor named above, all references to the guarantor shall be deemed to refer to the all of the guarantors collectively or to each guarantor individually as the context may require.

## 2. COVERAGE OF GUARANTY

This Guaranty extends to any and all liability which Tenant has or may have to Landlord by reason of the Lease, including any obligations of Tenant which survive the expiration or termination of the Lease. This guaranty extends to failure of payment or performance by any successor of Tenant or by any assignee or sublessee of Tenant, and to any extensions or renewals of the Lease and to any term established by reason of the holdover of Tenant, an assignee or sublessee. This Guaranty shall not be in any way affected by any indulgences granted by Landlord to Tenant or any modifications or amendments to the Lease granted by Landlord. Receipt by Landlord of rent with knowledge of the breach of any

1 – GUARANTY

provision of the Lease shall not be deemed a waiver of such breach nor have any affect on this Guaranty.

## 3. PERFORMANCE GUARANTY

In the event that Tenant fails to perform, satisfy or observe the terms and conditions of the Lease, rules and regulations, and related Lease obligations required to be performed, satisfied or observed by Tenant, the Guarantor will promptly and fully perform, satisfy and observe the obligation or obligations in the place of Tenant. Guarantor shall pay, reimburse and indemnify landlord for any and all damages, costs, expenses, losses and other liabilities arising or resulting from the failure of Tenant to perform, satisfy or observe any of the terms and conditions of the Lease, rules and regulations and related obligations.

## 4. CONTINUING GUARANTY

This Guaranty shall be continuing. Without notice to or further assent from the Guarantor, Landlord may waive or modify any of the terms or conditions of the Lease, any rules and regulations or related Tenant obligations; or compromise, settle or extend the time of payment of any amount due from Tenant or the time of performance of any obligation of Tenant. These actions may be taken by Landlord without discharging or otherwise affecting the obligations of Guarantor. Landlord need not provide Guarantor with any notice of default or demand for payment. Guarantor hereby waives diligence, presentment, demand, all notices (including notice of dishonor, presentment, acceptance and default), and the benefit of any statute of limitations.

## 5. LEASE SECURITY

This Guaranty shall remain in full force and effect, and the Guarantor shall be fully responsible, without regard to any security deposit or other collateral, for the performance of the terms and conditions of the Lease, or the receipt, disposition, application, or release of any security deposit or other collateral, now or hereafter held by or for Landlord.

## 6. UNCONDITIONAL OBLIGATIONS

This Guaranty shall not be affected by: (a) the validity or enforceability of any obligation of Tenant or any Guarantor; (b) any amendment, renewal, waiver, compromise, or new agreement, including but not limited to, the grant of a security interest to Landlord by Tenant, or interruption in relations between and/or among Tenant, any Guarantor, and Landlord; (c) relief granted pursuant to any statute now or hereafter in force; or (d) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of a Guarantor. The liability of Guarantor is direct, immediate, absolute, continuing, unconditional, primary and unlimited. Landlord shall not be required to pursue any remedies it may have against Tenant, against any other person or entity who is liable (primarily or otherwise) for performance of the Lease, or against any security deposit or other collateral as a condition to enforcement of this Guaranty. Nor shall Guarantor be discharged or released by

reason of the discharge or release of Tenant, such other person or entity, or any collateral, for any reason, including a discharge in Bankruptcy, receivership or other proceedings, a disaffirmation or rejection of the Lease by a trustee, custodian, or other representative in Bankruptcy, a stay or other enforcement restriction, or any other reduction, modification, impairment or limitations of the liability of Tenant or any remedy of Landlord.

## 7. BINDING EFFECT

This Guaranty is binding upon the Guarantor, its heirs, legal representatives, successors and assigns, and is binding upon and shall inure to the benefit of Landlord, its successors and assigns. No assignment or delegation by the Guarantor shall release the Guarantor of its obligations under this Guaranty. Landlord may assign this Guaranty in connection with an assignment of Landlord's interest in the Lease, in which event the assignee of Landlord shall have the right to enforce this Guaranty as if originally named as Landlord herein.

## 8. MODIFICATIONS

This Guaranty may not be modified orally, but only by a writing signed by both the Guarantor and Landlord. Modifications include any waiver, change, discharge, modification, or termination.

## 9. ATTORNEY FEES

In the event of litigation to enforce or interpret this Guaranty, the prevailing party shall be entitled to recover, in additional to all other costs, damages, and awards, its reasonable costs and attorney fees, both at and in preparation for trial and any appeal or review (including in connection with any petition for review), such amounts to be set for the court(s) before which the matter is heard.

## 10. REMEDIES CUMULATIVE

No remedy granted herein to Landlord is intended to be exclusive of any other available remedy or remedies, but each and every remedy granted under this Guaranty shall be cumulative and shall be in addition to every other remedy given under this Guaranty, now or hereafter existing at law or in equity.

## 11. INTERPRETATION

This Guaranty shall be interpreted under and enforced in accordance with the laws of the State of Oregon.

## 12. INSOLVENCY OF TENANT

If, as and when Tenant becomes insolvent (defined below), Guarantor shall be deemed to have absolutely waived and released any claim or other right which Guarantor may now or hereafter acquire against Tenant that arises from the existence, payment, performance or

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS.107828.1

EXHIBIT 1
Page 102 of 158

enforcement of the obligations of Guarantor under this Guaranty, including (without limitation) any right of subrogation, reimbursement, setoff, exoneration, contribution or indemnification, regardless of whether such claim arises in equity or under contract, statute or common law (such rights and claims are hereinafter collectively referred to as "Claims"). Such waiver and release of Claims shall be effective as of the date that Tenant becomes insolvent and shall remain in force and effect throughout the period of Tenant's insolvency. As used herein, the term "insolvent" shall have the meaning ascribed to it in the Federal Bankruptcy Code, as amended from time to time (as amended, the "Code), and shall include any presumption of insolvency mandated by the Code that is not overcome.

IN WITNESS WHEREOF, the Guarantor has duly signed this Guaranty for Lease Agreement effective on the date and year stated above.

Dated: 10/26/2000

Education Management Corporation,
a Pennsylvania corporation

By: _____

Print Name: Mark C Hodges

Title: VP Facilities + Project Development

4 – GUARANTY

## MEMORANDUM OF LEASE

WHEN RECORDED MAIL TO:

Gilbert E. Parker
851 SW Sixth Avenue, Suite 1500
Portland, Oregon 97204

SPACE ABOVE THIS LINE FOR RECORDER'S USE

### MEMORANDUM OF LEASE

This is a Memorandum of Lease made in reference to that certain Lease Agreement dated
_____, by and between THE BREWERY BLOCKS I, LLC, LLC, an Oregon
limited liability company ("Landlord") whose address is 4650 SW Macadam, Suite 200,
Portland, Oregon, and THE ART INSTITUTE OF PORTLAND, INC., an Oregon
corporation ("Tenant") whose address is 2000 SW Fifth Avenue, Portland, Oregon upon the
following terms:

1. Date of Lease: October 30, 2000
2. Description of Premises: A portion of the property, more particularly described on Exhibit A, attached hereto
3. Date of Commencement: The later of: (i) September 1, 2002, (ii) (a) if Tenant elects to have Landlord perform the Tenant Improvements, as provided in Exhibit C, the date Landlord delivers possession of the Premises to Tenant with all Tenant Improvement work to be performed by Landlord in the Premises (as agreed by Landlord in Exhibit C attached to this Lease) substantially completed with a permanent or temporary Certificate of Occupancy issued and Tenant has received written notice of the same and a copy of such Certificate of Occupancy, or (b) if Tenant elects to perform the Tenant Improvements, the date ninety (90) days after Landlord provides Tenant with complete and exclusive access to the Premises to perform the Tenant Improvements, (iii) such later date as provided in Section 29 of the Lease Agreement, (iv) the date the Premises is delivered to Tenant vacant and free and clear of all leases (other than this Lease), and all possessory rights of any tenant(s) or any other party, or (v) the date Tenant receives a non-disturbance agreement from any Superior Lessor or Mortgagee who is not subordinate to Tenant's Lease.
4. Term: Approximately Fifteen (15) years, expiring on July 31, 2017
5. Renewal Option(s): Three (3) Five (5) year
6. Purchase Option(s): None

1 – MEMORANDUM OF LEASE

7.  <u>Right of First Offer</u>:  Landlord shall provide Tenant with an on-going and continuous right of first offer to lease up to an additional approximately fifteen thousand (15,000) rentable square feet adjacent to the Premises ("Right of First Offer") which shall include the balance of the second (2nd) floor (excluding the retail tenant), as mutually determined by Landlord and Tenant (the "Adjacent Space").

8.  <u>Expansion Offer</u>:  Landlord shall provide Tenant with a continuous and on-going right of first opportunity (the "Expansion Right") to lease any space in the Building after the initial lease up of the Building (the "Expansion Space") whenever the Expansion Space may be available for lease during the Lease Term.

9.  <u>Exclusive Use</u>:  During the Lease Term, provided Tenant is not in material default after the expiration of all applicable notice and cure periods and is occupying the Premises for use as a post-secondary school, Landlord shall not lease space in the Building for use as a post-secondary school as defined in Paragraph 7 of the Basic Lease Information (as defined in the Lease).

The purpose of this Memorandum of Lease is to give record notice of the lease and of the rights created thereby, all of which are hereby confirmed.

IN WITNESS WHEREOF the parties have executed this Memorandum of Lease as of the dates set forth in their respective acknowledgments.

LANDLORD:
THE BREWERY BLOCKS, LLC,
an Oregon limited liability company

By: _____
Name: Mark C. Edlen
Title: Mgr.

TENANT:
THE ART INSTITUTE OF PORTLAND, INC.,
an Oregon corporation

By: _____
Name: STEVEN GOLDMAN
Title: President

2 – MEMORANDUM OF LEASE

[Acknowledgment of Landlord]

STATE OF Oregon        )
                       ) ss
COUNTY OF Multnomah    )

On October 30, 2000, before me, Kellie D. Lopez, a Notary Public in and for said County and State, personally appeared Mark C Fallen, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

OFFICIAL SEAL
**KELLIE D. LOPEZ**
NOTARY PUBLIC-OREGON
COMMISSION NO. 062678
MY COMMISSION EXPIRES MARCH 12, 2001
[SEAL]

WITNESS my hand and official seal.

Signature: Kellie D. Lopez

[Acknowledgment of Tenant]

STATE OF            )
                    ) ss
COUNTY OF           )

On 10/23, 2000, before me, Belia Marquez, a Notary Public in and for said County and State, personally appeared Steven Goldman, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature: Belia Marquez

[SEAL]


OFFICIAL SEAL
**BELIA MARQUEZ**
NOTARY PUBLIC-OREGON
COMMISSION NO. 304374
MY COMMISSION EXPIRES SEPT. 18, 2001

3 – MEMORANDUM OF LEASE

## EXHIBIT A

### Legal Description For Land

Block 80, Couch's Addition to the City of Portland, in the City of Portland, County of Multnomah, State of Oregon.

ODMA\GRPWISE\DUNN-CAR POST1 CLIENTS 108186.1
EXHIBIT 1
Page 107 of 158

PREM

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (the "Amendment") is made and entered into as of the _29th_ day of October, 2001, by and between BREWERY BLOCKS INVESTORS, LLC, an Oregon limited liability company (hereinafter referred to as "Landlord") and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation (hereinafter referred to as "Tenant").

## WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Lease on October 30, 2000 (referred to as the "Lease") for certain premises in the Building located in Block 4 of the Brewery Blocks (hereinafter the "Premises"), and;

WHEREAS, Tenant desires to lease additional space and Landlord desires to lease such space to Tenant on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the Premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree to amend the Lease as follows:

1.  Paragraph 5 of the Basic Lease Information is hereby deleted and replaced with the following:

    retail

    **Premises:** The floor area of the Building consisting of approximately (i) 8,095 rentable square feet ("RSF") (7,627 usable square feet) on the ground floor ("Retail Space"), (ii) 25,481 RSF (21,785 usable square feet) on the second floor, and (iii) 38,833 RSF (36,268 usable square feet) on the third floor (collectively the second and third floor space is referred to herein as "Office/School Space"), for a total of 72,409 RSF as outlined on the floor plan of the Building attached hereto as **Exhibit B** (Section 1.2). The ground floor retail conversion factor is 6.14%, the multi-tenant conversion factor for the second floor is 16.97% and the single tenant conversion factor for the third floor is 7.07%. In calculating the conversion from Tenant's usable square footage to RSF, the following shall not be included: (i) Lower Level 2, Room 4.205 in the amount of 362 usable square feet; (ii) Lower Level 2, Room 4.212 in the amount of 144 usable square feet; and (iii) Lower Level 1, Room 4.105 in the amount of 103 usable square feet:

2.  The first sentence of Section 1.7 of the Lease is hereby deleted and replaced with the following:

Landlord shall provide Tenant with an on-going and continuous right of first offer ("Right of First Offer") to lease the balance of the remaining space (less any retail space) on the second (2nd) floor ("Adjacent Space").

3.    **Exhibit B** to the Lease is hereby deleted and replaced with **Exhibit B**, attached hereto.

4.    **Exhibit B-1** and **Exhibit B-2**, attached hereto, are hereby inserted in the Lease. **Exhibit B-1** summarizes the usable area and common area of the Building as currently contemplated.    **Exhibit B-2** summarizes the ground floor areas including the Building Common Area as currently contemplated. As it pertains to Tenant's ground floor retail space, the Building "lobby" room #101 shall not be included as Building Common Area in the calculation of Tenant's conversion from usable square feet to RSF. The parties agree that upon completion of construction, the final configuration of the Building and Common Area may change and the initial RSF and usable square footage of the Building and Common Area shall be determined by Landlord in accordance with Section 1.4 of the Lease.

5.    The parties agree to execute an amended Memorandum of Lease in the form attached hereto as **Attachment 1** to revise the Right of First Offer and such amended Memorandum shall be promptly recorded in the records of the County of Multnomah, Oregon.

6.    This Amendment may be executed in counterparts and shall be effective when all parties have signed a copy of this Amendment. A copy of this Amendment bearing an original signature shall constitute a counterpart, and all such counterparts shall, taken together, constitute one and the same agreement. It is the parties' desire to immediately confirm and communicate their respective signatures on this Amendment. It is agreed that a facsimile copy of a signed signature page of a counterpart agreement shall evidence and constitute valid execution of this Amendment and shall be binding on a party to the same extent as the original signature counterpart copy.

7.    All other terms and conditions as set forth in the Lease shall remain the same.

:ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS:157307.1

EXHIBIT 1
Page 109 of 158

IN WITNESS WHEREOF, the parties have executed this First Amendment to Lease as of the date first above written.

**LANDLORD**

**TENANT**

BREWERY BLOCKS INVESTORS, LLC,
an Oregon limited liability company

THE ART INSTITUTE OF PORTLAND, INC.
an Oregon corporation

By: _____

By: _____

Title _____

Title _____

Date: _____

Date: _____

3 – First Amendment to Lease

**APPROVED BY LENDER:**

BANK OF AMERICA, N.A., a national
banking association, as Administrative
Agent

By: _Ann Young_

Title: _Vice President_

Date: _11-6-01_

## ACKNOWLEDGEMENT OF GUARANTOR

The undersigned, Education Management Corporation, a Pennsylvania corporation
("**Guarantor**") executed and delivered to Owner a document entitled "Guaranty" dated October
30, 2000 (the "**Guaranty**"). Guarantor certifies, acknowledges and agrees that (1) Guarantor has
reviewed and approved of this First Amendment to Lease, (2) all references in the Guaranty to
the Lease shall refer to and mean the Lease as modified by this First Amendment, and (3) the
Guaranty is ratified and affirmed.

**GUARANTOR:**

EDUCATION MANAGEMENT CORPORATION
A Pennsylvania corporation

By: _____

Title: _VP Facilities & Project Dev't_

Date: _Oct 31 2001_

4 – First Amendment to Lease

EXHIBIT 1
Page 111 of 158

05/14/2003 12:23 FAX 503 224 7324      DUNN CARNEY                        ☑008/015

## EXHIBIT B
### Floor Plan of Building



1    **Block 4 1st floor**

N.T.S.

1- Exhibit B: Floor Plan of Building

**THE BREWERY BLOCKS**
GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS - NOVEMBER 2002

EXHIBIT **4**
Page 112 of 158

'2:24 FAX 503 224 7324      DUNN CARNEY                                  ☎009/015



BREWERY
BLOCK

**4**

ART INSTITUTE

EXHIBIT "A"
MARCH 21, 2003

SECOND FLOOR

0  5  10   20

**THE BREWERY BLOCKS**

GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS      EXHIBIT 1

05/14/2003 12:24 FAX 503 224 7324        DUNN CARNEY        ☑010/015

EXHIBIT B
Floor Plan of Building



THIRD FLOOR PLAN

3 – Exhibit B: Floor Plan of Building

THE BREWERY BLOCKS
GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS - OCTOBER 2000



EXHIBIT I
Page 114 of 158

05/14/2003 12:24 FAX 503 224 7324    DUNN CARNEY    ☑011/015

**BLITZ BLOCK 4 -- NEW OFFICE BUILDING**
**PLAT BOOK**
Revised: 2/10/03

EXHIBIT B-1

Printed: 3/21/2003

| Floor | Notes | C Floor Usable S.F. | D Floor Common | E = F/C Floor Proration | F = C+D Floor Rentable S.F. | G Building Common | H = F*% Building Proration | I = F+H Rentable S.F. |
|---|---|---|---|---|---|---|---|---|
| L3 | | 408 | 0 | | 408 | 1,891 | 28 | 436 |
| L2 | | 692 | 0 | | 692 | 1,615 | 46 | 740 |
| L1 | | 998 | 0 | | 998 | 4,526 | 69 | 1,067 |
| Ground Floor | | 28,780 | 0 | 1.000 | 28,780 | 7,469 | 1,842 | 28,622 |
| Second Floor | | 35,327 | 0 | 1.000 | 35,327 | 0 | 2,430 | 37,757 |
| Third Floor | | 36,268 | 0 | 1.000 | 36,268 | 0 | 2,494 | 38,762 |
| Fourth Floor | 6 ? | 20,048 | 2,152 | 3.107 | 22,200 | 0 | 1,527 | 23,727 |
| Fifth Floor | 10 ? | 20,170 | 2,148 | 1.106 | 22,318 | 0 | 1,535 | 23,853 |
| Sixth Floor | 6 | 20,170 | 2,148 | 1.106 | 22,318 | 0 | 1,535 | 23,853 |
| Seventh Floor | 4 | 20,170 | 2,148 | 1.113 | 22,324 | 0 | 1,535 | 23,859 |
| Eighth Floor | | 20,054 | 2,270 | 1.113 | 22,324 | 0 | 1,535 | 23,859 |
| Ninth Floor | | 20,080 | 2,151 | 1.107 | 22,231 | 0 | 1,529 | 23,760 |
| Tenth Floor | | 20,080 | 2,151 | 1.107 | 22,231 | 0 | 1,529 | 23,760 |
| Rooftop Mech. | | 0 | 0 | | 0 | 2,133 | 0 | 0 |

Building Proration Factor = Total Floor Rentable plus Building Common Area/Total Floor Rentable:    1.0688

EXHIBIT 1
Page 115 of 158

# SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (the "Amendment") is made and entered into as of the __18th__ day of December, 2001, by and between BREWERY BLOCKS INVESTORS, LLC, an Oregon limited liability company (hereinafter referred to as "Landlord") and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation (hereinafter referred to as "Tenant").

## WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Lease on October 30, 2000, as amended on October 29, 2001 (referred to as the "Lease") for certain premises in the Building located in Block 4 of the Brewery Blocks (hereinafter the "Premises"), and;

WHEREAS, Tenant has the right of first offer to expand on the remaining space on the 2nd Floor of the Building; and

WHEREAS, Landlord has entered into a lease with another tenant for space on the 8th, 9th and 10th Floors of the Building and Landlord desires to use the 2nd Floor space for such tenant temporarily during the period from September 1, 2002, until Landlord substantially completes the 8th, 9th and 10th Floors of the Building;

WHEREAS, Tenant is willing to allow Landlord the use of the remaining space on the 2nd Floor on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the Premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree to amend the Lease as follows:

1. The first sentence of Section 1.7 of the Lease is hereby deleted and replaced with the following:

Landlord shall provide Tenant with an on-going and continuous right of first offer ("Right of First Offer") to lease the balance of the remaining space (less any retail space) on the second (2nd) floor ("Adjacent Space"); provided, however, Landlord shall have the right to allow the tenant of the 8th, 9th and 10th Floors to use the Adjacent Space from September 1, 2002, until Landlord has substantially completed the 8th, 9th and 10th Floors of the Building, including the tenant improvements, which is currently scheduled for April 1, 2003 ("Substantial Completion Date"). Landlord shall provide Tenant with notice of any delay in the Substantial Completion Date promptly upon Landlord becoming aware of such delay. Landlord shall use commercially reasonable efforts to mitigate delays in the Substantial Completion Date caused by Landlord's

contractor. Thereafter, Tenant shall be entitled to the Right of First Offer on the Adjacent Space as set forth herein.

2.    This Amendment may be executed in counterparts and shall be effective when all parties have signed a copy of this Amendment. A copy of this Amendment bearing an original signature shall constitute a counterpart, and all such counterparts shall, taken together, constitute one and the same agreement. It is the parties' desire to immediately confirm and communicate their respective signatures on this Amendment. It is agreed that a facsimile copy of a signed signature page of a counterpart agreement shall evidence and constitute valid execution of this Amendment and shall be binding on a party to the same extent as the original signature counterpart copy.

3.    All other terms and conditions as set forth in the Lease shall remain the same.

IN WITNESS WHEREOF, the parties have executed this Second Amendment to Lease as of the date first above written.

**LANDLORD**                                      **TENANT**

BREWERY BLOCKS INVESTORS, LLC,          THE ART INSTITUTE OF PORTLAND, INC.
an Oregon limited liability company              an Oregon corporation

By: _____            By: _Steven Goldman_____

Title: _12/13/01  Mgr._____            Title: _President_____

Date: _12/17/01_____            Date: _12|13|01_____


**APPROVED BY LENDER:**

BANK OF AMERICA, N.A., a national
banking association, as Administrative
Agent

By: _____

Title: _Vice President_____

Date: _12|19|01_____

2 – Second Amendment to Lease

## ACKNOWLEDGEMENT OF GUARANTOR

The undersigned, Education Management Corporation, a Pennsylvania corporation ("**Guarantor**") executed and delivered to Owner a document entitled "Guaranty" dated October 30, 2000 (the "**Guaranty**"). Guarantor certifies, acknowledges and agrees that (1) Guarantor has reviewed and approved of this Second Amendment to Lease, (2) all references in the Guaranty to the Lease shall refer to and mean the Lease as modified by this Second Amendment, and (3) the Guaranty is ratified and affirmed.

**GUARANTOR:**

EDUCATION MANAGEMENT CORPORATION
A Pennsylvania corporation

By: _____

Title: _____UP_____

Date: __12/12/21_____

3 – Second Amendment to Lease

: ODMA\GRPWISE\DUNN-CAR.POST1.CLIE\

EXHIBIT 1
Page 118 of 158

003 12:23 FAX 503⁴⁴            DUNN CARNEY                              ☒002/015

## THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE (the "Amendment") is made and entered into as of the _9th_ day of ~~March~~ May, 2003, by and between BREWERY BLOCKS INVESTORS, LLC, an Oregon limited liability company (hereinafter referred to as "Landlord") and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Lease on October 30, 2000, as amended by Amendment to Lease dated October 29, 2001 and Second Amendment to Lease dated December 19, 2001 (collectively referred to as the "Lease") for certain premises in the Building located in Block 4 of the Brewery Blocks (hereinafter the "Premises"), and;

WHEREAS, Tenant desires to lease additional space and Landlord desires to lease such space to Tenant on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the Premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree to amend the Lease as follows:

1.    Commencing on November 21, 2003, Tenant hereby leases from Landlord, and Landlord leases to Tenant, the balance of the second floor of the Building in the amount of 12,206 RSF (the "Expansion Space"), provided that Tenant shall have no obligation to commence payment of Base Rent or Additional Rent on the Expansion Space prior to December 1, 2003. Notwithstanding the foregoing, Landlord shall deliver the Expansion Space to Tenant within ten (10) days after execution of this Amendment for purposes of commencement by Tenant of the Additional Second Floor Tenant Improvements (as hereinafter defined) therein.

2.    Paragraph 3 of the Basic Lease Information is hereby deleted and replaced with the following:

      **Landlord's Address for Giving of Notices and Payment of Rent:**

      c/o Gerding/Edlen Development Company
      1120 NW Couch, Suite 600
      Portland, Oregon 97209

3.    Paragraph 5 of the Basic Lease Information is hereby deleted and replaced with the following:

      **Premises:** The floor area of the Building consisting of approximately (i) 8,095 rentable square feet ("RSF") (7,627 usable square feet) on the ground floor

05/14/2003 12:23 FAX 503 224 7324        DUNN CARNEY                          ☒003/015

("Retail Space"), (ii) 37,757 RSF (35,327 usable square feet) on the second floor, and (iii) 38,762 RSF (36,268 usable square feet) on the third floor (collectively the second and third floor space is referred to herein as "Office/School Space"), for a total of 84,614 RSF, as outlined on the floor plan of the Building attached hereto as **Exhibit B** (Section 1.2). The ground floor retail conversion factor is 6.14%, and the single tenant conversion factor for the second and third floors is 6.88%. The multi-tenant conversion factor for a floor, if any, is 16.97%. In calculating the conversion from Tenant's usable square footage to RSF, the following shall not be included: (i) Lower Level 2, Room 4.205 in the amount of 362 usable square feet; (ii) Lower Level 2, Room 4.212 in the amount of 144 usable square feet; and (iii) Lower Level 1, Room 4.105 in the amount of 103 usable square feet.

4.    Section 1.7 of the Lease is hereby deleted.

5.    Section 26 of the Lease is hereby amended to (a) delete the words "300 Sixth Avenue" on the 11th and 12th lines thereof and to substitute the words "210 Sixth Avenue" in lieu thereof and (b) delete the words 200 Park Avenue, New York, New York 10166, Attention: Richard A. Rosenbaum" and to substitute the words "2450 Colorado Avenue, Suite 400E, Santa Monica, California 90404" in lieu thereof.

6.    **Exhibits B, B-1** and **B-2** to the Lease are hereby deleted and replaced with **Exhibits B, B-1** and **B-2** attached hereto.

7.    Section 3 of **Exhibit C** to the Lease is hereby modified by the addition of the following:

Landlord agrees to provide an allowance in an amount equal to the sum of $30.80 multiplied by 12,206 RSF on the second floor of the Premises ("Additional Second Floor Tenant Improvement Allowance") for actual construction of Tenant's Improvements in the Expansion Space (the "Additional Second Floor Tenant Improvements") and for any Additional Second Floor Tenant Improvements costs including construction costs, permits, and governmental fees which are not the responsibility of Landlord. In the event Tenant constructs the Additional Second Floor Tenant Improvements and provided Tenant is not in default under the Lease (after the expiration of all applicable notice and cure periods), Landlord shall make progress payments of the Additional Second Floor Tenant Improvement Allowance to Tenant, each such progress payment shall be made within thirty (30) days after Landlord's receipt of a payment application approved by Tenant's architect and partial lien releases for the work completed. Landlord shall retain 5% of the total Additional Second Floor Tenant Improvement Allowance until final completion of the Additional Second Floor Tenant Improvements, Tenant's acceptance of the Expansion Space, and Landlord's receipt of the documents set forth in

items ii-v of Section 5.3.9 thereof, provided, however, if any liens are filed on the property by Tenant's general contractor, subcontractor, suppliers or materialmen, Landlord shall pay the five percent (5%) retainage to Tenant less 125% of the amount of such lien(s) and Tenant shall discharge such lien(s) in accordance with Section 12.1.1 the Lease. Upon discharge of any such lien, Landlord shall pay Tenant the amount withheld for such lien. In the event Landlord does not reimburse to Tenant the amount of the Additional Second Floor Tenant Improvement Allowance within the time periods set forth in Exhibit C and after Tenant's compliance with the requirements for payment, Tenant may, after thirty (30) days' prior written notice to Landlord and Landlord's failure to cure within such thirty (30) day period, offset amounts due Tenant from the Base Rent due to Landlord, Notwithstanding the foregoing, in the event Landlord reasonably disputes that payment of all or any portion of the Additional Second Floor Tenant Improvement Allowance is due to Tenant, Tenant shall not have the right to offset such claimed amounts and the parties shall submit such dispute to binding arbitration in Portland, Oregon within sixty (60) days of such notice. Each party shall designate an arbitrator having at least five (5) years experience in commercial leasing. The two arbitrators so chosen shall select an arbitrator having the above qualifications or, if they cannot agree, the presiding judge of the Circuit Court of Multnomah County, Oregon shall, upon application by either party, select an arbitrator having the above qualifications. Unless otherwise agreed, the arbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association. In the event the arbitration establishes that Tenant is due the claimed Additional Second Floor Tenant Improvement Allowance, Landlord shall pay such amount to Tenant within ten (10) business days. In the event Landlord fails to make such payment, Tenant shall be entitled to offset such amount without further notice to Landlord. In the event of an arbitration, the prevailing party shall be entitled to recover the costs of the arbitration as determined by the arbitrator.

The provisions of Exhibit C to the Lease pertaining to Tenant Improvements and the Tenant Improvement Allowance shall be applicable to the Additional Second Floor Tenant Improvements and the Additional Second Floor Tenant Improvement Allowance except with respect to those references to Tenant Improvements and Tenant Improvement Allowance that apply strictly to Tenant's initial Tenant Improvements. In particular, but without limitation, neither any references to dates in Exhibit C nor the following Sections of Exhibit C shall be applicable to the Additional Second Floor Tenant Improvements: Article 1, Sections 3.1, 5.5, 5.6 and 9.1.

EXHIBIT 1
Page 121 of 158

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS.230795.1

Notwithstanding anything to the contrary contained in the Lease, at the sole option of Tenant, Tenant may remove any or all specialty installations, improvements and alterations which are made to all or any of the Expansion Space in connection with Tenant's use of the Premises (but in no event may Tenant remove any alterations, installations or improvements which may be used for general office purposes), or any furniture, fixtures and equipment that Tenant has made to or at all or any part of the Expansion Space. Upon removal, Tenant will repair any damage to the Expansion Space caused solely by its installation and/or removal and will return the Expansion Space to the condition prior to such installation, improvement and/or alteration which was removed.

8.    The parties agree to execute an amended Memorandum of Lease in the form attached hereto as Attachment 1 to revise the Right of First Offer and such amended Memorandum shall be promptly recorded in the records of the County of Multnomah, Oregon.

9.    This Amendment may be executed in counterparts and shall be effective when all parties have signed a copy of this Amendment. A copy of this Amendment bearing an original signature shall constitute a counterpart, and all such counterparts shall, taken together, constitute one and the same agreement. It is the parties' desire to immediately confirm and communicate their respective signatures on this Amendment. It is agreed that a facsimile copy of a signed signature page of a counterpart agreement shall evidence and constitute valid execution of this Amendment and shall be binding on a party to the same extent as the original signature counterpart copy.

10.   All other terms and conditions as set forth in the Lease shall remain the same.

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS:310454.1

EXHIBIT 1
Page 122 of 158

IN WITNESS WHEREOF, the parties have executed this Third Amendment to Lease as of the date first above written.

**LANDLORD**                                    **TENANT**

BREWERY BLOCKS INVESTORS, LLC,          THE ART INSTITUTE OF PORTLAND, INC.
an Oregon limited liability company          an Oregon corporation

By: _____            By: _____

Title _____            Title  President

Date:  5/9/03                            Date:  5 | 9 | 03

**APPROVED BY LENDER:**

BANK OF AMERICA, N.A., a national
banking association, as Administrative
Agent

By: _____

Title: Senior Vice-President

Date:  5.13.03

EXHIBIT 1
::ODMA\GRPWISE\DUNN-CARL.POST1.CLIENTS.230795.1
Page 123 of 158

05/14/2003 12:23 FAX 503 224 7324        DUNN CARNEY                                    ☐007/015

## ACKNOWLEDGEMENT OF GUARANTOR

The undersigned, Education Management Corporation, a Pennsylvania corporation ("**Guarantor**") executed and delivered to Owner a document entitled "Guaranty" dated October 30, 2000 (the "**Guaranty**"). Guarantor certifies, acknowledges and agrees that (1) Guarantor has reviewed and approved of this Third Amendment to Lease, (2) all references in the Guaranty to the Lease shall refer to and mean the Lease as modified by the First Amendment dated October 29, 2001, Second Amendment dated December 19, 2001, and this Third Amendment, and (3) the Guaranty is ratified and affirmed.

**GUARANTOR:**

EDUCATION MANAGEMENT CORPORATION
A Pennsylvania corporation

By: _____

Title: _____

Date: _____

EXHIBIT I

::ODMA\GRPWISE\DUNN-CAR.POST1.CLIENTS:130795-1
Page 124 of 158

## FOURTH AMENDMENT TO LEASE

THIS FOURTH AMENDMENT TO LEASE (the "Amendment") is made and entered into as of the _____ day of _____, 2006, by and between BREWERY BLOCKS INVESTORS, LLC, an Oregon limited liability company (hereinafter referred to as "Landlord") and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation (hereinafter referred to as "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into that certain Lease on October 30, 2000, as amended by Amendment to Lease dated October 29, 2001 and Second Amendment to Lease dated December 19, 2001, and Third Amendment to Lease dated May 9, 2003 (collectively referred to as the "Lease") for certain premises in the Building located in Block 4 of the Brewery Blocks (hereinafter the "Premises"); and

WHEREAS, Landlord and Tenant desire to correct a typographical error in the Operating Costs provision as set forth herein.

NOW, THEREFORE, in consideration of the Premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree to amend the Lease as follows:

1.    Section 12 of the Basic Lease Information is deleted and replaced with the following:

> 12.    Tenant's Percentage of Operating Expenses: (Section 5.2) This is a net lease and Tenant will be responsible for its share of all operating expenses benefiting the Premises and for its share of all interior and exterior common area expenses, except as excluded in Section 4.3. Tenant's Retail Space shall be treated as Office/School Space for the purpose of calculating Tenant's pro rata share of Operating Expenses. Tenant's pro rata share for the Office/School Space (including the Retail Space) shall be a fraction, the numerator of which shall be the rentable square feet of the Office/School Space and Retail Space, and the denominator of which shall be 271,851 (the total rentable square feet of office and retail space in the Building). The allocation of the Premises between Office/School Space and Retail Space shall be deemed to be 93% and 7%, respectively.

2.    The sixth sentence of Section 5.2 of the Lease is hereby deleted and replaced with the following:

> During the periods when the Building is less than 95% occupied, Landlord shall reasonably adjust Operating Expenses to reflect the costs that would normally have been incurred had the Building been 95% occupied for the entire period and the Building had been fully assessed for property tax purposes.

1

3.  Landlord and Tenant agree that the final remaining amount payable by Tenant with respect to Tenant's 2003/2004 and 2004/2005 Operating Expenses as well as the estimated increase in the 2006 Operating Expenses currently owed by Tenant shall be $241,201.39, which amount Tenant agrees to pay within five (5) business days after full execution of this Amendment and delivery of same to Tenant. Landlord hereby acknowledges receipt of all prior amounts due with respect to Tenant's 2003/2004 and 2004/2005 Operating Expenses.

4.  This Amendment may be executed in counterparts and shall be effective when all parties have signed a copy of this Amendment. A copy of this Amendment bearing an original signature shall constitute a counterpart, and all such counterparts shall, taken together, constitute one and the same agreement. It is the parties' desire to immediately confirm and communicate their respective signatures on this Amendment. It is agreed that a facsimile copy of a signed signature page of a counterpart agreement shall evidence and constitute valid execution of this Amendment and shall be binding on a party to the same extent as the original signature counterpart copy.

5.  All other terms and conditions as set forth in the Lease shall remain the same.

6.  Landlord and Tenant each hereby represent and warrant that neither party has dealt with any brokers, finders or similar parties with respect to the negotiations and/or terms contained in this Amendment. Each party hereby agrees to indemnify and hold the other party harmless from and against any and all claims, damages, liabilities and expenses, including, but not limited to, reasonable attorneys' fees, including any appellate proceedings, that may arise from any claims or demands of any broker(s), finder(s) or similar party(ies) for any commission alleged to be due by such party in connection with this Amendment.

7.  Landlord and Tenant each hereby represents and warrants to the other that (i) the execution and delivery of this Amendment has been fully authorized by all necessary corporate action and (ii) the person executing this Amendment has the requisite authority to do so and has the authority and power to bind Landlord or Tenant, as applicable, on whose behalf such party has signed.

8.  In the event of any conflict between the terms of this Amendment and the terms of the Lease, it is expressly agreed that the terms of this Amendment shall control. Except as modified, amended or supplemented by the provisions of this Amendment, all of the terms, obligations and conditions of the Lease are hereby ratified and shall remain in full force and effect.

9.  (a)  At the time of execution of this Amendment, neither Landlord nor Tenant has any claims or demands against the other and there are no offsets or defenses to the terms and conditions of the Lease.

    (b)  The Lease and this Amendment shall be construed as one document and all the terms and conditions of this Amendment shall be incorporated by reference in the Lease.

(c)    This Amendment may be executed by one or more of the parties hereto on any number of separate counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.

LA 126585513v4 10/3/2006

EXHIBIT I
Page 127 of 158

IN WITNESS WHEREOF, the parties have executed this Fourth Amendment to Lease as of the date first above written.

**LANDLORD**

BREWERY BLOCKS INVESTORS, LLC,
an Oregon limited liability company

By: _____

Title  _Kelly T Sauto, Manager_

Date:  _10/13/06_

**TENANT**

THE ART INSTITUTE OF PORTLAND, INC.,
an Oregon corporation

By: _____
          John R. Roach
Title      Vice President
          Real Estate & Architectural Services

Date:  _10/9/06_

4

EXHIBIT 1
Page 128 of 158

## ACKNOWLEDGEMENT OF GUARANTOR

Education Management Corporation, a Pennsylvania corporation ("**EDMC**") executed and delivered to Landlord a document entitled "Guaranty" dated October 30, 2000 (the "**Guaranty**"). Education Management, LLC ("**Guarantor**"), successor-in-interest to EDMC, certifies, acknowledges and agrees that (1) Guarantor has reviewed and approved of this Fourth Amendment to Lease, (2) all references in the Guaranty to the Lease shall refer to and mean the Lease as modified by the First Amendment dated October 29, 2001, Second Amendment dated December 19, 2001, Third Amendment dated May 9, 2003 and this Fourth amendment, and (3) the Guaranty is ratified and affirmed.

> **GUARANTOR:**
>
> EDUCATION MANAGEMENT, LLC,
> a Delaware limited liability company
>
> By: _____
>               John R. Roach
> Title: _____
>           Vice President
>          Real Estate & Architectural Services
> Date: _10/9/06_

EXHIBIT 1
Page 129 of 158

# FIFTH AMENDMENT TO LEASE

THIS FIFTH AMENDMENT TO LEASE AGREEMENT ("**Amendment**") is made and entered into as of February 27, 2015 (the "**Effective Date**") by and between SPF BREWERY BLOCKS, LLC, a Delaware limited liability company ("**Landlord**"), and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation ("**Tenant**").

## RECITALS:

A.      By that certain Lease Agreement dated as of October 30, 2000, as amended by an Amendment to Lease dated as of October 29, 2001, a Second Amendment to Lease dated as of December 19, 2001, a Third Amendment to Lease ("**Third Amendment**") dated as of May 9, 2003, and a Fourth Amendment to Lease dated as of October 13, 2006 (collectively, the "**Original Lease**") between The Brewery Blocks I, LLC ("**Original Landlord**") and Tenant, Original Landlord agreed to lease to Tenant and Tenant agreed to lease from Landlord the Premises (as defined in the Lease) located within the building commonly known as Block 4, The Brewery Blocks in Portland, Oregon (the "**Building**").

B.      Landlord has succeeded to the rights of Original Landlord as "Landlord" under the Original Lease.

C.      Landlord and Tenant now desire to amend the Original Lease to remove from the Premises leased by Tenant thereunder the approximately 6,645 rentable square feet of space located on the ground floor of the Building depicted on **Exhibit "A"** hereto (the "**Surrender Premises**") and to modify the Lease in certain other particulars as more fully set forth in this Amendment.

D.      The Original Lease and this Amendment are hereinafter collectively referred to as the "**Lease**." All references to the Lease shall mean and refer to the Original Lease, as amended, whether or not such references shall expressly refer to this Amendment. Unless otherwise provided herein, all capitalized words and terms in this Amendment shall have the same meanings ascribed to such words and terms as in the Original Lease.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      <u>Surrender of Premises</u>.

A.      <u>Surrender Premises</u>.  On or before the seventy-fifth (75th) day after the Effective Date, Tenant shall vacate the Surrender Premises and surrender the same to Landlord vacant and broom clean, with all trade fixtures, furniture, office equipment, and other equipment and personal property removed therefrom, and otherwise in the condition required by the Lease, including, without limitation, Sections 13 and 19.1 thereof. Tenant's failure to timely so surrender the Surrender Premises shall constitute a breach of and a default under the Lease (and no notice, grace or cure period shall be applicable thereto). In addition, if the Surrender Premises shall not have been surrendered to Landlord in the condition required herein, Landlord

EXHIBIT I
Page 130 of 158

may, at its option and at Tenant's expense, perform any or all work as shall be required to put the Surrender Premises in the condition required above (the **"Restoration Work"**). Landlord's costs of the Restoration Work shall be reimbursed by Tenant within thirty (30) days after Landlord's written demand, and Tenant's failure to make such reimbursement when due shall constitute a breach of and a default under the Lease.

B.    Release.  The date on which Tenant shall surrender the Surrender Premises to Landlord in the condition required by this Section 1 (or, if applicable, such later date as Landlord shall complete the Restoration Work) is referred to herein as the **"Surrender Date."** Effective as of the Surrender Date, the Surrender Premises shall be deemed deleted from the Lease, the Premises shall be comprised of 77,969 rentable square feet as depicted on **Exhibit "B"** attached hereto, which exhibit shall replace **Exhibit "B"** attached to the Lease, and Tenant shall be released from its obligations thereafter arising under the Lease with respect to the Surrender Premises.  Notwithstanding the foregoing, however, Tenant shall remain liable for its obligations with regard to the Surrender Premises that arise prior to the Surrender Date, and Tenant's indemnification obligations under the Lease shall survive the deletion of the Surrender Premises from the Lease with regard to any events which occur prior to the Surrender Date.

C.    Demising.  Notwithstanding anything to the contrary in Paragraph A above or in the Lease, Landlord will be responsible, at its sole cost and expense, for performing any work needed to demise the Surrender Premises from the remainder of the Premises or any other portion of the Building.

D.    Termination Fee.  As consideration for Landlord's agreement to take back possession of the Surrender Premises prior to expiration of the Term of the Lease, Tenant agrees to pay Landlord a fee of Three Hundred Seventy-Seven Thousand Nine Hundred Eight and 00/100 Dollars ($377,908.00) (the **"Termination Fee"**) in installments in accordance with the following schedule and in not less than the following amounts:

| Payment Date | Payment Amount |
|---|---|
| March 1, 2015 | $29,023.00 |
| April 1, 2015 | $29,023.00 |
| May 1, 2015 | $29,023.00 |
| June 1, 2015 | $29,023.00 |
| July 1, 2015 | The remainder of the Termination Fee ($261,817.00 unless there is an overpayment of a preceding installment) |

Any failure to timely pay a portion of the Termination Fee shall be an event of default constituting a breach of the Lease and shall result in the entire Termination fee becoming immediately due and payable; provided, however, that Landlord shall be required to provide written notice to Tenant and Tenant shall have five (5) days thereafter to cure such default. Tenant shall be entitled to use up to Two Hundred Thirty-One Thousand Four Hundred Sixty-

- 2 -

EXHIBIT I
Page 131 of 158

Eight and 00/100 Dollars ($231,468.00) (the "**Available Allowance**") of the Additional Second Floor Tenant Improvement Allowance (as defined in the Third Amendment) to (i) offset a portion of the Termination Fee, (ii) reimburse Tenant's out-of-pocket costs incurred in connection with vacating the Surrender Premises and consolidating into the remainder of the Premises, or (iii) a combination of the foregoing. If Tenant desires to apply all or any portion of the Available Allowance to the Termination Fee, it shall do so by written notice given to Landlord on or prior to May 1, 2015, which notice shall specify how much of the Available Allowance it desires to apply to the Termination Fee and to which installments it desires to apply the Available Allowance. To the extent Tenant elects to apply a portion of the Available Allowance to vacation and consolidation costs, it shall provide to Landlord reasonable evidence of the out-of-pocket costs incurred (including paid invoices) and the amount of reimbursement claimed. Within thirty (30) days following receipt of the foregoing, Landlord shall reimburse to Tenant the requested amount up to the amount remaining in the Available Allowance. In no event shall Landlord be required to disburse funds from the Available Allowance with respect to any amount requested by Tenant after July 1, 2015.

   E. <u>Adjustments</u>. On the Surrender Date, Tenant shall no longer have the right to use the parking stalls allocated to the Surrender Space and Tenant's pro rata share of Operating Expenses will be adjusted to reflect the deletion of the Surrender Premises from the Premises.

   F. <u>Base Rent</u>. Effective as of March 1, 2015, the Base Rent for the Premises shall be amended to be $188,173.17 per month through the Expiration Date.

  2. <u>Expansion Space</u>. Section 1.8 of the Lease is hereby amended to provide that the "Expansion Space" subject to Tenant's "Expansion Right" thereunder will not include any space on the first floor of the Building.

  3. <u>Signage</u>. Effective on the Surrender Date, Landlord will have the right, at Landlord's sole cost and expense, to remove Tenant's blade sign located on the northeast corner of the Building and Tenant will have no further right to install a blade sign on such portion of the Building. Landlord shall promptly return to Tenant the blade sign if Landlord chooses to remove the same (Landlord shall have no obligation to Tenant with respect to the condition of the blade sign or to repair any damage to the blade sign that occurs during its removal or during delivery of such sign to Tenant). Tenant shall, however, have the right to install blade signs at its entrance on NW Davis Street provided (i) such signage is reasonably acceptable to Landlord, (ii) such signage complies with all applicable governmental rules, regulations, and ordinance, (iii) Tenant obtains, at its sole cost and expense, all governmental approvals and permits required for installation of such signage, (iv) Tenant complies with Landlord's Tenant Signage Criteria, and (v) such signage is generally in accordance with Exhibit C attached hereto.

  4. <u>Confidentiality</u>. Tenant shall keep in strict confidence the provisions of this Amendment, subject only to any disclosure required by law or legal process, and then only after delivering ten (10) days' notice of such requirement to Landlord. Without limiting the foregoing, Tenant shall use its best efforts to minimize the distribution of the provisions of this Amendment among its employees and shall not discuss or otherwise communicate (whether oral

- 3 -

EXHIBIT 1
Page 132 of 158

or in writing) with any other tenants or occupants of the Building regarding the provisions of this Amendment and/or the negotiation of this Amendment.

5.      Estoppel. As a material inducement for Landlord to enter into this Amendment, Tenant hereby represents and warrants, and certifies, to Landlord, that (i) the Lease, as amended, is in full force and effect, (ii) Landlord is not in any respect in default in the performance of the terms and provisions of the Lease, nor has any event occurred which, with the passage of time or the giving of notice, or both, would constitute a default by Landlord thereunder, and (iii) Tenant has no rights of setoff, claims against Landlord, or rebates or defenses to the enforcement of the Lease, as amended. Landlord hereby represents and warrants, and certifies to Tenant that (i) the Lease, as amended, is in full force and effect and (ii) there does not now exist an event of default constituting a breach of the Lease under Section 20 of the Lease, nor, to Landlord's actual knowledge, has any event occurred which, with the passage of time or the giving of notice, or both, would constitute an event of default constituting a breach of the Lease under Section 20 of the Lease.

6.      Lease in Full Force and Effect.   Except as specifically set forth in this Amendment, all provisions of the Lease shall remain in full force and effect and are not modified by this Amendment, and the parties hereby ratify and confirm each and every provision thereof.

7.      Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall have the same force and effect as the original thereof.

8.      Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of Landlord and Tenant and their respective successors and permitted assigns under the Lease.

9.      Brokers. Envision Realty Advisors LLC and Envision Realty Advisors West LLC (collectively, "**Landlord's Broker**") have exclusively represented Landlord, and Jones Lang LaSalle has exclusively represented Tenant ("**Tenant's Broker**") in connection with this Amendment. Tenant represents to Landlord that, in connection with this Amendment, except for Tenant's Broker, no third party broker or finder has been engaged or consulted by Tenant or is entitled to compensation or commission in connection herewith by or through acts of Tenant in connection with this Amendment, and Tenant hereby agrees to defend, indemnify and hold harmless Landlord from and against any and all claims of any brokers, finders or any like third party claiming any right to commission or compensation by or through acts of Tenant in connection with this Amendment except for Landlord's Broker who shall be compensated, if at all, by Landlord pursuant to a separate agreement. Tenant shall pay, at its sole cost and expense, any fee or commission payable to Tenant's Broker and shall defend, indemnify and hold harmless Landlord from and against any and all claims of Tenant's Broker.

10.     Entire Agreement. This Amendment contains the entire agreement between the parties with respect to the subject matter herein contained and all preliminary negotiations with respect to the subject matter herein contained are merged into and incorporated in this

- 4 -

EXHIBIT 1
Page 133 of 158

Amendment and all prior documents and correspondence between the parties with respect to the subject matter herein contained are superseded and of no further force or effect, other than the Lease.

11.    Representations and Warranties. Landlord and Tenant represent and warrant that (a) they have all the required power, capacity, and authority to enter into, execute, and perform this Amendment; (b) the execution of this Amendment is free and voluntary; and (c) they have not assigned or transferred to any person, firm, corporation, partnership, association or other entity whatsoever any or all of the rights, duties or obligations embodied or released in this Amendment.

[Signature page follows]

EXHIBIT I
Page 134 of 158

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above written.

LANDLORD:                                    TENANT:

SPF BREWERY BLOCKS, LLC,                     THE ART INSTITUTE OF PORTLAND,
a Delaware limited liability company         INC., an Oregon corporation

By: _____               By: _____

Name: _____Brian Okrent_____                Name: _____A. DANA GARCIA_____
              *Vice President*                              VICE PRESIDENT
Its: _____              Its: _____CORPORATE REAL ESTATE_____


## GUARANTOR CONSENT

The undersigned covenants and agrees that its obligations pursuant to that certain Guaranty dated as of October 30, 2000, as to the terms and provisions of that certain Lease Agreement dated as of October 30, 2000, as amended by an Amendment to Lease dated as of October 29, 2001, a Second Amendment to Lease dated of December 19, 2001, a Third Amendment to Lease dated as of May 9, 2003, and a Fourth Amendment to Lease dated as of October 13, 2006 by and between SPF BREWERY BLOCKS, LLC, a Delaware limited liability company, as the landlord, and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation, as the tenant, shall remain in full force and effect as to the terms and provisions of this Fourth Amendment to Lease Agreement, receipt of which is hereby acknowledged by the undersigned.


GUARANTOR:

EDUCATION MANAGEMENT CORPORATION, a
Pennsylvania corporation

By: _____
Name: _____A. DANA GARCIA_____
Its: _____VICE PRESIDENT_____
            CORPORATE REAL ESTATE

78994-0004/LEGAL124429601.4

EXHIBIT I
Page 135 of 158

# EXHIBIT A

## SURRENDER PREMISES



78994-0004/LEGAL124429601.4

EXHIBIT 1
Page 136 of 158

**EXHIBIT B**

**PREMISES**



78994-0004/LEGAL124429601 4

EXHIBIT 1
Page 137 of 158



EXHIBIT "A"

SECOND FLOOR

THE BREWERY BLOCKS

GERDING/EDLEN DEVELOPMENT COMPANY
GBD ARCHITECTS

- 9 -

EXHIBIT 1
Page 138 of 158



THIRD FLOOR PLAN

78994-0004/LEGAL124429601.4

EXHIBIT I
Page 139 of 158

## EXHIBIT C

### Blade Signage



78994-0004/LEGAL124429601.4

EXHIBIT 1
Page 140 of 158

## SIXTH AMENDMENT TO LEASE

MAY 0 4 2015

THIS SIXTH AMENDMENT TO LEASE AGREEMENT ("**Amendment**") is made and entered into as of April 28 2015 (the "**Effective Date**") by and between SPF BREWERY BLOCKS, LLC, a Delaware limited liability company ("**Landlord**"), and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation ("**Tenant**").

### RECITALS:

A.      By that certain Lease Agreement dated as of October 30, 2000, as amended by an Amendment to Lease dated as of October 29, 2001, a Second Amendment to Lease dated as of December 19, 2001, a Third Amendment to Lease dated as of May 9, 2003, a Fourth Amendment to Lease dated as of October 13, 2006, and a Fifth Amendment to Lease dated as of February 27, 2015 (the "**Fifth Amendment**"; the foregoing lease and amendments, collectively, the "**Original Lease**") between The Brewery Blocks I, LLC ("**Original Landlord**") and Tenant, Original Landlord agreed to lease to Tenant and Tenant agreed to lease from Landlord the Premises (as defined in the Lease) located within the building commonly known as Block 4, The Brewery Blocks in Portland, Oregon (the "**Building**").

B.      Landlord has succeeded to the rights of Original Landlord as "Landlord" under the Original Lease.

C.      Landlord and Tenant now desire to amend the Original Lease to remove from the Premises leased by Tenant thereunder the approximately 15,874 rentable square feet of space located on the second floor of the Building depicted on **Exhibit "A"** hereto (the "**Sixth Amendment Surrender Premises**") and to modify the Lease in certain other particulars as more fully set forth in this Amendment.

D.      The Original Lease and this Amendment are hereinafter collectively referred to as the "**Lease**." All references to the Lease shall mean and refer to the Original Lease, as amended, whether or not such references shall expressly refer to this Amendment. Unless otherwise provided herein, all capitalized words and terms in this Amendment shall have the same meanings ascribed to such words and terms as in the Original Lease.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Contingency. Landlord and Tenant acknowledge and agree that, as of the date of this Amendment, Landlord and Anthropologie, Inc. ("**Anthropologie**") are in the process of negotiating an amendment to Anthropologie's lease (the "**Adjacent Space Amendment**") pursuant to which Anthropologie will lease the Sixth Amendment Surrender Premises (as defined herein) and the Sixth Amendment Surrender Premises will be added to the premises leased to Anthropologie. Accordingly, anything in this Amendment to the contrary notwithstanding, this Amendment and all of Landlord's obligations hereunder are subject to and contingent upon Landlord and Anthropologie executing the Adjacent Space Amendment on or before April 29, 2015 (the "**Termination Contingency Date**"). In the event the Adjacent Space

EXHIBIT 1
Page 141 of 158

Amendment is not executed on or before the Termination Contingency Date, Landlord shall notify Tenant in writing and Landlord shall have the right to terminate this Amendment at any time after the Termination Contingency Date and prior to the date the Adjacent Space Amendment shall have been executed by Landlord and Anthropologie and, upon such termination by the Landlord, the terms of this Amendment shall be null, void and of no further force or effect.

    2.    Surrender of Premises.

        A.    Sixth Amendment Surrender Premises. On the ninetieth (90th) day after the date on which Tenant receives notice that Landlord and Anthropologie have executed the Adjacent Space Amendment ("**Sixth Amendment Surrender Date**"), Tenant shall vacate the Sixth Amendment Surrender Premises and surrender the same to Landlord vacant and broom clean, with all trade fixtures, furniture, office equipment, cabling or wiring, and other equipment and personal property removed therefrom and with all damage to the perimeter walls, Building systems and components, including but not limited to broken or cracked windows, damage to sprinkler systems, damage to window and door hardware, of the Sixth Amendment Surrender Premises resulting from such removal having been repaired, but otherwise in as-is condition, notwithstanding anything in the Lease to the contrary. Tenant's failure to timely so surrender the Sixth Amendment Surrender Premises shall constitute a breach of and a default under the Lease (and no notice, grace or cure period shall be applicable thereto). At any time at least five (5) business days prior to the Sixth Amendment Surrender Date, Tenant shall be entitled to give Landlord written notice that it believes the Sixth Amendment Surrender Premises are in the condition required hereunder (the "**Completion Notice**"). Landlord shall, within three (3) business days of receipt of the Completion Notice, deliver written notice to Tenant ("**Restoration Work Notice**") of any additional repairs required to put the Sixth Amendment Surrender Premises in the condition required above (the "**Restoration Work**"). Tenant shall then complete any Restoration Work by the Sixth Amendment Surrender Date. In the event Tenant does not complete the Restoration Work by the Sixth Amendment Surrender Date, Landlord may, at its option and at Tenant's expense, perform the Restoration Work described in the Restoration Work Notice. Landlord's costs of the Restoration Work shall be reimbursed by Tenant within thirty (30) days after Landlord's written demand, and Tenant's failure to make such reimbursement when due shall constitute a breach of and a default under the Lease. If Landlord fails to timely deliver a Restoration Work Notice, it will be deemed to have approved the condition of the Sixth Amendment Surrender Premises and accepted possession.

    If the Sixth Amendment Surrender Premises shall not have been surrendered to Landlord in the condition required herein by the Sixth Amendment Surrender Date, Landlord may immediately, at its option and at Tenant's expense, (i) remove and store at a location selected by Landlord, any trade fixtures, furniture, office equipment, or other equipment and personal property that Tenant fails to timely remove from the Premises and (ii) repair any damage resulting from such removal. Landlord shall have no liability to Tenant with respect to any damage occurring to such property in connection with removal or storage thereof and Landlord shall have no obligation to insure any such property. To the maximum extent allowable under applicable law, Tenant waives and releases any claims that may arise with respect to any such property removed and stored by Landlord. If, within thirty (30) days after the Sixth Amendment Surrender Date, Tenant does not claim any such property, it will be deemed to have abandoned

78994-0004/LEGAL125607979.2

EXHIBIT 1
Page 142 of 158

such property (and hereby waives any notice of such abandonment) and released any right, title or interest therein and Landlord will be free to dispose of such property as it desires. Notwithstanding any such abandonment, Tenant will still be liable to Landlord for all costs of removal and storage occurring prior to such abandonment, which costs and any repair costs shall be paid by Tenant within thirty (30) days after Landlord's written demand, and Tenant's failure to make such payment when due shall constitute a breach of and a default under the Lease.

        B.      **Release**. Effective as of the Sixth Amendment Surrender Date, the Sixth Amendment Surrender Premises shall be deemed deleted from the Lease, the Premises shall be comprised of 59,972 rentable square feet, consisting of 1,450 rentable square feet on the ground floor of the Building, 19,760 rentable square feet on the second floor of the Building, and 38,762 rentable square feet on the third floor of the Building, as depicted on **Exhibit "B"** attached hereto, which exhibit shall replace **Exhibit "B"** attached to the Lease, and Tenant shall be released from its obligations thereafter arising under the Lease with respect to the Sixth Amendment Surrender Premises, provided that if the Surrender Date (as defined in the Fifth Amendment) has not occurred by the Sixth Amendment Surrender Date, then the Premises shall be comprised of 66,617 rentable square feet until the Surrender Date has occurred. Notwithstanding the foregoing, however, Tenant shall remain liable for its obligations with regard to the Sixth Amendment Surrender Premises that arise prior to the Sixth Amendment Surrender Date, and Tenant's indemnification obligations under the Lease shall survive the deletion of the Sixth Amendment Surrender Premises from the Lease with regard to any events which occur prior to the Sixth Amendment Surrender Date.

        C.      **Demising**. In connection with its surrender of the Sixth Amendment Surrender Premises and subject to the terms of Section 12 of the Lease, Tenant shall, at its sole cost and expense: (i) install a new egress door and complete related card key reader, cabling work, and carpet repair and replacement in the area labeled "A" on **Exhibit "C"** attached hereto; (ii) have the right to install a card key reader on the doors marked on **Exhibit "D"** attached hereto, and (iii) install card key readers on the doors of the restrooms located on the second floor, in Tenant's sole discretion provided, however, such work shall be performed in compliance with all applicable laws including, without limitation, applicable fire code requirements and Landlord's approval of such work shall not be deemed Landlord's representation that such work in fact complies with applicable law. Notwithstanding anything to the contrary in Paragraph A above or in the Lease, Landlord will be responsible, at its sole cost and expense, for performing certain modifications to completely demise and split the Sixth Amendment Surrender Premises from the remainder of the Premises, including, but not limited to: (i) splitting all utilities, HVAC, chilled water and other building systems from the Sixth Amendment Surrender Premises; (ii) construction of a door and any related work necessary to create access between Tenant's air handler unit spaces "B" and "C" as depicted on **Exhibit "C"**; (iii) construction of a multi-tenant corridor consistent with applicable life safety and ADA laws; (iv) removal of the wall and all corresponding work separating Tenant's dedicated elevators from the four so-called "office" elevators; and (v) closing off the mechanical room from the space occupied by Anthropologie ("**Landlord's Restoration Work**"). Landlord shall use its reasonable efforts to minimize any interference with Tenant's use of the remainder of the Premises arising out of the performance of Landlord's Restoration Work including, without limitation, by performing any work that results in excessive noise or vibration outside of normal business hours for the Building. In addition, provided Tenant has given its class schedule to Landlord promptly following the Effective Date,

78994-0004 LEGAL125607979.2

EXHIBIT 1
Page 143 of 158

Landlord will use its reasonable efforts to schedule any work that results in excessive noise or vibration during times when classes are not being held. Any interruption of HVAC, utilities or other Building services to the remainder of Tenant's Premises resulting from Landlord's Restoration Work will be subject to Section 14.2.3 of the Lease. Tenant shall have exclusive use of the terrace located on the second floor of the Building. Tenant agrees to use its reasonable efforts to ensure that its agents, employees, students, visitors, and contractors use only its dedicated lobby on the north side of the Building and its dedicated elevators for access to the Premises following Sixth Amendment Surrender Date.

D.    Sixth Amendment Termination Fee.    As consideration for Landlord's agreement to take back possession of the Sixth Amendment Surrender Premises prior to expiration of the Term of the Lease, Tenant agrees to pay Landlord a fee of Four Hundred Twenty-Nine Thousand Twenty-Two and 00/100 Dollars ($429,022.00) (the "**Sixth Amendment Termination Fee**") in equal monthly installments of Thirty-Five Thousand Seven Hundred Fifty-Two and 00/100 Dollars ($35,752.00) each, payable on the first day of each calendar month commencing on July 1, 2015 and ending on June 1, 2016. Any failure to timely pay a portion of the Sixth Amendment Termination Fee shall be an event of default constituting a breach of the Lease and shall result in the entire Sixth Amendment Termination Fee becoming immediately due and payable; provided, however, that Landlord shall be required to provide written notice to Tenant and Tenant shall have five (5) days thereafter to cure such default.

E.    Adjustments.    On the Sixth Amendment Surrender Date, Tenant shall no longer have the right to use the parking stalls allocated to the Sixth Amendment Surrender Space and Tenant's pro rata share of Operating Expenses will be adjusted to reflect the deletion of the Surrender Premises from the Premises.

F.    Base Rent.    Effective as of the Sixth Amendment Surrender Date, the Base Rent for the Premises shall be amended to be $145,056.79 per month through the Expiration Date.

3.    Expansion Space    Section 1.8 of the Lease is hereby amended to provide that the "Expansion Space" subject to Tenant's "Expansion Right" thereunder will not include any space on the second floor of the Building.

4.    Confidentiality.    Tenant and Landlord shall keep in strict confidence the provisions of this Amendment, subject only to any disclosure required by law or legal process, and then only after delivering ten (10) days' notice of such requirement to the non-disclosing party.    Without limiting the foregoing, Tenant and Landlord shall use their commercially reasonable efforts to minimize the distribution of the provisions of this Amendment among their employees and shall not discuss or otherwise communicate (whether oral or in writing) with any other tenants or occupants of the Building regarding the provisions of this Amendment and/or the negotiation of this Amendment. Notwithstanding the foregoing, Landlord shall be entitled to disclose the provisions of this Amendment to its property managers, attorneys, accountants, lenders and prospective lenders, investors and prospective investors, any prospective purchasers of the Building or any interest therein, and its successors and assigns.

- 4 -

EXHIBIT 1
Page 144 of 158

5.    Estoppel. As a material inducement for Landlord to enter into this Amendment, Tenant hereby represents and warrants, and certifies, to Landlord, that (i) the Lease, as amended, is in full force and effect, (ii) Landlord is not in any respect in default in the performance of the terms and provisions of the Lease, nor has any event occurred which, with the passage of time or the giving of notice, or both, would constitute a default by Landlord thereunder, and (iii) Tenant has no rights of setoff, claims against Landlord, or rebates or defenses to the enforcement of the Lease, as amended. Landlord hereby represents and warrants, and certifies to Tenant that (i) the Lease, as amended, is in full force and effect and (ii) there does not now exist an event of default constituting a breach of the Lease under Section 20 of the Lease, nor, to Landlord's actual knowledge, has any event occurred which, with the passage of time or the giving of notice, or both, would constitute an event of default constituting a breach of the Lease under Section 20 of the Lease.

6.    Lease in Full Force and Effect.  Except as specifically set forth in this Amendment, all provisions of the Lease shall remain in full force and effect and are not modified by this Amendment, and the parties hereby ratify and confirm each and every provision thereof.

7.    Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures or electronic .pdf format signatures shall have the same force and effect as the original thereof.

8.    Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of Landlord and Tenant and their respective successors and permitted assigns under the Lease.

9.    Brokers. Jones Lang LaSalle has exclusively represented Tenant ("**Tenant's Broker**") in connection with this Amendment. Tenant represents to Landlord that, in connection with this Amendment, except for Tenant's Broker, no third party broker or finder has been engaged or consulted by Tenant or is entitled to compensation or commission in connection herewith by or through acts of Tenant in connection with this Amendment, and Tenant hereby agrees to defend, indemnify and hold harmless Landlord from and against any and all claims of any brokers, finders or any like third party claiming any right to commission or compensation by or through acts of Tenant in connection with this Amendment. Tenant shall pay, at its sole cost and expense, any fee or commission payable to Tenant's Broker and shall defend, indemnify and hold harmless Landlord from and against any and all claims of Tenant's Broker.

10.    Entire Agreement. This Amendment contains the entire agreement between the parties with respect to the subject matter herein contained and all preliminary negotiations with respect to the subject matter herein contained are merged into and incorporated in this Amendment and all prior documents and correspondence between the parties with respect to the subject matter herein contained are superseded and of no further force or effect, other than the Lease.

11.    Representations and Warranties. Landlord and Tenant represent and warrant that (a) they have all the required power, capacity, and authority to enter into, execute, and perform

- 5 -

EXHIBIT 1
Page 145 of 158

this Amendment; (b) the execution of this Amendment is free and voluntary; and (c) they have not assigned or transferred to any person, firm, corporation, partnership, association or other entity whatsoever any or all of the rights, duties or obligations embodied or released in this Amendment.

[Signature page follows]

78994-0004.LEGAL125607979.2

EXHIBIT I
Page 146 of 158

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above written.

LANDLORD:

SPF BREWERY BLOCKS, LLC,
a Delaware limited liability company

By: _____

Name: _____ Brian Okrent _____
                    Vice President
Its: _____

TENANT:

THE ART INSTITUTE OF PORTLAND,
INC., an Oregon corporation

By: _____

Name: A. Dana Garcia
            Vice President
Its:    Corporate Real Estate

## GUARANTOR CONSENT

The undersigned covenants and agrees that its obligations pursuant to that certain Guaranty dated as of October 30, 2000, as to the terms and provisions of that certain Lease Agreement dated as of October 30, 2000, as amended by an Amendment to Lease dated as of October 29, 2001, a Second Amendment to Lease dated of December 19, 2001, a Third Amendment to Lease dated as of May 9, 2003, a Fourth Amendment to Lease dated as of October 13, 2006, and a Fifth Amendment to Lease dated as of February 27, 2015 by and between SPF BREWERY BLOCKS, LLC, a Delaware limited liability company, as the landlord, and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation, as the tenant, shall remain in full force and effect as to the terms and provisions of this Sixth Amendment to Lease Agreement, receipt of which is hereby acknowledged by the undersigned.

GUARANTOR:

EDUCATION MANAGEMENT CORPORATION, a
Pennsylvania corporation

By: _____
Name: A. Dana Garcia
Its:    Vice President
            Corporate Real Estate

- 7 -

EXHIBIT I
Page 147 of 158

EXHIBIT A

SURRENDER PREMISES



BREWERY
BLOCK

4

SECOND FLOOR

THE BREWERY BLOCKS
GBD ARCHITECTS Incorporated
MARCH 11, 2013

EXHIBIT 1
Page 148 of 158

**EXHIBIT B**

**PREMISES**



FIRST FLOOR

THE BREWERY BLOCKS
GBD ARCHITECTS Incorporated

78994-0004 LEGAL125607979 2

EXHIBIT 1
Page 149 of 158

# Exhibit C – Landlord's Demising Work



78R993-00M/LEGAL1256079979.2

EXHIBIT I
Page 150 of 158

BREWERY
BLOCK

# 4



SECOND FLOOR

THE BREWERY BLOCKS

GBD ARCHITECTS Incorporated
FEBRUARY 23, 2016

EXHIBIT 1
Page 151 of 158



THIRD FLOOR PLAN

78994-0004/LEGAL125607979.2

EXHIBIT I
Page 152 of 158

**EDMC**
Education Management Corporation

July 20, 2012

SPF Brewery Blocks, LLC
245 Park Avenue, 2nd Floor
New York, NY 10167

RE:  Lease at OR, Portland, 1122 NW Davis St, 2024-A-L001

Dear Sir or Madam:

This is to advise you that EDMC has recently contracted Jones Lang LaSalle, Americas Inc. to provide lease administration services for all of our non-student housing leases. This letter shall constitute a FORMAL NOTICE of change regarding the new contact information and address.  All matters pertaining to non-housing lease payments, operating expenses, taxes and insurance will be handled by Jones Lang LaSalle effective August 1, 2012.  Please note that the utility bills currently being sent to CBRE for payment on EDMC's behalf should continue to be sent to CBRE in the same manner. This notice only pertains to lease payments, operating expenses, taxes and insurance.  Please update your contact information to reflect Jones Lang LaSalle and make any necessary invoicing changes needed to ensure September invoices are sent in advance by the 15th of the month.  Each month thereafter, please submit invoices by the 15th of each month to ensure timely review and processing.

Pursuant to the Lease at the above-referenced location, notice is hereby given that, effective August 1, 2012, the current Tenant Notice and Copy Notice addresses as stated in the Lease (or as subsequently amended) shall remain with the exception being all notices to Fischer, the former Lease Administrator shall be deleted and replaced with the following:

Copy to:               Jones Lang LaSalle Americas, Inc.
                       525 William Penn Place, 25th Floor
                       Pittsburgh, PA 15259
                       Attn: Lease Administration – EDMC 2024-A-L001

Please send all September 2012 and future rent invoices, rent statements, operating expense statements, insurance and real estate tax invoices, to the below address:

                       Jones Lang LaSalle Americas, Inc.
                       525 William Penn Place, 25th Floor
                       Pittsburgh, PA 15259
                       Attn: Lease Administration – EDMC 2024-A-L001

Jones Lang LaSalle will have our full authority to communicate directly with you, and we ask for your support and cooperation. If you have any questions or problems, your contact at Jones Lang LaSalle is Megan Amelio, Sr. Lease Analyst. She can be reached at 412-208-2086 or EDMC.Docs@am.jll.com.

Thank you,

*Linda McClintoch*

Linda McClintock
Senior Real Estate Counsel

cc: Jones Lang LaSalle

Education Management LLC | 210 Sixth Avenue, 33rd Floor, Pittsburgh, PA 15222-2603

EXHIBIT I
Page 153 of 158

# Exhibit D - Card Key Access control





= No Card Key Access control

= Cark Key Access control*

*Tenant shall have the right, but not the obligation to install card keys on the doors denoted in the plan above. Notwithstanding the forgoing, in addition, Tenant shall have the right to install additional card key access controls on other doors throughout the Premises.

78993-0004-0/LEGAL125607979v2

EXHIBIT I
Page 154 of 158

## SEVENTH AMENDMENT TO LEASE

THIS SEVENTH AMENDMENT TO LEASE AGREEMENT ("**Amendment**") is made and entered into as of **April 6th**, 2016 (the "**Effective Date**") by and between SPF BREWERY BLOCKS, LLC, a Delaware limited liability company ("**Landlord**"), and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation ("**Tenant**").

## RECITALS:

A.      By that certain Lease Agreement dated as of October 30, 2000 by and between Landlord's predecessor-in-interest, The Brewery Blocks I, LLC, and Tenant, as amended by an Amendment to Lease dated as of October 29, 2001, a Second Amendment to Lease dated as of December 19, 2001, a Third Amendment to Lease dated as of May 9, 2003, a Fourth Amendment to Lease dated as of October 13, 2006, a Fifth Amendment to Lease dated as of February 27, 2015 (the "**Fifth Amendment**"), and a Sixth Amendment to Lease dated as of April 28, 2015 (the foregoing lease and amendments, collectively, the "**Original Lease**"), Landlord agreed to lease to Tenant and Tenant agreed to lease from Landlord the Premises (as defined in the Lease) located within the building commonly known as Block 4, The Brewery Blocks in Portland, Oregon (the "**Building**").

B.      Landlord and Tenant now desire to amend the Original Lease to extend the Lease Term and to modify the Lease in certain other particulars as more fully set forth in this Amendment.

C.      The Original Lease and this Amendment are hereinafter collectively referred to as the "**Lease**." All references to the Lease shall mean and refer to the Original Lease, as amended, whether or not such references shall expressly refer to this Amendment. Unless otherwise provided herein, all capitalized words and terms in this Amendment shall have the same meanings ascribed to such words and terms as in the Original Lease.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      <u>Extension of Term</u>.  Section 1.3 of the Lease is hereby amended to provide that the Lease Term shall be extended for a period commencing on August 1, 2017 (the "**Extension Date**") and expiring on July 31, 2022 (the "**Extended Term**"). Tenant shall occupy the Premises during the Extended Term pursuant to all of the terms and provisions of the Lease as amended hereby. Tenant shall lease the Premises during the Extended Term in its as-is condition and acknowledges that Landlord has no obligation to improve the Premises on Tenant's behalf or to provide any allowance to Tenant for the improvement of the Premises. The extension of the Lease Term pursuant to this Amendment is in lieu of Tenant's exercise of its right to extend the Lease Term pursuant to Section 1.6 of the Lease. Accordingly, Tenant will only have the right to extend the Lease Term for two (2) additional periods of five (5) years each pursuant to the terms of Section 1.6 of the Lease. Section 1.8 of the Lease is hereby deleted in its entirety.

EXHIBIT I
Page 155 of 158

2.    Base Rent. During the Extended Term, Tenant shall pay Base Rent on account of the Premises in accordance with the following schedule:

| Time Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Aug. 1, 2017 - July 31, 2018 | $1,739,188.00 | $144,932.33 |
| Aug. 1, 2018 - July 31, 2019 | $1,791,363.64 | $149,280.30 |
| Aug. 1, 2019 - July 31, 2020 | $1,845,104.55 | $153,758.71 |
| Aug. 1, 2020 - July 31, 2021 | $1,900,457.69 | $158,371.47 |
| Aug. 1, 2021 - July 31, 2022 | $1,957,471.42 | $163,122.62 |

3.    Available Allowance. Within ten (10) business days following the full execution of this Amendment, Landlord will pay to Tenant the $231,468.00 of "**Available Allowance**" payable to Tenant pursuant to Section 1.D of the Fifth Amendment.

4.    Confidentiality.  Tenant and Landlord shall keep in strict confidence the provisions of this Amendment, subject only to any disclosure required by law or legal process, and then only after delivering ten (10) days' notice of such requirement to the non-disclosing party.   Without limiting the foregoing, Tenant and Landlord shall use their commercially reasonable efforts to minimize the distribution of the provisions of this Amendment among their employees and shall not discuss or otherwise communicate (whether oral or in writing) with any other tenants or occupants of the Building regarding the provisions of this Amendment and/or the negotiation of this Amendment. Notwithstanding the foregoing, (a) Landlord shall be entitled to disclose the provisions of this Amendment to its property managers, attorneys, accountants, lenders and prospective lenders, investors and prospective investors, any prospective purchasers of the Building or any interest therein, and its successors and assigns and (b) Tenant shall be entitled to disclose the provisions of this Amendment to its attorneys, accountants, lenders and prospective lenders, investors and prospective investors, and its successors and assigns.

5.    Estoppel. As a material inducement for Landlord to enter into this Amendment, Tenant hereby represents and warrants, and certifies, to Landlord, that (i) the Lease, as amended, is in full force and effect, (ii) Landlord is not in any respect in default in the performance of the terms and provisions of the Lease, nor has any event occurred which, with the passage of time or the giving of notice, or both, would constitute a default by Landlord thereunder, and (iii) Tenant has no rights of setoff, claims against Landlord, or rebates or defenses to the enforcement of the Lease, as amended.  Landlord hereby represents and warrants, and certifies to Tenant that (i) the Lease, as amended, is in full force and effect and (ii) there does not now exist an event of default constituting a breach of the Lease under Section 20 of the Lease, nor, to Landlord's actual knowledge, has any event occurred which, with the passage of time or the giving of notice, or both, would constitute an event of default constituting a breach of the Lease under Section 20 of the Lease.

6.    Lease in Full Force and Effect.  Except as specifically set forth in this Amendment, all provisions of the Lease shall remain in full force and effect and are not modified by this Amendment, and the parties hereby ratify and confirm each and every provision thereof.

- 2 -

EXHIBIT 1
Page 156 of 158

7.    Counterparts.  This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile signatures or electronic .pdf format signatures shall have the same force and effect as the original thereof.

8.    Successors and Assigns.  This Amendment shall be binding upon and inure to the benefit of Landlord and Tenant and their respective successors and permitted assigns under the Lease.

9.    Brokers.  Jones Lang LaSalle has exclusively represented Tenant ("**Tenant's Broker**") in connection with this Amendment.  Tenant represents to Landlord that, in connection with this Amendment, except for Tenant's Broker, no third party broker or finder has been engaged or consulted by Tenant or is entitled to compensation or commission in connection herewith by or through acts of Tenant in connection with this Amendment, and Tenant hereby agrees to defend, indemnify and hold harmless Landlord from and against any and all claims of any brokers, finders or any like third party claiming any right to commission or compensation by or through acts of Tenant in connection with this Amendment other than Tenant's Broker. Landlord will pay a commission to Tenant's Broker pursuant to a separate agreement.  Landlord and Tenant acknowledge that Dan Swift and Lana Baldock of Cushman & Wakefield ("**Landlord's Broker**") have exclusively represented Landlord in connection with this Amendment and Tenant will have no liability with respect to any commission owed to Landlord's Broker.

10.    Entire Agreement. This Amendment contains the entire agreement between the parties with respect to the subject matter herein contained and all preliminary negotiations with respect to the subject matter herein contained are merged into and incorporated in this Amendment and all prior documents and correspondence between the parties with respect to the subject matter herein contained are superseded and of no further force or effect, other than the Lease.

11.    Representations and Warranties. Landlord and Tenant represent and warrant that (a) they have all the required power, capacity, and authority to enter into, execute, and perform this Amendment; (b) the execution of this Amendment is free and voluntary; and (c) they have not assigned or transferred to any person, firm, corporation, partnership, association or other entity whatsoever any or all of the rights, duties or obligations embodied or released in this Amendment.

[Signature page follows]

78994-0004/130414382.3

EXHIBIT 1
Page 157 of 158

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above written.

LANDLORD:

SPF BREWERY BLOCKS, LLC,
a Delaware limited liability company

By: _____

Name: _____Brian Okrent_____
                    *Vice President*

Its: _____

TENANT:

THE ART INSTITUTE OF PORTLAND,
INC., an Oregon corporation

By: _____

Name: _____Joseph Marsico_____
              Vice President-Corporate Real Estate

Its: _____

## GUARANTOR CONSENT

The undersigned covenants and agrees that its obligations pursuant to that certain Guaranty dated as of October 30, 2000, as to the terms and provisions of that certain Lease Agreement dated as of October 30, 2000, as amended by an Amendment to Lease dated as of October 29, 2001, a Second Amendment to Lease dated of December 19, 2001, a Third Amendment to Lease dated as of May 9, 2003, a Fourth Amendment to Lease dated as of October 13, 2006, a Fifth Amendment to Lease dated as of February 27, 2015, and a Sixth Amendment to Lease dated as of April 28, 2015 by and between SPF BREWERY BLOCKS, LLC, a Delaware limited liability company, as the landlord, and THE ART INSTITUTE OF PORTLAND, INC., an Oregon corporation, as the tenant, shall remain in full force and effect as to the terms and provisions of this Seventh Amendment to Lease, receipt of which is hereby acknowledged by the undersigned.

### GUARANTOR:

EDUCATION MANAGEMENT CORPORATION, a
Pennsylvania corporation

By: _____
Name: _____
Its: _____Joseph Marsico_____
       Vice President-Corporate Real Estate

78994-0004/130414382.3

EXHIBIT 1
Page 158 of 158

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ District of Delaware
                        (State)

Case number (if known) 18-11494 _____ Chapter 7

☐ Check if this is an
   amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | Debtor's name | Education Management II LLC |
| 2. | All other names debtor used in the last 8 years | New Education Management LLC |
| | | EDMC Online Higher Education |
| | Include any assumed names, trade names, and *doing business as* names | |
| 3. | Debtor's federal Employer Identification Number (EIN) | 47-2042661 |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| Number    Street | Number    Street |
| 210 Sixth Avenue, 3rd Floor | P.O. Box |
| Pittsburgh, PA 15222 | |
| City          State    ZIP Code | City          State    ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| Allegheny | Number    Street |
| County | |
| | City          State    ZIP Code |

| | | |
|---|---|---|
| 5. | Debtor's website (URL) | edmc.com |
| 6. | Type of debtor | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐ Partnership (excluding LLP) |
| | | ☐ Other. Specify: _____ |

EXHIBIT 2
Page 1 of 23

Debtor    Education Management II LLC             Case number (if known) _____
       Name

**7. Describe debtor's business**

A. Check one:

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. Check all that apply:

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

6   1   1   3

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

Check one:

☒ Chapter 7

☐ Chapter 9

☐ Chapter 11. Check all that apply:

       ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

       ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

       ☐ A plan is being filed with this petition.

       ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

       ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form

       ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.   District_____   When _____ Case number _____
                                  MM / DD / YYYY

        District_____   When__Case number ____ MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

☒ Yes.   Debtor See Schedule 1 _____   Relationship _____ District

            _____ When
                                       MM / DD / YYYY

        Case number, if known _____

EXHIBIT 2
Page 2 of 23

Debtor    __Education Management II LLC__            Case number (if known)_____
         Name

**11. Why is the case filed in *this district*?**

Check all that apply·

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

     Why does the property need immediate attention? *(Check all that apply.)*

     ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
        What is the hazard? _____

     ☐ It needs to be physically secured or protected from the weather.

     ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat dairy, produce, or securities-related assets or other options).

     ☐ Other _____

     Where is the property?_____
                     Number       Street

                     City                    State    ZIP Code

     Is the property insured?
     ☐ No
     ☐ Yes. Insurance agency _____

         Contact name _____

         Phone _____

### Statistical and administrative information

**13. Debtor's estimation of available funds**

Check one:

☐ Funds will be available for distribution to unsecured creditors.

☒ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☐ 1-49             ☐ 1,000-5,000         ☐ 25,001-50,000
☐ 50-99           ☐ 5,001-10,000       ☐ 50,001-100,000
☐ 100-199         ☒ 10,001-25,000     ☐ More than 100,000
☐ 200-999

**15. Estimated assets**

☐ $0-$50,000         ☒ $1,000,001-$10 million       ☐ $500,000,001-$1 billion
☐ $50,001-$100,000   ☐ $10,000,001-$50 million     ☐ $1,000,000,001-$10 billion
☐ $100,001-$500,000   ☐ $50,000,001-$100 million    ☐ $10,000,000,001-$50 billion
☐ $500,001-$1 million   ☐ $100,000,001-$500 million   ☐ More than $50 billion

| Debtor | Education Management II LLC | | Case number (if known) | |
| | Name | | | |

**16. Estimated liabilities**

- ☐ $0–$50,000
- ☐ $50,001–$100,000
- ☐ $100,001–$500,000
- ☐ $500,001–$1 million
- ☐ $1,000,001–$10 million
- ☐ $10,000,001–$50 million
- ☐ $50,000,001–$100 million
- ☐ $100,000,001–$500 million
- ☒ $500,000,001–$1 billion
- ☐ $1,000,000,001–$10 billion
- ☐ $10,000,000,001–$50 billion
- ☐ More than $50 billion

**Request for Relief, Declaration, and Signatures**

**WARNING —** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- ■ The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

- ■ I have been authorized to file this petition on behalf of the debtor.

- ■ I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    6/28/18
                MM  / DD / YYYY

✘ _____          Frank Jalufka
Signature of authorized representative of debtor    Printed name

Title President

**18. Signature of attorney**

✘ _____          Date    6/28/18
Signature of attorney for debtor                      MM   / DD / YYYY

Evelyn J. Melter
Printed name
Pepper Hamilton LLP
Firm name
1313 Market St, Hercules Plaza Ste 5100, PO Box 1709
Number        Street
Wilmington                                    DE        19899-1709
City                                          State      ZIP Code
302-777-6500                                  strattond@pepperlaw.com
                                              meltzere@pepperlaw.com
Contact phone                                 Email address

David B. Stratton #960                        DE
Evelyn J. Meltzer #4581                       DE
Bar number                                    State

Official Form 201          Voluntary Petition for Non-Individuals Filing for Bankruptcy          page 4

EXHIBIT 2
Page 4 of 23

Schedule 1

| Case Number | Debtor | FEIN |
|---|---|---|
| 18-11494 | Education Management II LLC | 47-2042661 |
| 18-11495 | American Education Centers, Inc. | 23-2726160 |
| 18-11496 | Argosy Education Group, Inc. | 36-2855674 |
| 18-11497 | Argosy University of California LLC | 27-1651273 |
| 18-11498 | Brown Mackie College - Tucson, Inc. | 86-026-4601 |
| 18-11499 | Education Finance III LLC | 47-2192533 |
| 18-11500 | Education Management Corporation | 25-1119571 |
| 18-11501 | Education Management Holdings II LLC | 47-2042529 |
| 18-11502 | Education Management LLC | 20-4506022 |
| 18-11503 | Higher Education Services II LLC | 47-2203436 |
| 18-11504 | Miami International University of Art & Design, Inc. | 58-2641065 |
| 18-11505 | South Education – Texas LLC | 27-2192573 |
| 18-11506 | South University of Alabama, Inc. | 63-0314610 |
| 18-11507 | South University of Carolina, Inc. | 58-2338201 |
| 18-11508 | South University of Florida, Inc. | 75-3009226 |
| 18-11509 | South University of Michigan, LLC | 27-3966655 |
| 18-11510 | South University of North Carolina LLC | 26-1569113 |
| 18-11511 | South University of Ohio LLC | 45-0949944 |
| 18-11512 | South University of Virginia, Inc. | 26-1569263 |
| 18-11513 | South University Research II LLC | 47-2323744 |
| 18-11514 | South University, LLC | 58-1147090 |
| 18-11515 | Stautzenberger College Education Corporation | 23-2914675 |
| 18-11516 | TAIC-San Diego, Inc. | 95-3791894 |
| 18-11517 | TAIC-San Francisco, Inc. | 95-3789487 |
| 18-11518 | The Art Institutes International Minnesota, Inc. | 25-1796999 |
| 18-11519 | The Art Institute of Atlanta, LLC | 58-0671597 |
| 18-11520 | The Art Institute of Austin, Inc. | 26-1173626 |
| 18-11521 | The Art Institute of California-Hollywood, Inc. | 22-3863289 |
| 18-11522 | The Art Institute of California-Inland Empire, Inc. | 20-2316775 |

| 18-11523 | The Art Institute of California - Los Angeles, Inc. | 25-1364215 |
| 18-11524 | The Art Institute of California-Orange County, Inc. | 52-2136608 |
| 18-11525 | The Art Institute of California-Sacramento, Inc. | 20-5076212 |
| 18-11526 | The Art Institute of Charleston, Inc. | 20-5076048 |
| 18-11527 | The Art Institute of Charlotte, LLC | 56-1024912 |
| 18-11528 | The Art Institute of Colorado, Inc. | 84-0703062 |
| 18-11529 | The Art Institute of Dallas, Inc. | 75-1589012 |
| 18-11530 | The Art Institute of Fort Lauderdale, Inc. | 59-1500255 |
| 18-11531 | The Art Institute of Houston, Inc. | 75-1589015 |
| 18-11532 | The Art Institute of Indianapolis, LLC | 25-1586913 |
| 18-11533 | The Art Institute of Las Vegas, Inc. | 88-0256362 |
| 18-11534 | The Art Institute of Michigan, Inc. | 20-5218614 |
| 18-11535 | The Art Institute of Philadelphia LLC | 26-4467396 |
| 18-11536 | The Art Institute of Pittsburgh LLC | 26-4467441 |
| 18-11537 | The Art Institute of Portland, Inc. | 52-2082215 |
| 18-11538 | The Art Institute of Raleigh-Durham, Inc. | 26-1388031 |
| 18-11539 | The Art Institute of St. Louis, Inc. | 80-0449555 |
| 18-11540 | The Art Institute of San Antonio, Inc. | 26-4104394 |
| 18-11541 | The Art Institute of Seattle, Inc. | 52-1209614 |
| 18-11542 | The Art Institute of Tampa, Inc. | 01-0746822 |
| 18-11543 | The Art Institute of Tennessee-Nashville, Inc. | 20-1705359 |
| 18-11544 | The Art Institute of Virginia Beach LLC | 26-2242784 |
| 18-11545 | The Art Institute of Washington, Inc. | 52-1117043 |
| 18-11546 | The Art Institutes International II LLC | 47-2179270 |
| 18-11547 | The Illinois Institute of Art at Schaumburg, Inc. | 36-4043502 |
| 18-11548 | The Illinois Institute of Art, Inc. | 36-4043500 |
| 18-11549 | The Institute of Post-Secondary Education, Inc. | 25-1360283 |
| 18-11550 | The New England Institute of Art, LLC | 04-2987798 |
| 18-11551 | The University of Sarasota, Inc. | 59-3335558 |
| 18-11552 | Western State University of Southern California | 95-2313875 |

### CERTIFICATE OF SECRETARY OF BOARD OF DIRECTORS
### OF EDUCATION MANAGEMENT CORPORATION

June _1_ , 2018

The undersigned, in his capacity as duly appointed Secretary of Education Management Corporation, certifies as follows:

1.      On June 4, 2018, the members of the board of directors, members of the board of managers, individual managers, sole managers, sole trustees and sole members (collectively, the "Boards"), as applicable, of Education Management Corporation and all subsidiaries of Education Management Corporation (each, a "Company" and collectively, the "Companies") held a duly noticed meeting (the "Meeting") pursuant to each of such Company's bylaws, limited liability company agreement, or other governing document, as applicable, and the applicable laws of the jurisdiction in which such Company is organized.

2.      As part of that meeting, the Boards duly adopted the following resolutions by the unanimous vote of the members of the Boards at the meeting:

> RESOLVED, that the previous resolutions of the Company and certain Subsidiaries authorizing the filing of Chapter 7 Cases by the Company and certain Subsidiaries are hereby re-affirmed, affirmed, re-adopted and adopted in all respects by the Company and all Subsidiaries. The Authorized Officers are authorized and empowered, with the advice of the Company's professionals and advisors, to (i) execute, verify, and file with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") at such time as they shall determine all petitions, schedules, lists, and other papers or documents, and to take any and all actions which they deem necessary or proper, to commence and prosecute the Chapter 7 Cases for the Company and such Subsidiaries as such Authorized Officer or Authorized Officers deem advisable.

> FURTHER RESOLVED, that in addition to the specific authorizations conferred upon the Authorized Officers by these resolutions, each of the Authorized Officers (and their designees and delegates) be, and they are, authorized and empowered, in the name of and on behalf of the Company and Subsidiaries, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents, and

EXHIBIT 2
Page 7 of 23

pay such filing fees, as shall be necessary, advisable, or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein.

FURTHER RESOLVED, that all actions taken by the officers of the Company and Subsidiaries prior to the date hereof in connection with the liquidation of the Company or any matters related thereto, or by virtue of these resolutions, are in all respects ratified, confirmed, and approved.

IN WITNESS WHEREOF, the undersigned has executed this Secretary Certificate as of the date first set forth above.

By: _____

Name: Donn Patton

Title:   Secretary

EXHIBIT 2
Page 8 of 23

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| | Case No. 18- |
| EDUCATION MANAGEMENT II LLC, *et al.* | |
| Debtors. | |

## CONSOLIDATED CORPORATE OWNERSHIP STATEMENT PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 1007 AND 7007.1

Education Management II, LLC and fifty-eight of its affiliates (collectively, "Debtors") filed petitions for relief under chapter 7 of title 11 of the United States Code. Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, Debtors attach hereto as Exhibit A an organizational chart reflecting all of their ownership interests, with Debtors highlighted in yellow. Debtors further respectfully represent as follows:[1]

1.  To the best of Debtors' knowledge and belief, no person or entity directly owns 10% or more of the equity interests of **Education Management Corporation.**[2]

2.  **Education Management Corporation** owns 100% of the equity interests of Education Management Holdings LLC and **Education Management Holdings II LLC.**

---

[1] Debtors are bolded throughout.

[2] The most recent report available to Debtors lists CEDE & Co. as the nominal holder of 36.3% of the outstanding equity interests in Education Management Corporation. Debtors have been unable to determine the actual beneficial owners of the equity interests nominally held by CEDE & Co.

US.117890270.01

EXHIBIT 2
Page 9 of 23

3.      Education Management Holdings LLC owns 100% of the membership interests of Education Management LLC, which in turn owns 100% of the equity interests in the following entities:

     a.      Education Finance II LLC;

     b.      Education Management Finance Corp.;

     c.      The Art Institutes International LLC;

     d.      Brown Mackie Education Corporation; and

     e.      Higher Education Services, Inc.

4.      **Education Management Holdings II LLC** owns 100% of the equity interests of **Education Management II LLC** which in turn owns 100% of the equity interests in the following entities:

     a.      **Education Finance III LLC;**

     b.      **The Art Institutes International II LLC;**

     c.      **South University, LLC;**

     d.      Education Management Escrow LLC;

     e.      Brown Mackie Education II LLC (which owns 100% of the equity interests of Brown Mackie College – Salina LLC[3]);

     f.      **Argosy University of California LLC;**

     g.      **Higher Education Services II LLC;**

     h.      **South University Research II LLC;** and

     i.      BMC Real Property Holdings LLC.

---

[3] Brown Mackie College – Salina LLC owns 100% of the equity interests of: (i) Brown Mackie College – Birmingham LLC; (ii) Brown Mackie College – Kansas City LLC; and (iii) Brown Mackie College – Oklahoma City LLC.

EXHIBIT 2
Page 10 of 23

5.     **South University, LLC** owns 100% of the membership interests of the following entities:

    a.    **South University of Alabama, Inc.;**

    b.    South University of Arkansas LLC;

    c.    **South University of Florida, Inc.;**

    d.    **South University of Michigan, LLC;**

    e.    **South University of North Carolina LLC;**

    f.    **South University of Ohio LLC;**

    g.    **South University of Carolina, Inc.;**

    h.    South University of Tennessee, Inc.;

    i.    South Education – Texas LLC; and

    j.    **South University of Virginia, Inc.**

6.     **The Art Institutes International II LLC** owns 100% of the equity interests of the following entities:

    a.    **The Art Institute of Atlanta, LLC** (which owns 100% of the equity interests of **The Art Institute of Virginia Beach LLC**);

    b.    **The Art Institute of Washington, Inc.;**

    c.    The Art Institute of York – Pennsylvania LLC;

    d.    **The Art Institute of Pittsburgh LLC;**

    e.    **The Art Institute of Philadelphia LLC;**

    f.    The Art Institute of Washington – Dulles LLC;

US.117890270.01

EXHIBIT 2
Page 11 of 23

g.  **The Art Institute of Colorado, Inc.** (which owns 100% of the equity interests of **The Institute of Post-Secondary Education Inc.**);

h.  **The Art Institute of Austin, Inc.**;

i.  **The Art Institute of Fort Lauderdale, Inc.**;

j.  **The Art Institutes International Minnesota, Inc.**;

k.  The Art Institutes of New York City. Inc.;

l.  **The Art Institute of Portland, Inc.**;

m.  **The Art Institute of Seattle, Inc.**;

n.  The Art Institute of Jacksonville, Inc.;

o.  **The Art Institute of Tampa, Inc.**;

p.  **Miami International University of Art & Design, Inc.** (which owns 100% of the equity interests of **The Art Institute of Charlotte, LLC**[4] and **The Art Institute of Dallas, Inc.**[5]);

q.  **The Illinois Institute of Art, Inc.** (which owns 100% of the equity interests of: (i) **The Art Institute of Michigan, Inc.**; (ii) The Art Institute of Ohio – Cincinnati, Inc.; and (iii) **The Illinois Institute of Art at Schaumburg, Inc.**);

r.  The Illinois Institute of Art – Tinley Park LLC;

s.  **The New England Institute of Art, LLC**;

t.  **The Art Institute of San Antonio, Inc.**;

---

[4] The Art Institute of Charlotte, LLC owns 100% of the equity interests of **The Art Institute of Raleigh-Durham, Inc.**

[5] The Art Institute of Dallas, Inc. owns 100% of the equity interests of The Art Institute of Fort Worth, Inc.

EXHIBIT 2
Page 12 of 23

u.  **The Art Institute of Tennessee – Nashville, Inc.**; and

v.  **The Art Institute of Charleston, Inc.**

7.  The Art Institutes International Minnesota, Inc. owns 100% of the equity interests of the following entities:

a.  **American Education Centers, Inc.**;

b.  The Art Institute of Wisconsin, LLC;

c.  Michiana College Education Corporation (which owns 11% of the equity interests of Southern Ohio College LLC and 100% of the ownership interests of Brown Mackie College – Tulsa, Inc. and Brown Mackie College – Boise, Inc.);

d.  **The Art Institute of St. Louis, Inc.**;

e.  The Asher School of Business Education Corporation;

f.  The Art Institute of Salt Lake City, Inc.;

g.  The Art Institutes International – Kansas City, Inc.; and

h.  The Art Institute of Tucson, Inc.

8.  **American Education Centers, Inc.** owns 78% of the equity interests of Southern Ohio College LLC and 100% of the equity interests of the following entities:

a.  Brown Mackie College – Dallas/Ft. Worth LLC;

b.  Brown Mackie College – San Antonio LLC;

c.  Brown Mackie College – Miami North LLC;

d.  Brown Mackie College – Miami, Inc.; and

e.  **Stautzenberger College Education Corporation** (which owns 11% of the equity interests of Southern Ohio College LLC and

US.117890270.01

EXHIBIT 2
Page 13 of 23

100% of the ownership interests of Brown Mackie College –
Indianapolis, Inc.).

9.      Southern Ohio College LLC owns 100% of the equity interests of **Brown
Mackie College Tucson, Inc.**, which owns 100% of the ownership interests of the
following entities:

   a.   Brown Mackie College – Phoenix, Inc.;

   b.   Brown Mackie College – Greenville, Inc.;

   c.   Brown Mackie College – Alburquerque LLC; and

   d.   Brown Mackie College – St. Louis, Inc.

10.     **Argosy University of California LLC** owns 100% of the equity interests
of the following entities:

   a.   **TAIC – San Francisco, Inc.** (which owns 100% of the equity
        interests of: (i) **The Art Institute of California – Sacramento,
        Inc.**; (ii) **The Art Institute of California - Orange County, Inc.**;
        and (iii) **The Art Institute of California – Los Angeles, Inc.**);

   b.   The Art Institute of California – Silicon Valley, Inc.;

   c.   **TAIC – San Diego, Inc.** (which owns 100% of the equity interests
        of **The Art Institute of California – Inland Empire, Inc.**);

   d.   **The Art Institute of California – Hollywood, Inc.**; and

   e.   **Argosy Education Group, Inc.** (which owns 100% of the equity
        interests of **Western State University of Southern California** and
        **The University of Sarasota, Inc.**).

US 117890270.01

EXHIBIT 2
Page 14 of 23

Wilmington, Delaware

/s/ Evelyn J. Meltzer
**PEPPER HAMILTON LLP**
David B. Stratton (DE 960)
Evelyn J. Meltzer (DE 4581)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Email: strattond@pepperlaw.com
        meltzere@pepperlaw.com

and

**FAEGRE BAKER DANIELS LLP**
Jay Jaffe
Dustin R. DeNeal
Kayla D. Britton
600 E. 96th Street, Suite 600
Indianapolis, Indiana  46240
Telephone: (317) 569-9600
Email: Jay.Jaffe@FaegreBD.com
        Dustin.DeNeal@FaegreBD.com
        Kayla.Britton@FaegreBD.com

*Counsel for Debtors*

US.117890270.01

EXHIBIT 2
Page 15 of 23

## EXHIBIT A

[Organizational Chart]

8

EXHIBIT 2
Page 16 of 23



September 30, 2017

EDUCATION MANAGEMENT CORPORATION AND SUBSIDIARIES

EXHIBIT 2
Page 17 of 23



September 30, 2017

THE ART INSTITUTES INTERNATIONAL II LLC AND SUBSIDIARIES

EXHIBIT 2
Page 18 of 23

September 30, 2017

## Argosy University of California LLC and Subsidiaries



G:Legal\AU CA September 30, 2017

EXHIBIT 2
Page 19 of 23



SOUTH UNIVERSITY, LLC AND SUBSIDIARIES
September 30, 2017

September 30, 2017
GtLegalSSouth

EXHIBIT 2
Page 20 of 23

September 30, 2017

## HLC Brown Mackie College Schools

| Education Management Corporation (PA) |
|---|

| Education Management Holdings II LLC (DE) |
|---|

| Education Management II LLC (DE) |
|---|

| Brown Mackie Education II LLC (DE) |
|---|

| Brown Mackie College – Salina LLC (KS) |
|---|

Brown Mackie College – Salina (KS)

| Brown Mackie College – Birmingham LLC (AL) |
|---|

Brown Mackie College – Birmingham (AL)

| Brown Mackie College – Kansas City LLC (KS) |
|---|

Brown Mackie College – Kansas City (KS)

| Brown Mackie College – Oklahoma City LLC (OK) |
|---|

Brown Mackie College – Oklahoma City (OK)

G:\Legal\BMC_IILC  September 30, 2017

EXHIBIT 2
Page 21 of 23

The Art Institutes International Minnesota, Inc. and Subsidiaries — September 30, 2017



EXHIBIT 2
Page 22 of 23

The Institute of Post-Secondary Education, Inc. (d/b/a The Art Institute of Phoenix) and Subsidiaries – September 30, 2017



```
┌─────────────────────────────────┐
│   EDUCATION MANAGEMENT II LLC    │
└─────────────────────────────────┘

┌─────────────────────────────────┐
│ THE ART INSTITUTES INTERNATIONAL II LLC │
└─────────────────────────────────┘

┌─────────────────────────────────┐
│   THE ART INSTITUTE COLORADO, INC.   │
└─────────────────────────────────┘

┌─────────────────────────────────┐
│ THE INSTITUTE OF POST-SECONDARY EDUCATION, INC. │
│  (d/b/a THE ART INSTITUTE OF PHOENIX)   │
│              (AZ)                │
└─────────────────────────────────┘
        │                    │
┌──────────────────┐   ┌──────────────────┐
│ The Art Institute of │   │ The Art Institute of │
│   Las Vegas, Inc.    │   │  Indianapolis, LLC   │
│        (NV)          │   │        (IN)          │
└──────────────────┘   └──────────────────┘
                            │
                       ┌──────────────────┐
                       │  AINI Restaurant LLC │
                       │        (IN)          │
                       └──────────────────┘
```

K.L's.ppt.AIPX and Subsidiaries September 30, 2017

EXHIBIT 2
Page 23 of 23



760 SW Ninth Ave., Suite 3000
Portland, OR  97205
T. 503.224.3380
F. 503.220.2480
www.stoel.com

Andrew H. Solomon
D. 503.294.9203
andrew.solomon@stoel.com

July 24, 2018

**BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

The Art Institute of Portland
1122 N.W. Davis Street
Portland, OR  97209
Attn: President

Dream Center Education Holdings, LLC
1400 Penn Avenue
Pittsburgh, PA  15222
Attn: CFO

Re:     **Lease Agreement dated as of October 30, 2000, as amended by an Amendment to
Lease dated as of October 29, 2001, a Second Amendment to Lease dated as of
December 19, 2001, a Third Amendment to Lease dated as of May 9, 2003, a
Fourth Amendment to Lease dated as of October 13, 2006, a Fifth Amendment to
Lease dated as of February 27, 2015, a Sixth Amendment to Lease dated as of
April 28, 2015, and a Seventh Amendment to Lease dated as of April 6, 2016 (the
"Lease") by and between SPF Brewery Blocks, LLC ("Landlord") and The Art
Institute of Portland, LLC, as successor by assignment to The Art Institute of
Portland, Inc. ("Tenant") with respect to space in a building located at 1122 NW
Davis Street, Portland, Oregon - NOTICE OF DEFAULT AND BREACH AND
NOTICE TO QUIT**

To Whom It May Concern:

We are providing this letter to you on behalf of our client, SPF Brewery Blocks, LLC
("Landlord"), with respect to the above-referenced Lease.  Pursuant to Section 20.1.5 of the
Lease, it is a breach of the Lease if "any guarantor of the Tenant's obligations under this Lease
shall…file a petition in bankruptcy."  As you know, Education Management Corporation is the
guarantor of the Lease and on June 29, 2018 filed bankruptcy as part of the case titled In re
Education Management II LLC et al, case number 18-11494, filed in the U.S. Bankruptcy Court
for the District of Delaware.

Accordingly, Tenant is hereby notified that it is in default and breach of the Lease and that
Landlord intends to pursue all of its rights and remedies against you.  Tenant's right to

The Art Institute of Portland
Dream Center Education Holdings, LLC
July 24, 2018
Page 2

possession of the Premises is hereby terminated and this letter shall constitute a NOTICE TO
QUIT in accordance with ORS 105.120.

Landlord understands, however, that Tenant desires to continue occupying the Premises through
at least the end of the year.  Without in any way binding Landlord or waiving Tenant's breach
and default, Landlord may be willing to consider entering into a forbearance agreement pursuant
to which Tenant would continue to occupy the Premises provided it continues to pay all rent due
under the Lease.  Please contact Landlord at your earliest convenience should you desire to
pursue such an arrangement.

Very truly yours,

Andrew H. Solomon

Cc:    Brian Okrent (via email)

97696770.1 0067405-00004

EXHIBIT 3
Page 2 of 3



Return Receipt (Form 3811) Barcode

9590 9266 9904 2117 2846 61

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                                              ☐ Agent
                                               ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

1. Article Addressed to:
   Dream Center Education Holdings, LLC
   Attention: CFO
   1400 Penn Avenue
   Pittsburgh, PA 15222

3. Service Type:
   ☒ Certified Mail
   ☐ Certified Mail Restricted Delivery

Reference Information
67405-00004
Solomon

2. Certified Mail (Form 3800) Article Number

9414 7266 9904 2117 2846 68

PS Form 3811, Facsimile, July 2015          Domestic Return Receipt

---

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

USPS® ARTICLE NUMBER

9414 7266 9904 2117 2846 68

| | $ | |
|---|---|---|
| Certified Mail Fee | $ | 3.35 |
| Return Receipt (Hardcopy) | $ | 2.75 |
| Return Receipt (Electronic) | $ | 0.00 |
| Certified Mail Restricted Delivery | $ | 0.00 |
| | $ | 0.46 |
| Postage | $ | 6.56 |
| Total Postage and Fees | | |

PORTLAND OR MAIN OFFICE
JUL 2 4 2018
Postmark Here
USPS

Sent to:  Dream Center Education Holdings, LLC
          Attention: CFO
          1400 Penn Avenue
          Pittsburgh, PA 15222

Reference Information

Solomon
67405-00004

PS Form 3800, Facsimile, July 2015

EXHIBIT 3
Page 3 of 3